1  Thomas Rubinsky (SBN 302002)
   Thomas.rubinsky@halpernmay.com
2  HALPERN MAY YBARRA GELBERG LLP
   550 South Hope Street, Suite 2330
3  Los Angeles, California 90071
   Telephone:   (213) 402-1900
4  Facsimile:    (213) 402-1901

5  Robert K. Kry (pro hac vice pending)
   rkry@mololamken.com
6  Jackson A. Myers (pro hac vice pending)
   jmyers@mololamken.com
7  MOLO LAMKEN LLP
   600 New Hampshire Ave., N.W., Suite 500
8  Washington, D.C. 20037
   Telephone:   (202) 556-2011
9  Facsimile:    (202) 536-2011

10 Attorneys for Petitioner
   GATE GOURMET KOREA CO., LTD.

11

12                **UNITED STATES DISTRICT COURT**

13                **CENTRAL DISTRICT OF CALIFORNIA**

14

15 GATE GOURMET KOREA CO., LTD.,          CASE NO. 2:24-CV-1265
   a Korean company,
16                                         **PETITION TO ENFORCE
                    Petitioner,            ARBITRAL AWARD**
17
         v.
18
19 ASIANA AIRLINES, INC.,
   a Korean company,
20
                    Respondent.
21

22

23

24

25

26

27

28

Petitioner Gate Gourmet Korea Co., Ltd. states as follows:

## **INTRODUCTION**

1.      This is an arbitral enforcement proceeding under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (commonly known as the "New York Convention"), June 10, 1958, 21 U.S.T. 2517, and Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq.* Petitioner Gate Gourmet Korea Co., Ltd. ("Gate Gourmet") seeks to enforce an arbitral award rendered in its favor against respondent Asiana Airlines, Inc. ("Asiana") in an arbitration conducted in Singapore under the Arbitration Rules of the International Chamber of Commerce ("ICC"), captioned *Gate Gourmet Korea Co., Ltd. v. Asiana Airlines, Inc.*, ICC Arbitration No. 24544HTG.

2.      The arbitral tribunal issued a Final Award on February 18, 2021 (the "Award") that ordered Asiana to pay certain unpaid invoices plus interest and costs. A duly certified copy of the Award is attached as Exhibit 1 to the accompanying Declaration of Robert Bradshaw ("Bradshaw Decl.").

3.      On April 2, 2021, the tribunal issued an Addendum to the Final Award (the "Addendum") that corrected clerical errors in the dispositive section. A duly certified copy of the Addendum is attached as Exhibit 2 to the Bradshaw Declaration.

4.      As corrected, the Award ordered Asiana to pay 38,905,142,664 Korean won (KRW) on the invoices plus simple interest from October 30, 2020 at the rate of 3-month KORIBOR plus 8%. Bradshaw Decl. Ex. 2 (Addendum) ¶ 4.1.1. The Award also ordered Asiana to pay costs of 1,474,523.26 British pounds (GBP), 1,087,340.87 U.S. dollars (USD), and 6,948.05 Singapore dollars (SGD), plus interest at 5.33% from March 4, 2021. Bradshaw Decl. Ex. 1 (Award) ¶ 9.3.1(f).

5.      The arbitration arose out of a dispute over payment obligations under a Catering Agreement between Gate Gourmet and Asiana dated December 30, 2016 (the "Catering Agreement"). A duly certified copy of the Catering Agreement is attached as Exhibit 1 to the accompanying Declaration of Lin Zhurong James ("Lin Decl."). Clause 28 of the Catering Agreement states that "[a]ll disputes arising out of or in connection

with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce" and that "[t]he seat of the arbitration shall be Singapore."  Catering Agreement § 28.

6.     Asiana has failed to pay any of the amounts due under the Award.  As of February 15, 2024, the total amount due and owing with interest is **USD $50,747,170**.  Gate Gourmet therefore brings this petition to recognize and enforce the Award pursuant to the New York Convention and the Federal Arbitration Act.

## PARTIES

7.     Petitioner Gate Gourmet Korea Co., Ltd. ("Gate Gourmet") is a joint venture company based in the Republic of Korea.  Bradshaw Decl. Ex. 1 (Award) ¶¶ 1.3.1, 3.2.1.  Gate Gourmet is 60% owned by Gate Gourmet Switzerland GmbH and 40% owned by respondent Asiana Airlines, Inc.  *Id.* ¶ 3.2.9.  Gate Gourmet is part of the Gategroup group of companies, a global food and hospitality enterprise headquartered in Switzerland that provides catering services to the air travel industry.  Lin Decl. ¶ 2.  Gategroup serves more than 700 million passengers annually in over 60 countries.  *Id.*

8.     Respondent Asiana Airlines, Inc. ("Asiana") is an international airline based in the Republic of Korea.  Bradshaw Decl. Ex. 1 (Award) ¶ 1.3.2.  Asiana is part of the Kumho Asiana group of companies.  *Id.* ¶ 3.2.1.  Asiana maintains its primary U.S. base of operations in Los Angeles, California.  Specifically, Asiana's information statement filed with the California Secretary of State shows that Asiana maintains a permanent office at 3530 Wilshire Boulevard, Suite 1700, Los Angeles, California, 90010.  A copy of that statement is attached as Exhibit 1 to the accompanying Declaration of Robert K. Kry ("Kry Decl.").  Asiana's website shows that Asiana operates its U.S. Reservation Center at that same address in Los Angeles, California.  Kry Decl. Ex. 2.  Asiana also operates a Los Angeles Sales Office at that same address.  *Id.*  Finally, Asiana operates multiple flights per day between Incheon International Airport in Seoul, Korea (ICN) and Los Angeles International Airport (LAX).  Kry Decl. Ex. 3.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this petition to enforce a foreign arbitral award pursuant to 9 U.S.C. § 203.

10.     This Court has personal jurisdiction over Asiana because Asiana is the respondent held liable on the Award and Asiana owns property in this State that may be executed against to satisfy the Award.  *See Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1127-28 (9th Cir. 2002) ("Considerable authority supports [petitioner's] position that it can enforce the award against [respondent's] property in the forum even if that property has no relationship to the underlying controversy between the parties."); *Cerner Middle E. Ltd. v. iCapital, LLC*, 939 F.3d 1016, 1022 (9th Cir. 2019).  That property includes, without limitation, Asiana's U.S. Reservation Center in Los Angeles or interests therein; Asiana's Los Angeles Sales Office or interests therein; Asiana's movable property in those offices; Asiana's aircraft or interests therein that are routinely present in the State; and any trade receivables or other debts that may be due to Asiana in the State.

11.     This Court has personal jurisdiction over Asiana for the independent reason that the underlying dispute relates to catering services for Asiana's international flights, including flights from Incheon International Airport to Los Angeles International Airport.  *See* Cal. C.C.P. § 410.10; *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (permitting specific personal jurisdiction so long as claims "arise out of or relate to the defendant's contacts" with the forum).

12.     Venue is proper in this district under 9 U.S.C. § 204 and 28 U.S.C. § 1391(b)(1), (2), and (3) because, among other things, Asiana resides in this district and is subject to jurisdiction here.  *See Jones Day v. Orrick, Herrington & Sutcliffe, LLP*, 42 F.4th 1131, 1140-42 (9th Cir. 2022).

## **GENERAL FACTUAL ALLEGATIONS**

13.     This dispute arises out of an arbitration between Gate Gourmet and Asiana over Asiana's failure to pay invoices for catering services that Gate Gourmet provided on Asiana's flights pursuant to a Catering Agreement between the parties.

### A.     **The Catering Agreement**

14.     In early 2016, Asiana was dissatisfied with the services it was receiving from its existing caterer, a company called LSGK.  Bradshaw Decl. Ex. 1 (Award) ¶3.2.2.  Kumho Asiana's investment adviser approached Gategroup about taking over Asiana's catering operations once the LSGK contract expired in 2018.  *Id.*

15.     Those discussions bore fruit.  Gategroup and Kumho Asiana agreed to form a new joint venture structured through various agreements, principally a Joint Venture Agreement, a Bonds with Warrants Subscription Agreement, and a Catering Agreement. Bradshaw Decl. Ex. 1 (Award) ¶¶3.2.7-3.2.8.  The Joint Venture Agreement governed the parties' interests in the new joint venture company — Gate Gourmet — granting Gategroup a 60% stake and Asiana a 40% stake.  *Id.* ¶¶3.2.8, 3.2.9.  Under the Bonds with Warrants Subscription Agreement, Gategroup agreed to lend Kumho Asiana KRW 160 billion.  *Id.* ¶3.2.10.

16.     Gate Gourmet and Asiana executed the Catering Agreement on December 30, 2016.  Lin Decl. Ex. 1 (Catering Agreement) pmbl.  The Catering Agreement gave Gate Gourmet the exclusive, long-term right to provide catering services for Asiana flights at Incheon and three other airports.  *Id.* §§1.1, 1.2.

17.     The Catering Agreement provided that Gate Gourmet would pass on its material and labor costs to Asiana as direct costs, and that Asiana would pay an additional "contribution charge" per passenger or crew member toward Gate Gourmet's profit and overhead.  Lin Decl. Ex. 1 (Catering Agreement) §§6.4.1, 6.4.2.

18.     The Catering Agreement attached an "Initial Business Plan" as Appendix 1, itemizing Gate Gourmet's revenues, costs, and profit.  Lin Decl. Ex. 1 (Catering Agreement) app. 1.  The agreement contemplated that two further Business Plans would

be adopted in 2018 and 2020, but sharply limited the adjustments that would be made to those plans relative to the Initial Business Plan.  Specifically, Annex 1.4 states:

> **Business Plan**
>
> The Parties have agreed to adopt the business plan as set out in <u>Appendix 1</u> (the "**Initial Business Plan**").
>
> Provided that the Initial Business Plan shall be adjusted during the following periods:
>
> i.  The Initial Business Plan shall be adjusted in 2018 at least four (4) months prior to the Commencement Date and the Initial Business Plan shall be replaced with the new business plan starting from the Commencement Date (the "**2018 Business Plan**"). . . .
>
> ii.  Thereafter, the 2018 Business Plan shall be adjusted prior to January 2020 and the 2018 Business Plan shall be replaced with the new business plan starting from January 2020 until the expiration of the Term (unless otherwise terminated in accordance with Clause 11.2 of the Main Agreement) (the "**2020 Business Plan**"). . . .
>
> ***The adjustments to the Business Plan shall be limited to any changes to cost elements and passenger numbers based on the actual results during the relevant period.  The net profit as committed in the Business Plan will be preserved.***

Lin Decl. Ex. 1 (Catering Agreement) annex 1.4 (last emphasis added).

19.     Asiana promised that it would promptly pay all invoices Gate Gourmet issued under the Business Plans.  It agreed to "settle [all] invoice[s] in full within thirty (30) days of receipt" and "agree[d] that on-time payment of invoices and other amounts due is of the essence under this Agreement."  Lin Decl. Ex. 1 (Catering Agreement) §§ 8.2.3-8.2.4.

20.     The Catering Agreement states that it shall be "governed by and construed in accordance with the laws of Korea."  Lin Decl. Ex. 1 (Catering Agreement) § 28.  It also contains the following arbitration clause:

> All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce in force on the date on which the Notice of Arbitration is submitted.  The number of arbitrators shall be three.  The seat of the arbitration shall be Singapore.

Lin Decl. Ex. 1 (Catering Agreement) § 28.

21.     On March 10, 2017, Gate Gourmet and Asiana entered into a Supplemental Agreement to Catering Agreement that amended the Catering Agreement in respects not relevant here.  Lin Decl. Ex. 2.  On June 15, 2018, Gate Gourmet and Asiana entered into a First Amendment to the Catering Agreement that similarly made amendments not relevant here.  Lin Decl. Ex. 3.

## B.     The Invoice Dispute

22.     In August 2018, Gate Gourmet met with Asiana to discuss the next Business Plan, explaining that "the Initial Business Plan would be adjusted in 2018" and that, as provided in the Catering Agreement, "the net profit as committed in the Business Plan will be preserved."  Bradshaw Decl. Ex. 1 (Award) ¶3.8.1.  Despite the Catering Agreement's clear terms, Asiana responded that "the pricing terms, including the net profit, were still up for discussion."  *Id.* ¶3.8.3.

23.     In September 2018, Gate Gourmet began providing catering services under the contract and advised Asiana that it would invoice expenses as per the contract.  Bradshaw Decl. Ex. 1 (Award) ¶3.9.7.  Consistent with the Catering Agreement, Gate Gourmet updated the Initial Business Plan to reflect actual results.  *Id.* ¶3.10.1.  But Asiana unilaterally announced that it would "set its payment at KRW 15,700 per [passenger] on any further invoices pending the Parties' 'agreement' on a pricing methodology."  *Id.* ¶3.10.3.  Asiana then paid only a portion of Gate Gourmet's invoices.  *Id.* ¶3.10.4.  During a meeting in December 2018, Asiana demanded "significant changes" to the Business Plan, "including a renegotiation (reduction) of the net profit."  *Id.* ¶3.10.9.

24.     Asiana continued making only partial payments in 2019.  Bradshaw Decl. Ex. 1 (Award) ¶3.10.15.  In June 2019, Asiana announced that it would henceforth make only payments in amounts it "deemed reasonable and appropriate."  *Id.* ¶3.10.20.

25.     In light of Asiana's refusal to abide by its promises, on June 17, 2019, Gate Gourmet filed a Request for Arbitration with the International Chamber of Commerce

seeking payment of the unpaid invoices in full.  Bradshaw Decl. Ex. 1 (Award) ¶3.10.21.

### C.   **The Arbitration**

26.     Consistent with the Catering Agreement's arbitration clause, the ICC convened a tribunal consisting of three exceptionally experienced and well-qualified arbitrators.  Gate Gourmet nominated Mr. John Beechey CBE of Arbitration Chambers in London; Asiana nominated Mr. Gary Born from Wilmer Hale in London; and those two arbitrators then jointly nominated Mr. William Rowley KC of Arbitration Place in Toronto, Canada, as presiding arbitrator.  Bradshaw Decl. Ex. 1 (Award) ¶1.5.1.

27.     Gate Gourmet contended in the arbitration that the Catering Agreement required Asiana to pay its invoices as calculated pursuant to the Catering Agreement's Business Plans, rather than seeking to renegotiate those Business Plans to reduce Gate Gourmet's profit margins.  Bradshaw Decl. Ex. 1 (Award) ¶4.2.1.  Although other pricing components were charged on a pass-through basis, "the exact 'contribution per passenger' for each given year of the Catering Agreement was specifically agreed to be based on a formula that incorporated net profit figures agreed in the Initial Business Plan set out in Appendix 1 of the Catering Agreement."  *Id.* ¶4.2.2.

28.     Asiana, by contrast, contended that the "adjustments contemplated in Annex 1.4 . . . were intended to be 'wholesale adjustments.'"  Bradshaw Decl. Ex. 1 (Award) ¶5.2.7.  According to Asiana, "the Parties contemplated that the net profit figures would be 'preserved' . . . in the sense that those figures would be target projections to be taken into account" when negotiating "reasonable parameters" for future Business Plans.  *Id.* ¶5.2.8.

29.     Gate Gourmet submitted a statement of claim and three witness statements.  Bradshaw Decl. Ex. 1 (Award) ¶2.2.1.  Asiana responded with a statement of defense and counterclaim, four witness statements, and two expert reports.  *Id.* ¶2.2.2.  Both parties exchanged document requests, and the tribunal ruled on discovery disputes.  *Id.* ¶2.2.4.  Gate Gourmet then submitted a reply along with four more witness statements.

*Id.* ¶2.2.10.  Asiana submitted a rejoinder with six more witness statements and three more expert reports.  *Id.* ¶2.2.16.  One of those expert reports was from a Korean law expert, Professor Young-Joon Kwon.  *Id.*

30.     The tribunal held a five-day merits hearing from November 23 to 28, 2020. Bradshaw Decl. Ex. 1 (Award) ¶2.3.1.  Both parties had the opportunity to cross-examine the other side's witnesses and experts.  *Id.* ¶¶2.2.22, 2.2.23, 3.1.2.

**D.     The Final Award**

31.     The arbitral tribunal issued its Final Award on February 18, 2021. Bradshaw Decl. Ex. 1 (Award) at signature page.

32.     The tribunal held that, under the plain terms of the Catering Agreement, Gate Gourmet was not required to obtain Asiana's agreement to the adjustments made in the 2018 and 2020 Business Plans.  Bradshaw Decl. Ex. 1 (Award) ¶8.1.5.  The tribunal considered the contract "reasonably clear" on that issue.  *Id.* ¶8.1.6.

33.     Annex 1.4 states that "[t]he adjustments to the Business Plan shall be limited to any change to cost elements and passenger numbers based on the actual results during the relevant period" and that "***[t]he net profit as committed in the Business Plan will be preserved***."  Bradshaw Decl. Ex. 1 (Award) ¶8.1.9 (emphasis altered).  That language, the tribunal noted, was "very nearly the antithesis" of a requirement that Asiana must agree before Gate Gourmet could retain the same profit margins in later Business Plans.  *Id.* ¶8.1.10.  Asiana's assertion that "the Parties used the word 'adjusted' as a synonym for 'renegotiated' or 'agreed'" was "inconsistent with the usual dictionary definition of adjustment."  *Id.* ¶8.1.8.

34.     Because the Catering Agreement was unambiguous, the tribunal had no occasion to resort to "subsidiary means of interpretation."  Bradshaw Decl. Ex. 1 (Award) ¶8.1.12.  Nonetheless, those secondary canons favored Gate Gourmet too.  In particular, Asiana's interpretation was "inconsistent with commercial common sense." *Id.* ¶8.1.16.  "It would seem highly unlikely that Gategroup and its affiliates would have invested over USD 200 million . . . [and] taken on a 30-year obligation to provide

[Asiana] with costs plus catering services" if "[Asiana's] subsequent agreement to the 2020 Business Plan . . . would determine Gategroup's return on its investment." *Id.*

35.     The specific adjustments that Annex 1.4 prescribed for the Business Plans were equally "clear."  Bradshaw Decl. Ex. 1 (Award) ¶8.2.12.  Annex 1.4 required that "the yearly net profit amounts as set out in Annex 1 (*i.e.*, in the Initial Business Plan) are to be used in the relevant yearly calculation of the applicable contribution per catered passenger." *Id.*  While that clear contract language made it unnecessary to consider subsidiary principles of interpretation, those principles favored Gate Gourmet too. *Id.* ¶8.2.13.

36.     The tribunal considered and rejected Asiana's arguments, including an argument that a reduction in profit margin was required by a "No Less Favorable" clause in the Catering Agreement, which stated that prices for the first 12 months would be no less favorable to either party than Asiana's prices from LSGK for the same or similar services.  Bradshaw Decl. Ex. 1 (Award) ¶8.3; Lin Decl. Ex. 1 (Catering Agreement) §6.1.1 & annex 1.4.  The tribunal also rejected all of Asiana's counterclaims for alleged overpayments under the contract and alleged breaches of service standards.  Bradshaw Decl. Ex. 1 (Award) ¶8.6.

37.     The tribunal observed that Asiana did not dispute the calculation of the amounts owed on the invoices.  Bradshaw Decl. Ex. 1 (Award) ¶8.4.2.  Under Clause 8.2.4 of the Catering Agreement, Asiana also owed interest at three-month KORIBOR plus 8%.  *Id.* ¶8.5.1.

38.     Finally, having prevailed on all issues, Gate Gourmet was entitled to its legal fees and other costs.  Bradshaw Decl. Ex. 1 (Award) ¶9.2.19.  The tribunal deemed Gate Gourmet's claimed costs "reasonable on their face." *Id.* ¶9.2.21.

39.     The Award's dispositive section ordered Asiana to pay Gate Gourmet KRW 28,898,427,731 in unpaid principal and interest through January 10, 2020.  Bradshaw Decl. Ex. 1 (Award) ¶9.3.1(a)-(c).  The Award also ordered Asiana to pay simple interest from January 10, 2020 at three-month KORIBOR plus 8%.  *Id.* ¶9.3.1(c).

40.     Finally, the Award ordered Asiana to pay costs of GBP 1,474,523.26, USD 1,087,340.87, and SGD 6,948.05, plus simple interest from two weeks from the date of the Award at 5.33%, the statutory default rate under Singapore law.  Bradshaw Decl. Ex. 1 (Award) ¶9.3.1(f).

### E.     The Addendum

41.     On April 2, 2022, the tribunal issued an Addendum to the Final Award under Article 36 of the ICC Rules to correct certain clerical errors in the dispositive section of the Award.  Bradshaw Decl. Ex. 2 (Addendum).

42.     The tribunal explained that the correction was necessary because "the dispositif failed, because of the Tribunal's clerical error, to reflect what the Tribunal had determined in the body of the Final Award."  Bradshaw Decl. Ex. 2 (Addendum) ¶2.1.7.

43.      The tribunal corrected the dispositive section to state that Asiana must pay Gate Gourmet KRW 38,905,142,664 in principal and interest on the unpaid invoices.  Bradshaw Decl. Ex. 2 (Addendum) ¶4.1.1.  The tribunal also ordered Asiana to pay simple interest on that amount from October 30, 2020, at the rate of three-month KORIBOR plus 8%.  *Id.*

44.     The Addendum did not modify the costs award.  Bradshaw Decl. Ex. 2 (Addendum) ¶4.1.2.

### F.     The Singapore Set-Aside Proceedings

45.     Asiana sought judicial review of the Award in Singapore, the seat of the arbitration.  On May 27, 2022, the Singapore International Commercial Court rejected Asiana's application.  Bradshaw Decl. Ex. 4 (the "SICC Judgment").

46.     Asiana challenged the Award on the ground that there had been a "breach of natural justice and a failure to consider all issues placed before the Tribunal."  Bradshaw Decl. Ex. 4 (SICC Judgment) ¶17.  In particular, Asiana complained that the tribunal did not consider the expert report from its Korean law expert, Professor Young-Joon Kwon.  *Id.*

47.     Professor Kwon had asserted that, under the Korean law doctrine of "abuse of power of representation," "if a representative director of a company, who assumes a duty of care towards the company, abuses his or her power of representation by executing a contract with a counterparty, with a view to conferring a benefit to himself or herself or a third party against the company's interests," the contract is "deemed null and void, provided that the counterparty was aware or should have been aware of the representative director's abuse of his or her power of representation."  Bradshaw Decl. Ex. 4 (SICC Judgment) ¶64 (quoting Kwon Report ¶42).

48.     In its briefs in the arbitration, Asiana had argued that the "abuse of power of representation" doctrine was a reason to prefer Asiana's contract interpretation over Gate Gourmet's.  According to Asiana, if the tribunal adopted Gate Gourmet's interpretation, the agreement would be so favorable to Gate Gourmet that it could run afoul of that doctrine.  Bradshaw Decl. Ex. 4 (SICC Judgment) ¶¶39, 45, 52.  In particular, if Asiana's chairman had approved generous pricing terms under the Catering Agreement as part of a "package deal" to secure financial benefits for another Kumho Asiana group affiliate through the Bonds with Warrants Subscription Agreement, his actions would implicate the abuse of power of representation doctrine.  *Id.*  By failing to specifically address that argument, Asiana urged, the tribunal committed a "breach of natural justice" that warranted setting aside the Award.  *Id.* ¶17.

49.     The Singapore International Commercial Court rejected that argument.  The court observed that Asiana did not argue in the arbitration that the Catering Agreement was void under the "abuse of power of representation" doctrine — to the contrary, Asiana was asserting counterclaims that presumed the agreement's validity.  Bradshaw Decl. Ex. 4 (SICC Judgment) ¶97.  Instead, Asiana had invoked that doctrine only to argue the canon of "effective interpretation" — that the tribunal should avoid construing the contract in a way that could render it void.  *Id.* ¶94.  The tribunal, however, had no reason to reach that issue:  Because the tribunal found the Catering Agreement clear and

unambiguous, there was no reason to apply secondary canons of construction like the principle of effective interpretation. *Id.* ¶96.

50. The Singapore International Commercial Court accordingly dismissed Asiana's application to set aside the Award. Bradshaw Decl. Ex. 4 (SICC Judgment) ¶¶100, 114.

51. On November 29, 2022, the Singapore Court of Appeal dismissed Asiana's appeal from that decision. Bradshaw Decl. Ex. 5.

52. Despite losing at every stage, Asiana has refused to pay any portion of the amounts it owes Gate Gourmet under the Award. Lin Decl. ¶7. Gate Gourmet accordingly brings this petition to recognize and enforce the Award.

## GROUNDS FOR ENFORCING THE AWARD

### A. The Presumption of Enforcement

53. The New York Convention is an international treaty signed by over 150 countries that is designed to facilitate and expedite the recognition and enforcement of foreign arbitral awards. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 (Kry Decl. Ex. 4). To that end, the Convention requires that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles." *Id.* art. III, 21 U.S.T. at 2519. The United States is a party to the Convention and is bound by its terms. *See New York Arbitration Convention: Contracting States*, www.newyorkconvention.org/countries (Kry Decl. Ex. 5). Singapore (the seat of the arbitration) and Korea (the respondent's domicile) are both parties too. *Id.*

54. The New York Convention's goal is "to encourage the recognition and enforcement of commercial arbitration agreements." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). That objective is consistent with the "emphatic federal policy in favor of arbitral dispute resolution" — a policy that "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-*

-13-

*Plymouth, Inc.*, 473 U.S. 614, 631 (1985).  The Convention thus reflects a "strong public policy favoring confirmation of foreign arbitration awards."  *Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1098 (9th Cir. 2011).

55.   The United States implemented the New York Convention through Chapter 2 of the Federal Arbitration Act.  That statute provides that "[t]he Convention . . . shall be enforced in United States courts in accordance with this chapter."  9 U.S.C. § 201. Section 207 specifies:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration.  The court ***shall confirm the award*** unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

9 U.S.C. § 207 (emphasis added).  Enforcement is thus mandatory unless one of the Convention's defenses to recognition applies.  "These defenses are construed narrowly, and the party opposing recognition or enforcement bears the burden of establishing that a defense applies."  *Cubic Def. Sys.*, 665 F.3d at 1096.

56.   The Federal Arbitration Act adopts a "policy of expedited judicial action" for confirmation, consistent with the goal of fostering an "alternative method for dispute resolution that would be speedier and less costly than litigation."  *O.R. Sec., Inc. v. Pro. Planning Assocs.*, 857 F.2d 742, 745-46 (11th Cir. 1988).  The Act directs that petitions to confirm awards "shall be made and heard in the manner provided by law for the making and hearing of motions," rather than the pleading procedures applicable to traditional civil actions.  9 U.S.C. §§ 6, 208.  A court should thus consider the petition, any opposition, the reply, and any declarations, and then enter judgment on the award based on that single round of briefing.  *See TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 940 (D.C. Cir. 2007) (proceedings follow "a summary procedure in the nature of federal motion practice"); *Productos Mercantiles e Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 46 (2d Cir. 1994); *O.R. Sec.*, 857 F.2d at 745-46.

57.     The Award in this case falls within the scope of the Convention.  Under the Federal Arbitration Act, "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial . . . falls under the Convention" unless it arises out of a "relationship which is entirely between citizens of the United States."  9 U.S.C. § 202.  Those requirements are met.  The Award arises out of a Catering Agreement for the provision of catering services for international air travel.  No party is a citizen of the United States.

58.     Article IV of the Convention requires a party seeking recognition and enforcement to submit "[t]he duly authenticated original award or a duly certified copy thereof" as well as "[t]he original [arbitration] agreement . . . or a duly certified copy thereof."  21 U.S.T. at 2519-20.  Gate Gourmet has submitted those materials.  Bradshaw Decl. Exs. 1-2; Lin Decl. Exs. 1-3.

**B.     No Grounds for Denying Enforcement**

59.     Article V of the Convention provides only narrow grounds for denying recognition of a foreign arbitral award.  "The grounds for a court's refusal or deferral of recognition or enforcement of an arbitration award are limited to the seven grounds listed in Article V . . . ."  *MediVas, LLC v. Marubeni Corp.*, 592 F. App'x 642, 643 (9th Cir. 2015).  "[T]he Convention is 'clear' that a court 'may refuse to enforce the award only on the grounds explicitly set forth in Article V.'"  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012).  None of those grounds applies here.

60.     Asiana argued in the Singapore set-aside proceedings that the Award was a "breach of natural justice" because the tribunal failed to consider its argument that Asiana's own chairman violated the doctrine of "abuse of power of representation" by agreeing to generous pricing terms in the Catering Agreement in return for financial benefits to another affiliate in the Kumho Asiana group.  Bradshaw Decl. Ex. 4 (SICC Judgment) ¶ 17.  Whatever the merits of that argument under the law of Korea or Singapore, the argument is no basis for denying recognition under the New York Convention.

61.    A court may not refuse to enforce an award under the New York Convention merely because the tribunal did not explicitly address an argument a party made during the arbitration.  Under the Convention, a court "may refuse to enforce the award only on the grounds explicitly set forth in Article V."  *Belize Soc. Dev.*, 668 F.3d at 727.  A tribunal's alleged failure to address a party's argument is not one of the grounds enumerated in Article V.  21 U.S.T. at 2519-20.

62.    Article V.1(c) permits a court to deny recognition where a tribunal addressed matters **beyond** the parties' submissions.  21 U.S.T. at 2520.  But "[n]othing in the language of article V(1)(c) grants enforcing authorities the discretion to refuse or otherwise limit the recognition or enforcement of an award which has failed to address all issues submitted by the parties."  UNCITRAL Secretariat, *Guide on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards* 177 ¶14 (2016 ed.) (Kry Decl. Ex. 6).  "An incomplete award . . . does not constitute a cause for refusal of enforcement under Article V(1)(c), nor under any other ground of Article V."  Albert Jan van den Berg, *The New York Arbitration Convention of 1958*, at 320-22 (1981) (Kry Decl. Ex. 7).

63.    It is well-established under U.S. domestic law that arbitrators "need not give their reasons for their results."  *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 203 (1956); *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1214-15 (2d Cir. 1972).  *A fortiori*, arbitrators need not respond to every single argument a party makes.  Where a tribunal does not expressly address a particular argument, the most reasonable inference is not that the tribunal overlooked the argument, but that the tribunal deemed the argument insufficiently important or meritorious to be worth mentioning in light of other, more persuasive arguments.  Party memorials in international arbitrations are already extremely long.  *See, e.g.*, Bradshaw Decl. Ex. 4 (SICC Judgment) ¶40 (citing "para 299(2)" of Asiana's statement of defense).  A rule that arbitrators must explicitly respond to every argument a party makes, no matter how inconsequential, would

undermine the goal of fostering a more efficient alternative to litigation. *See Sobel*, 469 F.2d at 1215.

64.     In any event, as the Singapore International Commercial Court explained, the tribunal did not fail to address any argument that was properly before it. During the arbitration, Asiana argued only that the "abuse of power of representation" doctrine was a reason to construe contractual ambiguities in its favor, not a reason why the tribunal should invalidate the Catering Agreement. Bradshaw Decl. Ex. 4 (SICC Judgment) ¶¶94, 97. Because the tribunal found the contract unambiguous, it had no reason to address secondary canons of construction like the effective interpretation principle. *Id.* ¶96.

65.     Asiana cannot belatedly challenge the Catering Agreement's validity in these enforcement proceedings. Article V.1(a) permits a court to deny enforcement where the ***arbitration agreement*** was "not valid under the law to which the parties have subjected it." 21 U.S.T. at 2520. But under well-established severability principles, a party may not challenge an arbitration clause simply by challenging the broader contract in which it appears. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."); *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 102-03 (D.C. Cir. 2015). In any event, Asiana forfeited any challenge to the arbitration clause by not challenging the tribunal's jurisdiction during the arbitration. *See George Day Constr. Co. v. United Bhd. of Carpenters & Joiners of Am.*, 722 F.2d 1471, 1474-75 (9th Cir. 1984) (party forfeited objection by not "preserv[ing] the jurisdictional question"); *Sistem Mühendislik İnşaat Sanayi Ve Ticaret, A.Ş. v. Kyrgyz Republic*, 741 F. App'x 832, 834 (2d Cir. 2018).

66.     Nor can Asiana recast its challenge to the Catering Agreement as a public policy defense. Article V.2(b) provides for non-recognition where "recognition or enforcement of the award would be contrary to the public policy of th[e] country" in which recognition is sought. 21 U.S.T. at 2520. But in light of the "presumption

favoring upholding international arbitration awards under the Convention, this defense is 'construed narrowly'" and "applies only when confirmation or enforcement of a foreign arbitration award 'would violate the forum state's ***most basic notions of morality and justice***.'" *Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1096-97 (9th Cir. 2011) (emphasis added). The alleged public policy must not only exist, but must be sufficiently compelling to overcome the "strong public policy favoring confirmation of foreign arbitration awards." *Id.* at 1098. "Although this defense is frequently raised, it 'has rarely been successful.'" *Id.* at 1097. Asiana cannot make this demanding showing.

67.     For one thing, whether or not U.S. public policy forbids enforcing awards based on allegedly illegal contracts as a general matter, there is no public policy against enforcement where the respondent had ample opportunity to challenge the agreement in the arbitration and failed to do so. In *Tatneft v. Ukraine*, 21 F.4th 829 (D.C. Cir. 2021), for example, the court rejected a public policy defense based on the illegality of certain share purchases where, "[i]f Ukraine wanted to raise claims about the illegality of the share purchases . . . , it had the opportunity to raise those claims before the arbitral panel." *Id.* at 838. And in *Tecnicas Reunidas de Talara S.A.C. v. SSK Ingenieria y Construccion S.A.C.*, 40 F.4th 1339 (11th Cir. 2022), the Eleventh Circuit rejected a public policy defense based on attorney conflicts where the respondent "knew of the side-switching and failed to timely object." *Id.* at 1345-46.

68.     Asiana was well aware of the grounds for its objection here. Asiana's former caterer, LSGK, filed a complaint with Korea's Fair Trade Commission challenging the same financial support to Asiana's affiliate that forms the basis for Asiana's "abuse of power of representation" claim. On August 27, 2020 — three months before the arbitration hearing and six months before the Final Award — the Commission publicly imposed a KRW 32 billion (USD $27 million) fine on Kumho Asiana and referred Asiana's chairman for criminal investigation. *See Kumho Asiana Fined 32 Bln Won for Unfairly Supporting Affiliate*, Yonhap News Agency, Aug. 27,

2020 (Bradshaw Decl. Ex. 3).  The factual basis for Asiana's argument was thus common knowledge during the arbitration.  Beyond that, the very fact that Asiana raised its "abuse of power of representation" argument during the arbitration as a contract interpretation argument shows that Asiana could have challenged the Catering Agreement's validity on the same facts.

69.    Even if the Court were to overlook Asiana's forfeiture, the Korean government's objections to Kumho Asiana's conduct do not rise to the level of a violation of fundamental U.S. public policy.  The public policy exception applies only when enforcement would "violate the forum state's ***most basic notions of morality and justice***."  *Cubic Def. Sys.*, 665 F.3d at 1096-97 (emphasis added).  That is an exceptionally strict standard.  As a general matter, "the U.S. does not have a policy against enforcing arbitral awards predicated on underlying violations of foreign law." *Tatneft*, 21 F.4th at 837-38.  In *Northrop Corp. v. Triad International Marketing S.A.*, 811 F.2d 1265 (9th Cir. 1987), for example, the Ninth Circuit enforced an award for breach of contract even though performance of the agreement would have been illegal under Saudi law.  *Id.* at 1270-71.  The court saw no sufficiently "well defined and dominant" ***United States*** public policy against enforcement.  *Id.* at 1271.

70.    This case is no different.  Although Asiana's chairman may have insisted on a "package deal" that involved a financing agreement with one affiliate and a catering agreement with another affiliate, any impropriety in that arrangement under Korean law hardly offends this country's "most basic notions of morality and justice."  While the United States imposes fiduciary duties on corporate officers and directors to avoid conflicts of interest, those duties are largely corporate law obligations enforced through shareholder derivative suits, not fundamental moral obligations that carry harsh criminal penalties.  *See, e.g.*, *In re McDonald's Corp. Stockholder Deriv. Litig.*, 289 A.3d 343, 380 (Del. Ch. 2023).  Still less is there any violation of fundamental public policy where a contracting party merely proceeds with a transaction despite an alleged conflict of interest affecting the ***other party's*** officers or directors — especially where the other

party is a commercially sophisticated business, advised by its own external counsel and investment advisors, which formed its own assessment of the transaction.

71.     Refusing to enforce the Award on public policy grounds would give a windfall to Asiana at Gate Gourmet's expense.  Korean regulators plainly viewed Kumho Asiana as the wrongdoer in the "package deal," imposing fines on Kumho Asiana and referring its chairman for criminal investigation while imposing no similar sanctions on Gate Gourmet or its affiliates.  Allowing Asiana to escape its contractual obligations because ***Asiana's own chairman*** allegedly engaged in unlawful conduct would punish an innocent party for a guilty party's misconduct.  Nothing in United States public policy countenances, much less requires, that upside-down result.

72.     None of the New York Convention's other exceptions to recognition applies either.  Asiana had ample opportunity to present its case through legal briefs, witness statements, expert reports, and a hearing.  New York Convention art. V.1(b), 21 U.S.T. at 2520.  The tribunal neither exceeded the scope of the parties' submissions nor departed from the agreed-upon arbitral procedures.  *Id.* art. V.1(c), (d), 21 U.S.T. at 2520.  Far from setting aside the award, the Singapore courts have confirmed its validity.  *Id.* art. V.1(e), 21 U.S.T. at 2520.  And the subject matter of the dispute was plainly arbitrable under U.S. law.  *Id.* art. V.2(a), 21 U.S.T. at 2520.

73.     The Court should accordingly recognize and enforce the Final Award as corrected by the Addendum in its entirety.

### C.     Interest and Currency Conversion

74.     The Court should grant prejudgment interest, both pre-award and post-award, at the rates specified in the Award.  The Court should also convert the foreign currency portions of the Award to U.S. dollars at the exchange rate prevailing on the date of the Award.

75.     "[P]ost-award, prejudgment interest is available in an action to confirm an arbitration award under the New York Convention."  *Cubic Def. Sys.*, 665 F.3d at 1102.  Indeed, "payment of appropriate interest [is] 'a dictate of natural justice' necessary 'to

repair all the damages that accrue naturally' from the breach of an obligation." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 881 (D.C. Cir. 2021).  Prejudgment interest is thus "an element of complete compensation" under United States law.  *Id.* "[O]nly if such interest is awarded will a person wrongfully deprived of his money be made whole for the loss." *Waterside Ocean Nav. Co. v. Int'l Nav. Ltd.*, 737 F.2d 150, 153-55 (2d Cir. 1984).

76.     A decision to award prejudgment interest "must be exercised in a manner consistent with the underlying arbitration award." *Cubic Def. Sys.*, 665 F.3d at 1103; *see also Stileks*, 985 F.3d at 881.  Thus, where a tribunal's award specifies pre-award and post-award interest, a court should apply the same rates and terms in awarding prejudgment interest on the judgment enforcing the award.  After a court enters judgment enforcing the award, by contrast, post-judgment interest accrues at the statutory rate prescribed by 28 U.S.C. §1961.

77.     The tribunal ordered Asiana to pay simple interest from October 30, 2020 on KRW 38,905,142,664 at the contractually specified rate of three-month KORIBOR plus 8%.  Bradshaw Decl. Ex. 2 (Addendum) ¶4.1.1.  The tribunal also ordered Asiana to pay simple interest on the costs award from March 4, 2021 at the statutory rate of 5.33%.  Bradshaw Decl. Ex. 1 (Award) ¶9.3.1.  This Court should therefore grant prejudgment interest at those same rates.

78.     In addition, the Court should convert the foreign currency portions of the Award to U.S. dollars.  When a foreign arbitral award is denominated in foreign currency, courts ordinarily convert the amounts to U.S. dollars.  *See Linley Invs. v. Jamgotchian*, No. LACV1100724, 2014 WL 12665812, at *4 (C.D. Cal. Apr. 16, 2014) (canvassing authorities), *aff'd*, 670 F. App'x 627 (9th Cir. 2016); *see also uSens, Inc. v. Chongqing Junma New Energy Auto. Co.*, No. 19-CV-00315-BLF, 2022 WL 410938, at *4 (N.D. Cal. Feb. 10, 2022) ("[T]he weight of authority disfavors judgments in foreign currency."); *Cont'l Transfert Tech. Ltd. v. Fed. Gov't of Nigeria*, 932 F. Supp. 2d 153, 157-58 (D.D.C. 2013) ("Conversion of such foreign currency amounts in dollars at

judgment is the norm rather than the exception."), *aff'd*, 603 F. App'x 1 (D.C. Cir. 2015); *cf. Stileks*, 985 F.3d at 881 ("Traditionally, U.S. courts render judgments in U.S. dollars."). The tribunal awarded damages in Korean won and awarded costs in British pounds, U.S. dollars, and Singapore dollars. Bradshaw Decl. Ex. 2 (Addendum) ¶4.1.1; Bradshaw Decl. Ex. 1 (Award) ¶9.3.1. The Court should convert all of the foreign currency amounts to U.S. dollars.

79. The Court should convert those foreign currencies to U.S. dollars at the exchange rate prevailing on the date of the Final Award. Most recent decisions use the award date exchange rate rather than the judgment date rate when enforcing an award. *See, e.g.*, *EGI-VSR, LLC v. Coderch Mitjans*, 963 F.3d 1112, 1123-24 (11th Cir. 2020) (applying award date); *Cont'l Transfer Tech.*, 932 F. Supp. 2d at 158-62 (same); *but see Linley*, 2014 WL 12665812, at *4 (applying judgment date). Courts especially favor the award date where, as here, the foreign currency has depreciated, so that using the judgment date rate would reward the debtor for its delay in satisfying the award. *Cont'l Transfer Tech.*, 932 F. Supp. 2d at 161. The Court should therefore use the exchange rate on the date of the Final Award rather than the date of judgment. *See* Kry Decl. Ex. 8 (exchange rate data for both dates).

80. Claim calculations showing the total amounts due with interest as of February 15, 2024, and converting the foreign currency portions to U.S. dollars at the exchange rates prevailing on the date of the Final Award, are attached as Exhibit 9 to the Kry Declaration.

81. A proposed order and proposed form of judgment are attached. In the event the Court grants this petition, petitioner can submit an updated claim calculation to reflect the additional interest accrued.

# **PRAYER FOR RELIEF**

WHEREFORE, Petitioner requests that this Court enter an order:

1.      GRANTING this petition;

2.      RECOGNIZING, ENFORCING, and CONFIRMING the Final Award and Addendum in their entirety;

3.      ENTERING JUDGMENT in favor of Gate Gourmet and against Asiana in the amounts prescribed by the Final Award and Addendum, including all post-award interest through the date of judgment, converted to U.S. dollars at the exchange rate prevailing on the date of the Award, such amounts comprising USD $50,747,170 as of February 15, 2024;

4.      AWARDING post-judgment interest as prescribed by 28 U.S.C. § 1961;

5.      AWARDING such other fees, costs, and interest as may be recoverable in this proceeding; and

6.      GRANTING such other and further relief as the Court deems just and proper.


DATED:  February 15, 2024                    HALPERN MAY YBARRA GELBERG LLP


                                                          By: _____*/s/ Thomas Rubinsky*_____
                                                                   THOMAS RUBINSKY

                                                          *Attorneys for Petitioner*
                                                          *GATE GOURMET KOREA CO., LTD.*