# EXHIBIT 1

ICC ARBITRATION NO. 24544HTG

GATE GOURMET KOREA CO., LTD
(Republic of Korea)

Claimant

ASIANA AIRLINES, INC.
(Republic of Korea)

Respondent

---

FINAL AWARD

---

The Arbitral Tribunal

Mr John Beechey CBE
Mr Gary Born
J. William Rowley QC (President)





CERTIFIED TRUE COPY OF THE ORIGINAL
PARIS, 30 JANUARY 2024

Alexander G. FESSAS
Secretary General
ICC International Court of Arbitration

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | INTRODUCTION | 5 |
| 1.1 | Overview | 5 |
| 1.2 | The Arbitration Agreement and the Governing Law | 5 |
| 1.4 | The Parties' Representatives | 6 |
| 1.5 | The Arbitral Tribunal | 8 |
| 2. | BACKGROUND DETAILS | 9 |
| 2.1 | Initial Pleadings and Proceedings | 9 |
| 2.2 | Subsequent Pleadings and Proceedings | 10 |
| 2.3 | The Oral Hearing | 13 |
| 3. | THE RELEVANT FACTS | 14 |
| 3.1 | The Tribunal's Approach to the Facts | 14 |
| 3.2 | Background to the Catering Agreement | 15 |
| 3.3 | Negotiation and Key Terms of the Catering Agreement | 17 |
| 3.4 | The Parties Agree the Services/Menus to be Offered by Claimant | 23 |
| 3.5 | Provision of Training in Claimant's Standard Airlines Catering System | 23 |
| 3.6 | Supplemental Agreement Respecting Possible Alternative Arrangements | 24 |
| 3.7 | Incheon Kitchen Unit Fire Requires Alternative Arrangement | 24 |
| 3.8 | Price Mechanism Discussions in Mid-Late 2018 | 26 |
| 3.9 | Claimant's Commencement of Services | 27 |
| 3.10 | Discussions Regarding Claimant's Invoices to Respondent | 28 |
| 4. | CLAIMANT'S CASE | 33 |
| 4.1 | The Factual Matrix of the Catering Agreement | 33 |
| 4.2 | The Pricing Mechanism in the Catering Agreement | 34 |
| 4.3 | Interim Arrangements Pending the Completion of Claimant's Kitchen Unit at Incheon International Airport | 35 |
| 4.4 | Claimant's Claim is Based on its Invoices Issued to Respondent Pursuant to the Catering Agreement | 35 |
| 4.5 | Claimant's Right to Payment of its Invoices, together with Interest | 37 |
| 4.6 | Respondent is in Breach of its Payment Obligations in the Catering Agreement as Properly Construed | 38 |
| 4.7 | The Business Plan and its Adjustments Are Not Subject to Further Agreement | 38 |
| 4.8 | The Negotiating History Contradicts Any Requirement for Further Agreement | 40 |
| 4.9 | Commercial Common Sense Undermines Respondent's Argument that the Catering Agreement was an "Agreement to Agree" | 41 |
| 4.10 | The Parties' Post-Execution Conduct Does Not Assist Respondent | 42 |
| 4.11 | Adjustments to the Business Plan Must Preserve the Net Profit as Agreed in the Initial Business Plan | 43 |

2

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

| | | |
|---|---|---|
| 4.14 | The Pass-Through Mechanism for Direct Costs is not Subject to Further Agreement | ..47 |
| 4.15 | Respondent Misinterprets and Mis-Applies the "No Less Favourable" Wording to Negate the Detailed Pricing Methodology | ..48 |
| 4.16 | Claimant's Claims for Meal Prices (Direct Costs) | ..50 |
| 4.17 | Claimant's Claim for Contribution Charges | ..51 |
| 4.18 | Claimant's Claim for Handling Prices and Contract Item Prices | ..51 |
| 4.19 | Claimant is Entitled to Declaratory Relief Regarding Future Invoices | ..52 |
| 4.20 | Claimant's Entitlement to Interest Under the Catering Agreement | ..52 |
| 4.21 | Defences to Respondent's Counterclaim | ..52 |
| 4.22 | Claimant's Prayers for Relief | ..59 |
| 5. | RESPONDENT'S CASE | ..60 |
| 5.1 | The Essence of the Dispute | ..60 |
| 5.2 | Claimant's Claims for Payment are in Breach of the Agreed Pricing Mechanism | ..61 |
| 5.3 | Claimant's Invoices Failed to Comply with the Requirements of the CA | ..63 |
| 5.4 | Claimant's Invoices for Meal Prices (Direct Material and Direct Labour Costs) Do Not Comply with the Agreed Pricing Methodology | ..65 |
| 5.5 | Claimant Cannot Impose Payment Obligations on Respondent Where the Fundamental Basis for its Pricing is in Dispute | ..65 |
| 5.6 | Respondent's Counterclaims | ..66 |
| 5.7 | Claim for Repayment of Excess Payments | ..67 |
| 5.8 | Counterclaim Based on the "No Meal" Incident of July 2018 | ..68 |
| 5.9 | Additional Costs Paid by Asiana to SDCK | ..70 |
| 5.10 | Counterclaim for Damages Resulting from Claimant's Provision of Poor Quality Meals | ..71 |
| 5.11 | Entitlement to Interest | ..71 |
| 5.12 | Request for Relief | ..72 |
| 6. | TRIBUNAL'S APPROACH TO THE CASE ON THE MERITS | ..73 |
| 6.1 | Approach to be Followed / Issues for Consideration | ..73 |
| 7. | INTERPRETATION PRINCIPLES APPLICABLE TO THE RELEVANT AGREEMENTS | ..74 |
| 7.1 | Interpretation Principles | ..74 |
| 8. | TRIBUNAL'S ANALYSIS | ..76 |
| 8.1 | Do the Adjustments to the Business Plan Set Out in Annex 1.4 Require the Parties' Agreement? | ..76 |
| 8.2 | Are the Net Profit Figures Set out in Initial Business Plan Fixed for the Term of the CA? | ..81 |
| 8.3 | Do the No Less Favourable Provisions Limit Claimant's Prices to the Per Pax Prices LSGK Charged Asiana Immediately prior to the Commencement Date? | ..89 |
| 8.4 | Are the Amounts That Remain Unpaid on Claimant's Invoices Now Due and Payable? | ..95 |
| 8.5 | Claimant's Claim for Interest | ..111 |

3



| 8.6 | Respondent's Counterclaims for Repayment and Damages | 111 |
|---|---|---|
| 9. | COSTS | 117 |
| 9.1 | Introduction | 117 |
| 9.2 | Determination and Apportionment of the Costs of Arbitration | 118 |
| | FINAL AWARD | 123 |
| 9.3 | Tribunal's Final Award | 123 |

4



## 1. INTRODUCTION

### 1.1 Overview

This arbitration concerns the payment obligations of Asiana Airlines, Inc. (**"Asiana"** or **"Respondent"**) pursuant to a Catering Agreement dated 30 December 2016 between Gate Gourmet Korea Co., Ltd. (**"GGK"** or **"Claimant"**) as amended (**"Catering Agreement"** or **"CA"**) and Respondent. Claimant's claim is essentially one for unpaid invoices. Respondent denies any liability for such payments and counterclaims for recovery of overpayments on Claimant's invoices, as well as for damages in relation to certain additional costs alledgedly caused by Claimant's alleged failure to provide catering services in accordance with the CA.

### 1.2 The Arbitration Agreement and the Governing Law

1.2.1 Clause 28 of the Catering Agreement provides for arbitration in the following terms (**"Arbitration Agreement"**):

> *"This Agreement including its Annexes shall be governed by and construed in accordance with the laws of Korea.*
>
> *Any disputes shall be escalated according to Annex 1 prior to taking any legal action; however, preliminary injunctions or similar instruments remain reserved.*
>
> *All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce in force on the date on which the Notice of Arbitration is submitted. The number of arbitrators shall be three. The seat of the arbitration shall be Singapore"*



**1.2.2** Pursuant to parties' subsequent agreement by way of Respondent's correspondence dated 24 July 2019 and Claimant's correspondence dated 30 July 2019, parties agreed that English will be the language of the arbitration.

1.3     The Parties

**1.3.1  Claimant**

Gate Gourmet Korea Co., Ltd.
103 Gonghangdong-ro
2-gil, Jung-gu
Incheon
Republic of Korea

Tel: + 82 2 6105 2030
Email: szainab@gategroup.com

**1.3.2  Respondent**

Asiana Airlines, Inc.
443-83 Ojeong-ro, Gangseo-gu
Seoul 07505
Republic of Korea

Attn:  Jin Kim / Jinu Park
Email: jinkim@flyasiana.com
Email: jinupark@flyasiana.com

1.4     **The Parties' Representatives**

1.4.1   Claimant is represented in this arbitration by:

LALIVE (LONDON) LLP
25 Eastcheap
London EC3M 1DE

Mr Marc Veit
Mr Timothy L. Foden
Mr Robert Bradshaw
Ms Anita Subedi

6



Tel: + 44 20 3880 1540
Email : mveit@lalive.law
Email : tfoden@lalive.law
Email : rbradshaw@lalive.law
Email : asubedi@lalive.law

LALIVE SA
Stampfenbachplatz 4
P.O. Box 212
8042 Zürich
Switzerland

Mr Philippe Hovaguimian

Tel: + 41 58 105 2000
Email: phovaguimian@lalive.law

1.4.2   Respondent is represented in this arbitration by:

BAE, KIM & LEE LLC
133 Teheran-ro, Gangnam-gu
Seoul 06133
Republic of Korea

Mr John P. Bang
Mr Hongjoong Kim
Ms Hyunjung Lee
Ms Hyesung Jeong

Tel: + 82 2 3404 0333
Fax: + 82 2 3404 7306

Email: john.bang@bkl.co.kr
Email: hongjoong.kim@bkl.co.kr
Email: hyunjung.lee@bkl.co.kr
Email: hyesung.jeong@bkl.co.kr

PETER & KIM
1704 Trade Tower
511 Yeongdong-daero, Gangnamer-Gu
Seoul 06164
Republic of Korea

7



Mr Kap-You (Kevin) Kim
Mr Mino Han

Tel: + 82 2 538 2900
Fax: + 82 2 538 2901

Email: kevinkim@peterandkim.com
Email: minohan@peterandkim.com

### 1.5 The Arbitral Tribunal

1.5.1 The Arbitral Tribunal (**"Tribunal"**) has been constituted as follows:

Nominated by Claimant:

Mr John Beechey CBE
Arbitration Chambers
Lamb Building, Third Floor South
Temple, London EC4Y 7AS
United Kingdom

Tel: + 44 7785 700171
Email: jb@beecheyarbitration.com

and

Nominated by Respondent:

Mr Gary Born
WILMER CUTLER PICKERING HALE AND DORR LLP
49 Park Lane
London W1K 1PS
United Kingdom

Tel: + 44 207 872 1020
Email: gary.born@wilmerhale.com

who were confirmed by the Secretary General on 19 August 2019, in accordance with Article 13(2) of the 2018 ICC Rules of Arbitration (**"ICC Rules"**).[1]

Nominated jointly as Presiding Arbitrator by the co-arbitrators:

---

[1] The applicable version of the ICC Rules of Arbitration for this arbitration is the 2017 Rules of Arbitration.



Mr J. William Rowley QC
Suite 900, 333 Bay Street
Arbitration Place
Toronto, Ontario M5H 2R2 Canada

20 Essex Street
London WC2R 3AL
United Kingdom

Tel: + 1 416 865 7008
Email: wrowley@twentyessex.com

Tel: + 44 (0)20 7842 6702
Email: wrowley@twentyessex.com

who was confirmed by the Secretary General on 1 October 2019.

## 2. BACKGROUND DETAILS

### 2.1 Initial Pleadings and Proceedings

2.1.1 On 17 June 2019, Claimant submitted a Request for Arbitration (**"Request"**) which sought payment of certain outstanding invoices as well as declaratory relief to confirm the binding character of the Catering Agreement's pricing mechanism.

2.1.2 On 19 August 2019, pursuant to Article 13(2) of the ICC Rules, the Secretary General confirmed Mr John Beechey as co-arbitrator upon the nomination of Claimant and Mr Gary Born as co-arbitrator upon the nomination of Respondent.

2.1.3 On 30 August 2019, Respondent submitted its Answer and Counterclaim (**"Answer"**) in which it denied any liability for Claimant's claims and counterclaimed to recover certain payments of catering costs made to Claimant as well as damages caused by Claimant's alleged failure to provide catering services in accordance with the Catering Agreement.

2.1.4 On 1 October 2019, pursuant to Article 13(2) of the ICC Rules, the Secretary General confirmed Mr J. William Rowley QC as President of the Arbitral Tribunal upon the joint nomination of the co-arbitrators.

2.1.5 On 4 November 2019, Claimant submitted its Reply to Respondent's Counterclaims (**"Reply to Answer"**).

2.1.6 On 28 November 2019, the Parties and the Tribunal held a first procedural meeting by teleconference to agree and/or fix a timetable for the arbitration and procedural measures to

9



be followed. Due execution of the Terms of Reference dated 28 November 2019 was confirmed and the Tribunal consulted the Parties on the procedures to be followed in this arbitration. It was agreed that the results of those consultations would be reflected in Procedural Order No. 1.

2.1.7   On 5 December 2019, the Tribunal issued its Procedural Order No. 1 fixing the timetable and procedures to be followed in the arbitration.

## 2.2   Subsequent Pleadings and Proceedings

2.2.1   On 10 January 2020, Claimant filed its Statement of Claim (**"SoC"**) which was accompanied by witness statements from Mr Jann Fisch, Miss Mei Foong Chong and Mr Qin Liang Lim.

2.2.2   On 25 March 2020, Respondent filed its Statement of Defence and Counterclaim ("**SoD**") which was accompanied by witness statements from Messrs. Hong-Seok Park, In-won Lee, Joo-Hyun Paik and Soo-Sung Lim, as well as expert reports from Mr Lance Hayward and Mr Howard Rosen.

2.2.3   On 9 May 2020, the Tribunal wrote the Parties about the possible need for the hearing scheduled to be held in-person in Singapore from 23-28 November 2020 to be held remotely in light of the Covid-19 pandemic.

2.2.4   On 11 May 2020, following earlier requests for disclosure and production of documents, the Tribunal ruled on the Parties' disclosure requests.

2.2.5   On 19 May 2020, the Parties agreed to extend the deadline for voluntary production of documents until 29 May 2020 in light of the Covid-19 restrictions. It was agreed that the Parties could supplement their voluntary production by 10 June 2020 to the extent that it was not possible to complete searches by 29 May 2020.

2.2.6   On 5 June 2020, the Tribunal wrote the Parties expressing its concern about the ability to hold an in-person hearing as scheduled in Singapore in November 2020 and requesting the Parties' input on the holding of a remote or semi-remote hearing on the scheduled dates.

10



COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

2.2.7 On the same date, the Parties reverted to the Tribunal as to possible back-up plans in the event that it would not be possible to hold the in-person hearing scheduled for November 2020 in Singapore.

2.2.8 On 30 June 2020, Claimant applied to the Tribunal for an order for production of documents from Respondent that the latter had agreed to produce in response to Claimant's Document Request dated 8 April 2020.

2.2.9 On 14 July 2020, the Tribunal issued a reasoned order directing production by Respondent of certain spreadsheets in native format, as well as production of documents which had been withheld by Respondent on grounds of its asserted confidentiality obligations.

2.2.10 On 15 July 2020, Claimant filed its Statement of Reply and Defence to Counterclaim (**"SoR"**), together with reply witness statements from Mr Jann Fisch, Miss Mei Foong Chong, Mr Qin Liang Lim, and Mr Andreas Weber.

2.2.11 On 31 July 2020, Respondent wrote to Claimant and the Tribunal designating the law firm of Kim & Chang as a related entity in this dispute.

2.2.12 On 6 August 2020, Respondent sought an order from the Tribunal: (a) requiring the disclosure of the identity of the members of the counsel team at Kim & Chang previously or currently involved in the arbitration proceeding; (b) requiring Claimant to take all steps necessary to procure consent from LSG Sky Chefs Korea (**"LSGK"**) to enable it to disclose the documents which the Tribunal had ordered Respondent to produce; and (c) requiring Claimant to produce certain documents which it had disclosed in unrelated proceedings before the KFTC.

2.2.13 On 23 August 2020, having considered the Parties submissions of 6 and 19 August 2020, the Tribunal issued a reasoned ruling in which each of Respondent's three applications was denied. In particular, Respondent was directed to produce the previously ordered LSGK documents not later than 5:00 p.m., Singapore time, on Friday, 28 August 2020.



2.2.14 On 1 September 2020, the Tribunal agreed to: (a) a jointly proposed two-week extension to the date for Respondent's Statement of Rejoinder; and (b) a one-week extension to the date for Claimant's Statement of Rejoinder to the Counterclaim.

2.2.15 On 5 September 2020, the Tribunal gave directions as to the form of confidentiality undertaking to be given by Claimant in relation to the LSGK documents and required them to be produced by Respondent forthwith following receipt of Claimant's undertaking.

2.2.16 On 25 September 2020, Respondent filed its Statement of Rejoinder (**"Rejoinder"**) together with Rejoinder witness statements from Mr Hong-Seok Park, Mr Soo-Sung Lim, Mr Joo-Hyun Paik, Mr In-Won Lee, Mr Ja-Joon Goo, Mr John M. Kim, and expert reports from Mr Lance Hayward, Mr Howard Rosen and Professor Young-Joon Kwon.

2.2.17 On 22 October 2020, the Parties made a joint proposal for the conduct of the remote hearing and set out their respective positions on points on which they differed.

2.2.18 On 28 October 2020, Respondent filed an updated version of its Rejoinder to correct typographical and mechanical errors.

2.2.19 On 29 October 2020, the Tribunal provided directions as to the conduct and management of the upcoming hearing, including the hearing manager, logistics, hearing hours, allocation of time between the Parties and skeleton submissions.

2.2.20 On 30 October 2020, Claimant filed its Statement of Rejoinder to Counterclaim (**"Rejoinder to Counterclaim"**), together with Rejoinder witness statements from Messrs Qin Liang Lim, Andreas Weber and Tal Eisenberg.

2.2.21 On 3 November 2020, Respondent asserted that Section 2 of Claimant's Rejoinder to Counterclaim, Section 3 of Mr Qin Liang Lim's witness statement and the witness statement of Mr Tai Eisenberg were beyond the proper scope of the Rejoinder to Counterclaim. It requested an adjustment of the allocation of time between the Parties at the hearing to address these materials.

12



2.2.22 On 4 November 2020, Respondent notified the names of those of Claimant's witnesses whom intended to cross-examine being Mr Jann Fisch, Ms Mei Foong Chong, Mr Qin Liang Lim, Mr Andreas Weber and Mr Tal Eisenberg.

2.2.23 On the same date, Claimant notified the names of those of Respondent's witnesses whom it intended to cross-examine, being Mr Hong-Seok Park, Mr John Kim; Mr In-Won Lee, Mr Soo-Sung Lim, Mr Joo-Hyun Paik, Mr Ja-Joon Goo, Mr Lance Hayward, and Mr Howard Rosen.

2.2.24 On 6 November 2020, having considered Claimant's comments on Respondent's correspondence of 3 November 2020, the Tribunal gave directions that the allocation of time at the Hearing, being fairly balanced, should remain as earlier fixed.

2.2.25 On 12 November 2020, the Parties filed the Agreed Bundle of Documents (**"ABD"**).

2.2.26 On 16 November 2020, the Parties filed their respective Skeleton Arguments.

2.2.27 On 18 November 2020, the Chairman conducted a pre-hearing conference with the Parties to settle the final procedures and timetable for the Hearing.

## 2.3  The Oral Hearing

2.3.1  A five-day remote hearing was held between 23-28 November 2020 (**"Hearing"**).[2] The Hearing was recorded and transcribed and the transcripts were corrected after the Hearing to the extent required by the Parties.

2.3.2  At the Hearing, the Tribunal heard oral testimony from Mr Jann Fisch, Miss Mei Foong Chong, Mr Qin Liang Lim, Mr Andreas Weber, Mr Hong-Seok Park, Mr In-won Lee, Mr Joo-Hyun Paik, Mr Soo-Sung Lim, Mr Lance Haywood and Mr Howard Rosen. Although having been required to attend for cross-examination by Respondent, Mr Tal Eisenberg was released by Respondent without being cross-examined.

---

[2] The Hearing had been scheduled to cover six days.  As the Parties completed the evidence on 26 November 2020, the day of the 27th was used for the preparation of their oral closings which were made on Saturday, 28 November 2020.

13



2.3.3   The available time at the Hearing was divided between the Parties on the basis of Claimant having roughly 60% of the time available and Respondent having roughly 40% of the time available, in accordance with the directions made by the Tribunal on 29 October 2020.

2.3.4   On 14 January 2021, the Tribunal notified the Parties that it had on that date declared the proceedings closed as regards the filings by the Parties of further evidence or submissions on the issues under consideration in the arbitration.

2.3.5   The initial date for rendering a Final Award was extended by the Court from time to time under Article 30(2) of the Rules. On 27 February 2020, the Court fixed the time limit for rendering the final award as of 31 March 2021. No extensions were required for this arbitration.

2.3.6   In reaching its conclusions in this Award, the Tribunal has taken into account all of the pleadings, witness statements, expert reports. testimony, documents and submissions filed, given or made in the case.

2.3.7   Throughout the course of these proceedings, the Tribunal has been greatly assisted by the submissions of counsel, who, in turn, were helped by many others whose names do not appear in the transcript of the Hearing. It is therefore appropriate, at the beginning of this Award, to record the Tribunal's appreciation of the efforts that counsel to the disputing Parties brought to bear during these proceedings, together with their respective assistants and other advisors.

## 3.   THE RELEVANT FACTS

### 3.1   The Tribunal's Approach to the Facts

3.1.1   A review of the disputing Parties' submissions, witness statements, and the oral testimony given at the Hearing, indicates that, with several exceptions, the factual matrix out of which this dispute arises is either agreed or not seriously disputed. Put another way, most of the differences between the Parties in this case have to do with the true construction of the scope and application of the Catering Agreement, the Supplemental Agreement to the Catering Agreement (**"Supplemental Agreement"**), the First Amendment to the Catering

14



Agreement (**"First Amendment to the CA"**), the catering agreement with SDCK (**"Asiana-SDCK Catering Agreement"**) and the settlement agreement entered into between Asiana and SDCK (**"Asiana-SDCK Settlement Agreement"**).

3.1.2   The Tribunal sets out below a summary of the facts most relevant to the questions at issue in these proceedings – either as agreed, not disputed or as determined by the Tribunal. It would burden this document unduly if indeed it were possible, for all relevant factual evidence, documents and testimony to be dealt with fully. It should be assumed that the Tribunal has considered all such evidence adduced by the Parties in this arbitration, and further, that no evidence in this arbitration has been overlooked by the Tribunal by reason only of its omission from the summary below.

3.2   **Background to the Catering Agreement**

3.2.1   Claimant is a joint venture company formed by the Gate Gourmet group of companies (**"Gategroup"**) and the Kumho Asiana Group (**"Kumho Asiana"** or **"Kumho"**), which includes Respondent.

3.2.2   The idea for the joint venture between the two groups originated in January 2016 when Kumho Asiana's investment advisers, Spring Partners, approached Gategroup. At that time, Respondent had a catering agreement with LSGK, part of the Lufthansa Group, which was coming to an end. Respondent was by this time dissatisfied with the catering agreement with LSGK, particularly due to the latter's opaque pricing structure. Respondent was thus looking for a new provider to take over on-board catering starting in July 2018 when the LSGK contract ended.

3.2.3   After an introductory meeting in Seoul, delegates from Spring Partners, Kumho Asiana and Gategroup met at the latter's offices in Singapore in mid-January 2016. Following further meetings in London and Zürich, Spring Partners sent Gategroup a legal memorandum on a proposed deal structure and a business plan valuing the joint venture.

3.2.4   Over the following weeks, Gategroup and Spring Partners (on behalf of Asiana) worked on a business plan for the joint venture, basing their assumptions principally on data derived from Asiana's experience with LSGK.

15

3.2.5   The draft business plan and key terms of what was to become the deal were approved at a meeting in Seoul in mid-February 2016 between Mr Xavier Rossinyol, Gategroup's Global CEO, and Mr Sam-Koo Park, co-CEO of Asiana and Chairman of Kumho Asiana. This draft of the business plan (**"Original Business Plan"**) was to become the basis for the Initial Business Plan which was later annexed to the Catering Agreement.

3.2.6   The proposed joint venture represented an important opportunity for Gategroup. It had been looking to establish a foothold at an important hub airport in Asia, which would enable it to build a new flagship kitchen from which it could expand its presence in east Asia.

3.2.7   By this point Kumho Asiana and Gategroup had agreed in principle to structure the Joint Venture through a suite of related agreements: namely, a Joint Venture Agreement, a Bonds with Warrants Subscription Agreement and the Catering Agreement.

*The Joint Venture Agreement*

3.2.8   The Joint Venture Agreement governs the Parties' interests in the Joint Venture Company (**"GGK"**). The Joint Venture Agreement (**"Joint Venture Agreement"** or **"JVA"**) was executed on 30 December 2016, the same day as the Catering Agreement.

3.2.9   Under the JVA, Gate Gourmet Switzerland GmbH (**"GGS"**) would acquire 60% share in Claimant, with Respondent holding the remaining 40%. GGS also committed to contribute KRW 80 billion to the capital of Claimant, which would fund "all equipment, building modifications and general working capital", including the construction of the proposed new kitchen. Respondent was required to provide a capital contribution of KRW 53.33 billion, which was offset by an exclusivity fee it received under the Catering Agreement (discussed below).

*Bonds with Warrant Subscription Agreement*

3.2.10  Simultaneously, Gate Group Financial Services. S.á.r.L. (an affiliate of GGS) and Kuhmo & Company Inc. (Respondent's indirect parent) agreed on a Bonds with Warrants Subscription Agreement (**"BWA"**) under which Gategroup would lend Kuhmo Asiana a total of KRW 160 billion in the form of zero-coupon bonds.

16



3.2.11  In a side letter, dated 30 December 2016, which was made at the time the JVA and the Catering Agreement were executed, Gategroup, Claimant and Respondent agreed that in the event the BWA was not signed by 6 February 2017, or if it was terminated prior to its closing date, any of the parties to the side letter would have the right to terminate the JVA and Catering Agreement in which event they were deemed to be terminated *ab initio*.

3.2.12  The BWA took longer than the Joint Venture Agreement or the Catering Agreement to negotiate and it was executed on 10 March 2017.

*Catering Agreement*

3.2.13  Respondent concluded a long-term Catering Agreement with Claimant under which the latter would provide certain catering and handling services to Respondent (**"Services"**). The Catering Agreement, which was executed on 30 December 2016, was to take effect in July 2018 on the expiry of the LSGK catering agreement. Under the terms of the JVA, Respondent became a 40% shareholder in Claimant and was entitled to share (with GGS, the 60% shareholder) in the profits Claimant generated from the Services.

3.2.14  The Catering Agreement granted Claimant the exclusive right to provide the Services to Respondent at Incheon and three other airports in Korea. In return, Claimant paid Respondent an exclusivity fee of KRW 53.33 billion. As noted above, this offset Respondent's capital contribution of KRW 53.33 billion under the Joint Venture Agreement which provided Respondent with its 40% stake in Claimant.

3.3  **Negotiation and Key Terms of the Catering Agreement**

3.3.1  The Catering Agreement was negotiated over approximately 11 months. Senior managers on each side took part in these negotiations. Respondent was also advised by Spring Partners and its external counsel, Mr John Kim of KL Partners.

3.3.2  The Catering Agreement, is comprised of the main body of the agreement, and two annexes which set out in detail, *inter alia*, provisions concerning the scope of services, pricing and quality control to be applied in the catering operations. In the event of any inconsistency, the Catering Agreement provided that the annexes would prevail.

17



3.3.3 The Catering Agreement provided for a thirty-year term to commence on 1 July 2018 (**"Commencement Date"**) and expiring on 30 June 2048.

*Pricing Mechanism*

3.3.4 In its catering agreement with LSGK, Respondent had become concerned about the lack of visibility and transparency over LSGK's pricing and costs. In negotiating the pricing mechanism for the Catering Agreement, the Parties therefore agreed that Claimant's pricing would be broken down into four components to ensure greater transparency and to reflect actual costs. The four components were: (a) Meal prices; (b) Contribution per passenger and crew; (c) Handling prices; and (d) Contract Item prices.

3.3.5 During the course of negotiations, the Parties exchanged drafts which covered, *inter alia*, the determination of the price of Claimant's Services. Early drafts provided for the determination of the price by later negotiations. For example, the draft proposed by Respondent on 18 July 2016 proposed a wording at clause 6.1 in the following terms:

> *"All prices for meals and other Services to be provided under this Agreement shall be agreed by the Parties based on the pricing methodology to be mutually discussed and agreed by the Parties prior to the Commencement Date ..."[3]*

3.3.6 Subsequently, the Parties deleted the wording above and replaced it with a reference to the detailed pricing methodology (which contained no reference to the need for further agreement) that was included in the executed version of the Catering Agreement:

> *"All prices for meals and other Services to be provided under this Agreement shall be as set forth in <u>Annex 1</u> and subject to the pricing methodology and adjustment mechanisms set out in this Agreement and Annex 1 ..."[4]*

---

[3] Draft Catering Agreement (Respondent's comments in redline) dated 18 July 2016, Exhibit R-70, C-35, Clause 6.1.1. See also draft Annex 1 to the Catering Agreement (Respondent's comments in redline) dated 18 July 2016, Exhibit C-114, Annex 1.4.

[4] Email from John Kim to Chaim Su Sin, 2 August 2016 attaching marked-up draft of Catering Agreement, Exhibit R-71, p. 34, Clause 6.1.1.



3.3.7  On 29 August 2016, Gategroup met with Spring Partners and Respondent at the latter's head office at which time Gategroup presented proposed pricing terms and walked through the methodology and the principles underlying the proposed pricing mechanism. These principles reflected the concept of a "cost-plus" contract whereby the price would be calculated to cover the costs of providing meals and services plus an agreed element of profit. Gategroup's presentation noted that the proposed pricing mechanism reflected the projected financials in the Original Business Plan that had been approved by Mr Rossinyol and Chairman Park when they met in Seoul in mid-February 2016. This Original Business Plan, as refined over the next several days, ultimately became the **"Initial Business Plan"** annexed to the Catering Agreement.

3.3.8  The slide deck used by Gategroup in the presentation set out, *inter alia*, a meal price per passenger of CHF 17.8 which was said to be in line with its estimates of the current price Respondent was paying LSGK (estimated to be CHF 17-18 per passenger). These estimates were based on historical information of LSGK's pricing provided by Spring Partners.

3.3.9  During the presentation, Respondent suggested that Claimant bring up-to-date the business plan slide which contained the financials (it also contained Claimant's proposed meal price) by using Respondent's most recent passenger numbers.

3.3.10 Three days later, on 2 September 2016, Claimant provided Spring Partners and Respondent with an updated set of slides based on Respondent's latest numbers. Two important changes were made. First, Claimant's proposed price per meal per pax was reduced to CHF 14.5, based on more up-to-date information on LSGK's pricing that Respondent had provided. Second, it was noted that the "net profit as committed in the Business Plan (as per slide 4) will be preserved."

*Meal Prices*

3.3.11 The Catering Agreement provided that the price of meals was to cover Claimant's direct costs. These in turn are broken down into material costs and labour costs:

19



(a) direct material costs cover the material costs (*i.e.,* ingredients) necessary for the preparation of the meals. The CA specifies that these should be based "directly" on the material costs paid by Claimant to its suppliers;[5]

(b) direct labour costs cover the necessary labour to prepare, portion, assemble and pack the meals. The CA provides for these costs to be calculated based on the standard number of minutes required for meal preparation multiplied by the contractual labour rate per minute.

3.3.12 The Parties described these components as "pass-through costs" in negotiations.[6]

3.3.13 This reflected the understanding of the Parties' discussions during negotiations that Claimant would not charge a mark-up on meal prices, since the passenger contributions which were to be paid by Respondent were intended to meet its overheads and profits.

3.3.14 To address a feature that had been missing in Respondent's contract with LSGK, the Parties agreed that Respondent would have access to such information on costs as it might reasonably request. In particular, Respondent would have access to the relevant suppliers' invoices and Claimant's time needs (to prepare a meal) according to Claimant's cost and time management systems for material and labour costs respectively. [7]

*Contribution Charges*

3.3.15 In addition to paying for Claimant's direct meals costs, the Parties agreed that Respondent would pay a contribution charge for each catered passenger and crew member, also referred to as a "contribution per passenger", "contribution per passenger and crew", "contribution per pax", or "per pax margin". Under Clause 6.4.2, the contribution per pax is stated to cover Claimant's overheads and profit;

---

[5] Catering Agreement, Exhibit C-1, annex 1.4.1.1.1.

[6] Email from Gategroup (Mei Foong Chong) to Spring Partners (Steve Chough) with attached presentation and business plan dated 29 August 2016, at Exhibit C-28, p. 6.

[7] Catering Agreement, Exhibit C-1, Annex 1.4.1.1.1 and 1.4.1.1.2.

20



*"Overhead and recovery and profit shall be based on a per pax or crew basis."*[8]

*The Business Plan*

3.3.16  The Original Business Plan for the joint venture, approved in principle by Mr Rossinyol and Chairman Park in February 2016, set out: (a) Claimant's anticipated direct costs; (b) its anticipated indirect costs and overheads; and (c) net profit over 30 years. It also included a line for the "contribution per pax". Contribution per pax was to be calculated based on the overheads, passenger numbers and the pre-agreed net profit for any given year, calculated by dividing the sum of Claimant's total overhead costs plus its net profit by Respondent's total passenger numbers. The Original Business Plan was updated and refined slightly as a result of discussions between the Parties over the balance of 2016. As so refined, it became the agreed Initial Business Plan that was set out in Appendix 1 to the Catering Agreement.

3.3.17  Given that the projected overheads and passenger numbers in the Initial Business Plan might differ from the actual figures in the first full year of operation after the Catering Agreement came into effect, the Parties agreed that the Initial Business Plan should be adjusted during the so-called Ramp-Up Period, to take account of actual numbers, such that it formed a reliable basis for the remainder of the Catering Agreement's term.

3.3.18  The concept discussed was that the Parties would adjust the Initial Business Plan by updating the "baseline" for its projections, at least four months prior to the Commencement Date of 1 July 2018. Thereafter, the Parties would adjust the Business Plan again, with effect from January 2020, using actual data from the first year of catering operations.

3.3.19  Following further negotiations on the question of adjusting the Initial Business Plan, Gategroup sent a revised draft of Annex 1.4 to Respondent on 10 October 2016 which contained the following terms:

> *"The Initial Business Plan shall be adjusted in 2018 at least four (4) months prior to the Commencement Date and the Initial Business Plan shall be replaced with the*

---

[8] Catering Agreement, Exhibit C-1, Clause 6.4.2.

21

*new business plan starting from the Commencement Date (the 2018 Business Plan")*

*...*

*Thereafter, the 2018 shall be adjusted prior to January 2020 and the 2018 business plan shall be replaced with the new business plan starting from January 2020 until the expiration of the Term (unless otherwise terminated in accordance with Clause 11.2 of the Main Agreement) ("the 2020 Business Plan") ...,*

*The adjustments to the Business Plan shall be limited to any changes to cost elements and passenger numbers based on the actual results during the relevant period. The profit margin as committed in the business plan will be preserved."[9]*

3.3.20 This language was accepted and is contained in the executed version of the Catering Agreement.

3.3.21 Annex 1.4 does not provide for further adjustments to the Business Plan after the 18-month Ramp-Up (i.e., after 31 December 2019). After this date, price adjustments are only permitted under the circumstances specified in Annex 1.4.2, which include changes in the consumer price index, changes in the Services provided by Claimant or currency fluctuations.

*Payment Terms*

3.3.22 The Catering Agreement provides that Respondent shall settle all invoices within 30 days of receipt, acknowledging that timely payment was "of the essence". The Parties also agreed that payments should not be subject to any deduction, set-off or counterclaim by Respondent. Clause 8.3 of the Catering Agreement set out a specific mechanism to resolve disputes over invoices in the following terms:

*"The Parties shall have a period of two (2) months after payment of an invoice to confirm the accuracy of the details set out in the invoice and to agree on any adjustment to the invoice of the charges. The Parties shall review information*

---

[9] Draft Annex 1 in the Catering Agreement, 10 October 2016, Exhibit C-115, Annex 1.4.



*provided by Gate Gourmet and determine, by mutual agreement, the amount of the*
*correct charges, and billing amounts shall be adjusted retroactively, if required, and*
*the amount of such adjustment shall be reflected in the invoice amount of the*
*immediately following Invoice Period [...]"*

3.4     **The Parties Agree the Services/Menus to be Offered by Claimant**

3.4.1   In late 2017, as part of the preparation for the upcoming transition between LSGK and
        Claimant, teams from Claimant met with their counterparts from Respondent to explain the
        operation of the Catering Agreement's pricing methodology, the application in practice of
        pass-through pricing and to discuss the scope and nature of the catering services Respondent
        wanted to offer its passengers.

3.4.2   During these meetings, Respondent made it clear that it wanted Claimant to offer better
        quality, upgraded menus compared with LSGK's. A series of working meetings followed
        between the catering teams (including Respondent's and Claimant's chefs) in which
        Respondent explained the menus and service that were being provided by LSGK and what
        was expected from Claimant when it took over.

3.4.3   The initial work culminated in a further series of meetings over four days in January 2017 at
        Gategroup's catering facilities at Narita airport in Japan in the course of which, Claimant
        presented to Respondent's senior catering manager the menus it proposed to use from 1 July
        2018. Over the course of the four days, Respondent provided its comments and approved
        the menus that were to be provided after the Commencement Date – the so-called **"Narita
        Menus"**.

3.5     **Provision of Training in Claimant's Standard Airlines Catering System**

3.5.1   As part of planning the transition from LSGK, Claimant held training sessions for
        Respondent's catering team on its Standard Airline Catering System (**"SACS"**). SACS
        provides real-time data on purchasing, stock, production processes and billing. Access to
        SACS by Respondent would allow it to see a breakdown of material and labour costs for
        each menu item.

23

3.5.2    After the Parties agreed the Narita Menus, Claimant held four further training sessions on SACS between March and April 2018.

### 3.6    Supplemental Agreement Respecting Possible Alternative Arrangements

3.6.1    Because the negotiation of the Catering Agreement had taken longer than expected, this delayed Claimant in awarding the construction contract (**"Construction Agreement"**) for its new Incheon Kitchen Unit.

3.6.2    Consequently, on 10 March 2017, the Parties entered into the Supplemental Agreement. The Supplemental Agreement provided that if the Incheon Kitchen Unit was not completed by the Commencement Date, then Claimant would "ensure the delivery of the Services" to Asiana through third parties or other arrangements (defined as **"Alternative Arrangements"**).

### 3.7    Incheon Kitchen Unit Fire Requires Alternative Arrangement

3.7.1    Following the conclusion of the Construction Agreement in July 2017, Kuhmo Industrial undertook the construction of the Incheon Kitchen Unit.  On 25 March 2018, a fire broke out at the site which destroyed the top floor of the building.  It became apparent that Kuhmo Industrial would not be able to complete the Kitchen Unit in time to start operations on 1 July 2018.

3.7.2    The Parties thus began discussions on Alternative Arrangements for the period until the Kitchen Unit became operational (known as the **"Contingency Period"**).  The Parties considered either having LSGK continue to supply Respondent for a period of three months or alternatively temporarily hiring a third-party caterer.

3.7.3    Ultimately, Respondent opted for Sharp Do & Co Korea LLC (**"SDCK"**), a Korean airline caterer to provide Alternative Arrangements.

3.7.4    On 15 June 2018, Respondent signed the Asiana-SDCK Catering Agreement under which SDCK agreed to provide catering services for the duration of the contingency period.

3.7.5    On the same day, the Parties entered into a First Amendment to the CA.

24



3.7.6    The First Amendment to the CA, amended certain terms to reflect the deferred start-up.

3.7.7    Neither the Asiana-SDCK Catering Agreement nor the First Amendment to the CA varied the pricing methodology as between Claimant and Respondent.

3.7.8    In the first several days following the transition from LSGK to SDCK, the catering services on some of Respondent's flights were interrupted and/or some flights were delayed.

3.7.9    During the operation of the Alternative Arrangement, SDCK incurred certain additional costs (**"Additional Costs"**).  In late 2018, after the end of the Contingency Period, when Claimant began providing services from the Incheon Kitchen Unit, the Parties discussed how these Additional Costs should be allocated.

3.7.10  On 22 November 2018, Claimant and Respondent's external counsel discussed in an email exchange the settlement of Respondent's claim arising out of SDCK's delayed or missing meals and SDCK's claims for payment by Respondent of SDCK's Additional Costs.[10]

3.7.11  The exchange began with Claimant's email in which Ms Zainab wrote to Respondent's external counsel, Mr John Kim, proposing that all issues between Respondent, Claimant and SDCK be fully and finally settled by the payment by Respondent of a net amount of KRW 3.8 billion (*i.e.,* SDCK additional costs of KRW 4.185 billion, less penalties owed for delayed meals of KRW 385 million).

3.7.12  Mr Kim responded on the same day, saying that he had discussed the proposal with Respondent and, provided that the payments were made separately (not netted), and that SDCK provides a breakdown of its additional costs, Respondent agreed that SDCK's payment of KRW 385 million "will be in full and final settlement of all amounts from SDC and GGK in relation to the Contingency Period".

3.7.13  On 2 January 2019, Respondent and SDCK executed the Asiana-SDCK Settlement Agreement.  In it, Respondent agreed that it would bear KRW 4.185 billion of the

---

[10] Exhibit C-19.

25

Additional Costs and that SDCK would pay penalties of KRW 385 million in respect of the delays that had occurred at the beginning of July 2018.

3.8 **Price Mechanism Discussions in Mid-Late 2018**

3.8.1 On 16 August 2018, shortly before it was to take over catering services from SDCK, Claimant met with Respondent. It delivered a pricing presentation which noted that the Business Plan, as developed and approved jointly by the Parties, was the basis for the pricing mechanism. It further noted that the Initial Business Plan would be adjusted in 2018 and indicated that "the net profit as committed in the Business Plan will be preserved". Because the adjustment had been deferred due to the delayed start-up, the slides included estimated numbers for the adjustment to the Initial Business Plan. Claimant also suggested "a possible adjustment for 2019".

3.8.2 Although the Catering Agreement had not contemplated an adjusted business plan for 2019 (**"2019 Business Plan"**), Claimant proposed such an adjustment given the lack of data from Respondent upon the basis of which to adjust the Initial Business Plan. In the absence of a proper transition from LSGK to Claimant on the date contemplated, Claimant never received updated data on costs. Consequently, Claimant proposed to use its results from the last quarter of 2018 to calculate a 2019 Business Plan. The Catering Agreement provided for the adjustment of the Initial Business Plan to occur before the Commencement Date, such that the Parties would have to use data from Respondent's existing catering operations from LSGK in order to do so.

3.8.3 During the 16 August 2018 meeting, Mr Goo, the head of Respondent's operational team, argued that the pricing terms, including the net profit, were still up for discussion.

3.8.4 On 20 August 2018, Claimant sent a draft mutual agreement on the prices, specifications pricing methodology, and price adjustment (**"Mutual Agreement"**) to Respondent. Claimant's aim was to record the Parties' mutual understanding on the pricing methodology so as to ensure that Respondent would honour its invoices.

26



3.8.5  The Mutual Agreement set out that:

> *"(a)  there would be an additional adjustment at the end of 2018, giving rise to the 2019 Business Plan;*
>
> *(b)  the Parties "acknowledge and confirm" that any adjustments would be limited to costs elements and passenger numbers based on actual results, as the Catering Agreement indeed provided; and*
>
> *(c)  the net profit in the Initial Business Plan would, "[f]or the avoidance of doubt", remain unchanged"[11]*

3.8.6  Having received no reply, Claimant sent a further email on 23 August 2018 in which it indicated it would need a signed copy of the Mutual Agreement the same day in order to commence catering operations by 5 September 2018.

3.8.7  On 24 August 2018, Respondent replied, claiming that the pricing claims set out in the draft Mutual Agreement seemed to be "substantially different" from the price terms set out in the Catering Agreement. It did not set out its views on how they differed.

3.8.8  The Parties held further meetings on 28-29 August 2018, during which Respondent sought to re-open discussions on pricing terms and to extend the price it had paid for the Alternative Arrangements to the Services to be provided by Claimant under the CA.

## 3.9  Claimant's Commencement of Services

3.9.1  On 29 August 2018, Claimant notified Respondent that the Incheon Kitchen was complete and ready to commence catering operations on 5 September 2018, but that disagreement over pricing was delaying start-up.

3.9.2  On 30 August, Respondent proposed that it would pay a flat fee of KRW 15,700 per pax (the same as it paid to SDCK), from the commencement of Claimant's services until 31

---

[11] Exhibit C-42.

27



December 2018 and that the 2019 Business Plan would be determined based on "mutual agreement".

3.9.3    Claimant responded by sending a **"Second Supplemental Agreement"** to Respondent which offered "start-up pricing terms" as an expressed deviation from the Catering Agreement.   Under this agreement, Claimant would charge Respondent KRW 15,700 per pax until 31 December and thereafter adjust the 2019 Business Plan, based on actual results and the committed net profits.  Respondent would then pay the difference between the start-up pricing and the prices as determined under the 2019 Business Plan.

3.9.4    On 31 August 2018, Respondent proposed amending the draft Second Supplemental Agreement to delete the reference to the committed net profit and the reconciliation of the start-up pricing against the contractual pricing.

3.9.5    A few days later, Respondent informed Claimant that its President and CEO, Mr Soo-Cheong Kim, had resigned and it would not be able to deal with the Second Supplemental Agreement.

3.9.6    On 12 September 2018, Claimant began providing its catering services to Respondent from the Incheon Kitchen.

3.9.7    On 17 September 2018, since Respondent had not responded to its offer on start-up pricing, Claimant notified Respondent that its offer of start-up pricing had lapsed, and that it would begin invoicing on the basis of the Catering Agreement.

3.10    **Discussions Regarding Claimant's Invoices to Respondent**

*Claimant's 2018 Invoices*

3.10.1  In October 2018, Claimant began to invoice Respondent on the basis of the pricing mechanism under the Catering Agreement.  By the end of the first invoice period of 12-30 September 2018, Claimant had reviewed data from SDCK on actual overheads and catered passenger numbers.  Based on these figures, it prepared the first adjustment to the Business Plan in order to ensure that the contribution per passenger charged in its first invoices would reflect actual numbers.

28

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

3.10.2 Following the adjustment of the contribution charges, on 15 October 2018, Claimant issued invoices for the period 12-30 September 2018.

3.10.3 On 19 October 2018, Respondent wrote to Claimant advising that it would set its payment at KRW 15,700 per pax on any further invoices pending the Parties' "agreement" on a pricing methodology.

3.10.4 On 5 November 2018, Claimant wrote to Respondent, noting that it had made part-payment applying the prices paid during the Contingency Period "rather than in accordance with the Catering Agreement", and that a further KRW 3,326,697,211 was due and outstanding.

3.10.5 On 9 November 2018, Claimant sent a further letter to Respondent setting out, *inter alia*, that it was in breach of the Catering Agreement by reason of its failure to make full payment of the invoices that had been sent. It reminded Respondent that if there was a dispute, Respondent should first make payment and then raise a correction in accordance with Clause 8.3 of the Catering Agreement.

3.10.6 On 26 November 2018, at a meeting at Respondent's offices in Seoul, the Parties discussed, *inter alia*, the unpaid invoices. During the meeting, Mr Chang-Soo Ham (Respondent's new CEO) and his colleagues agreed that Respondent would pay the overdue invoices, but they simultaneously requested an adjustment to the Business Plan for 2019.

3.10.7 At a dinner that evening, during which the Parties discussed Kumho Asiana's plan to issue new corporate bonds in 2019, Gategroup agreed to provide its consent to the issue once the 2019 Business Plan had been finalised. At a meeting the next day, Mr Chang-Soo Ham and Mr Hong-Seok Park reiterated that Respondent would make full payment under the Catering Agreement.

3.10.8 Thereafter, Respondent paid the remaining outstanding invoice amounts and continued to make full and on-time payments for subsequent invoices until and including the 1st December 2018 invoice.[12]

---

[12] List of invoices issued to Asiana until 31 December 2019, at Exhibit C-71.

29



3.10.9 After discussion between the Parties in December 2018 concerning the 2019 Business Plan, Claimant prepared a draft agreement (**"Agreement to 2019 Business Plan"**). In response thereto, Respondent sought significant changes to the 2019 Business Plan, including a renegotiation (reduction) of the net profit.

3.10.10 Following Claimant's resistance to such a reduction, Respondent suggested that it could be recouped through a separate Service Level Agreement.

3.10.11 Claimant sought to accommodate Respondent's request and shared the draft Agreement to the 2019 Business Plan with Respondent on 26 December 2018.

3.10.12 On 28 December 2018, Claimant also elaborated its position in a letter to Respondent. Discussions that followed in January 2019 failed to resolve the Parties differences and on 22 January 2019, Claimant wrote to Respondent, summarising the remaining issues between the Parties on the 2019 Business Plan.

3.10.13 Shortly thereafter, Respondent refused to pay Claimant's final invoice for 2018 for the period 16-31 December 2018 until the 2019 Business Plan was finalised.

3.10.14 On 25 February 2019, Claimant wrote to Respondent stating that the invoices for the second half of December 2018 were now overdue and on 27 February 2019, Claimant's then legal representatives, Eversheds Harry Elias LLP, wrote to Respondent with a formal demand for payment. Respondent did not accept the demand.

*Claimant's 2019 Invoices*

3.10.15 For Claimant's invoices issued from 1 January 2019 to 30 April 2019, Respondent made payment, with the exception of the Delta (catch-up) invoices for direct material costs for the first quarter of 2019. Claimant's Delta invoices reflected the differences between the estimated costs initially invoiced and the actual costs incurred by Claimant for the relevant period.

3.10.16 On 21 May 2019, Claimant adjusted the 2019 Business Plan and recalculated the contribution charge to KRW 9,007 per pax.

30



3.10.17 On 23 May 2019, the Parties held a Joint Steering Committee Meeting, during which Claimant tabled its adjustment to the contribution charge. Respondent rejected the adjusted rate, while Claimant pointed out that the adjustment was made pursuant to the relevant CA adjustment provisions.

3.10.18 On 23 May 2019, GGK sent an invoice to Asiana for the period 1 May to 15 May 2019, based on the adjusted contribution rate of 9,007 KRW per pax. Respondent refused to make payment and claimed that the contribution charge discussed at the Joint Steering Committee (**"JSC"**) meeting was merely a "suggestion". Claimant replied to Asiana on 24 May 2019, noting that the updated KRW 9,007 contribution charge was not a suggestion, but rather the adjusted rate as provided under the Catering Agreement.

3.10.19 On 5 June 2019, Claimant invoiced Respondent for 16 to 31 May 2019, applying the new contribution charge again. On that same date, Claimant also issued a catch-up invoice which sought to recover the difference between a reduced contribution charge of KRW 7,882 – which it had billed to Respondent on a provisional basis from January to April 2019. Respondent declined to pay any of Claimant's catch-up invoices for the contribution charge and, for the month of May 2019, only paid the prior rate of KRW 7,882 instead of the rate of KRW 9,007 actually invoiced.

3.10.20 On 27 June 2019, Respondent wrote to Claimant, stating that discussions on the 2019 Business Plan had been suspended and that it would henceforth only "make payments to GGK in the amounts deemed reasonable and appropriate under the [catering agreement]."[13] Respondent repeated its claim that the Catering Agreement did not preserve the net profit amounts of the Initial Business Plan and required Claimant to stop issuing invoices without having consulted it.

3.10.21 With its outstanding invoices mounting and no sign of agreement that they would be paid, Claimant issued its Request for Arbitration herein on 17 June 2019.

---

[13] Letter from Asiana (Ja-Joon Goo) to Gate Gourmet Singapore Pte Ltd dated 27 June 2019, at Exhibit C-55.

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

**Exhibit 1, Page 37**

3.10.22 Respondent has since applied the rate of KRW 15,700 per pax to all of Claimant's invoices beginning with those for the period 1 June – 15 June 2019.

3.10.23 On 20 August 2019, Respondent advised Claimant that it had recalculated its payments for 2018 and having applied the rate of KRW 15,700 per pax retroactively to the period from September to December 2018, it stated it was withholding payment of Claimant's services for the period 16-30 June 2019 (approximately KRW 8.3 billion) on the basis that it had overpaid in 2018. Since then, Respondent has declined to make full payment on Claimant's invoices.

*Summary of Claimant's Invoices and Amounts Outstanding*

3.10.24 For the relevant period covered by its invoices, Claimant has invoiced separately for each of the four "prices" which it is entitled to charge to Respondent under the Catering Agreement – *i.e.,* Meal prices (comprising direct material and direct labour costs); the Contribution Charge per passenger (comprising overhead costs plus margin); Handling prices; and Contract Item prices.

3.10.25 The amounts outstanding on account of principal for each of these price components as at 30 October 2020 (the latest date for which figures have been provided) are set out below – stated in KRW:[14]

| Price Component | Outstanding Principal Amount (excluding over-payment) | Outstanding Principal Amount (including over-payment) |
|---|---|---|
| Direct Material & Labour (w/o DM Catch-up) | 17,256,021,285<br>1,435,048,184 | 16,656,870,448<br>1,435,048,184 |
| Total Direct Material & Labour | 18,691,069,469 | 17,991,918,632 |
| Contribution Charge | 17,723,845,016 | 17,156,618,694 |
| Handling & Contract Items | 673,116,082 | 650,702,776 |
| Total | 37,088,030,566 | 35,799,240,103[15] |

---

[14] Exhibit C-336; Claimant's Skeleton, ¶62.

[15] This figure appears to be slightly understated because of a calculation error made in the table when totalling the first two figures in this column. As the error is minor and does not prejudice Respondent, the Tribunal has not required it to be corrected.

32



3.10.26 Respondent does not dispute the mathematics of Claimant's calculations or that the amount outstanding reflect correctly the amounts outstanding on Claimant's invoices as at 30 October 2020.

3.10.27 Respondent does dispute Claimant's entitlement to invoice for these amounts, based on a proper interpretation of the Catering Agreements pricing provisions – as to which see Section 5 below.

4.     **CLAIMANT'S CASE**

4.1    **The Factual Matrix of the Catering Agreement**

4.1.1  Claimant says that the Catering Agreement is part of a broader collaboration between Gategroup and Kumho Asiana. As part of its effort to enter the Korean market with a local partner in 2016, Gategroup was put in contact with Kumho through the latter's investment advisor, Spring Partners (also referred to as **"Spring"**). In the result, Claimant contends that the two groups entered into several related agreements that had been proposed by Kumho:

(a)     the JVA pursuant to which, Asiana subscribed for and acquired a 40% shareholding stake in the newly incorporated GGK in exchange for a contribution of KRW 53.33 billion;

(b)     the Catering Agreement of the same date between GGK and Asiana, which entitled Asiana to a one-time exclusivity fee in the same amount of KRW 53.33 billion, thereby offsetting its contribution under the JVA;

(c)     the BWA, dated 10 March 2017 between Gate Group Financial Services S.à.r.l. (an affiliate of Gate Gourmet Switzerland GmbH) and Kumho & Company Inc (Asiana's indirect parent company and part of the Kumho Asiana group, pursuant to which Gategroup Financial Services S.à.r.l. purchased bonds with warrants in an aggregate amount of KRW 160 billion, which bear no interest and were to be repaid in four tranches: KRW 28 billion by 2018, KRW 28 billion by 2019, KRW 35 billion by 2037, and KRW 69 billion also by 2037; and

33



(d)     the Construction Agreement dated 25 July 2017 between GGK and Kumho Industrial Co., Ltd. (Asiana's parent company), pursuant to which, Kumho Industrial Co., Ltd. undertook the construction of GGK's new catering facility in exchange for KRW 48,058,500,00, plus VAT and a provisional sum of KRW 8.91 billion.

## 4.2     The Pricing Mechanism in the Catering Agreement

4.2.1     Claimant says that the Catering Agreement requires it to provide certain services to Respondent (to commence on 1 July 2018) in return for which, Respondent is obliged to pay the charges as set out in the annexes to the Catering Agreement. It asserts that the present dispute concerns principally the pricing mechanism for those services set out under Annex 1.4.

4.2.2     Claimant argues that while other pricing components are charged to Respondent on a pass-through basis, the exact "contribution per passenger" for each given year of the Catering Agreement was specifically agreed to be based on a formula that incorporated net profit figures agreed in the Initial Business Plan set out in Appendix 1 of the Catering Agreement.

4.2.3     Claimant contends that the contribution rates agreed in the Initial Business Plan were based on three underlying variables for each given year – the total of passengers, the total overhead costs and a pre-agreed net profit margin. Stated as a formula, contribution per passenger is calculated as follows:

$$\text{Contribution per passenger} = \frac{\text{Total overhead costs} + \text{net profit}}{\text{Total passenger numbers}}$$

4.2.4     In the knowledge that the overhead costs and passenger numbers projected in the Initial Business Plan might differ from actual figures, Claimant submits that the Parties agreed on a ramp-up period of 18 months, during which the business plans for current and future years would be adjusted based on the actual figures known to-date. Claimant argues that these adjustments are explicitly limited to costs and passenger numbers "based on the actual results during the relevant period", leaving the net profit variable unchanged from the Initial

34



Business Plan. It further contends that there is to be no adjustment to the Business Plan after the 18-month ramp-up period, *i.e.,* after 2020.

4.2.5   Claimant says that a departure from the contribution per passenger set in the (adjusted) Business Plan is only permitted under certain circumstances specified in Annex 1.4.2, none of which is relevant to this dispute.

4.3   **Interim Arrangements Pending the Completion of Claimant's Kitchen Unit at Incheon International Airport**

4.3.1   Although the provision of services under the Catering Agreement was to commence on 1 July 2018, in contemplation of potential delays in the construction of Claimant's Incheon Kitchen Unit, Claimant notes that the Parties entered into a Supplemental Agreement, dated 10 March 2017, which enabled the Parties to secure the supply of catering services for the period between 1 July 2018 and the date of the Kitchen Unit's completion through arrangements with a third party.

4.3.1   On 15 June 2018, following the fire which delayed completion of the Incheon Kitchen Unit, Respondent entered into a separate catering agreement with SDCK which provided its own pricing methodology

4.4   **Claimant's Claim is Based on its Invoices Issued to Respondent Pursuant to the Catering Agreement**

4.4.1   In August 2018, with the Incheon Kitchen Unit nearing completion, Claimant states that it advised Respondent that it was ready to take over from SDCK and that it would invoice Respondent in accordance with the Catering Agreement. At Respondent's request, Claimant says that it offered to charge "start-up pricing" until 31 December 2018 on terms that would depart from the pricing mechanism under the Catering Agreement but that the resulting difference would be reclaimed by Claimant through an invoice at the end of 2018.

4.4.2   Claimant argues that it began providing catering services from its completed Kitchen Unit on 12 September 2018. When Respondent failed to respond to its "start-up pricing" offer, Claimant says that it announced on 17 September 2018 that it would thereafter invoice

35



Respondent pursuant to the pricing mechanism set out in the Catering Agreement. For the rest of the year Claimant invoiced Respondent under the terms of the Catering Agreement.

4.4.3   On 2 October 2018, pursuant to Annex 1.4 of the Catering Agreement, Claimant asserts that it proceeded to adjust the Initial Business Plan based on actual overhead costs and passenger numbers recorded to date. The recalculated contribution per passenger for the 2018 year amounted to KRW 7,708 – lower than the contribution of KRW 8,280 set in the Initial Business Plan for the year.

4.4.4   On 4 January 2019, Claimant invoiced Respondent a total amount of KRW 8,463,538,948 for the period 16 to 31 December 2018. The contribution component of the invoice was based on the adjusted rate of contribution per passenger.

4.4.5   On 21 May 2019, again pursuant to Annex 1.4, Claimant says that it further recalculated the contribution per passenger based on the actual figures to date. The recalculated contribution per passenger for the year 2019 amounted to KRW 9,007. The figure was higher than the contribution of KRW 85,207 in the Initial Business Plan for that year, since the actual passenger numbers had to be adjusted downwards.

4.4.6   On 23 May 2019, Claimant invoiced Asiana a total amount of KRW 4,558,681,287 for the period 1 to 15 May 2019.

4.4.7   On 5 June 2019, Claimant invoiced a further amount of KRW 7,566,783,188 for the period 16 to 31 May 2019[16] In both instances, the contribution component of the invoice was based on the adjusted rate of KRW 9,007 per passenger.

4.4.8   In each instance, Claimant contends that the billing process reflected the underlying agreement of the Catering Agreement pricing mechanism. Specifically:

(a)   at the end of 2018, Respondent requested to be billed a part of the total amount due on a provisional basis, and that the balance be billed later, *inter alia*, under a proposed service level agreement.[17] Claimant says that, as a

---

[16] Invoices for the period of 16 to 31 May 2019 dated 31 May 2019 issued in June 2019, at Exhibit C-7.
[17] Email from GGK to Asiana dated 24 May 2019, at Exhibit C-8.

36

gesture of goodwill, it invoiced Respondent throughout the period between 1 January 2019 and 30 April 2019 on the basis of an interim contribution per passenger of KRW 7,882.[18] However, by the end of April 2019, the Parties failed to reach an agreement on the remuneration of Claimant through a service level agreement;

(b)    on 24 May 2019, Claimant states that it informed Respondent that it would issue an invoice to recover the difference between the interim amounts paid by Respondent and the amounts owed pursuant to the Catering Agreement;[19]

(c)    accordingly, on 5 June 2019, Claimant invoiced Respondent a total amount of KRW 923,605,335.[20] This amount discounted an earlier catch-up invoice dated 22 April 2019 for KRW 2,170,414,664. The amounts of KRW 923,605,335 plus KRW 2,170,414,664 reflect the difference between the interim rate of KRW 7,882 and the actually applicable rate of KRW 9,007 for the period 1 January 2019 to 30 April 2019.

4.4.9    In addition to the above invoices relating to the contribution per pax, one invoice in dispute between the Parties relates to the direct material costs for the period 12 September 2018 to 31 March 2019. As noted above, under the Catering Agreement, direct material costs are charged to Respondent on a pass-through basis. Accordingly, on 22 April 2019, Claimant invoiced Respondent a total amount of KRW 830,824,141, reflecting the difference between the amounts charged to date (based on estimates) and the actual costs incurred by Claimant during that period.[21]

## 4.5    **Claimant's Right to Payment of its Invoices, together with Interest**

4.5.1    Claimant asserts that under the Catering Agreement, its invoices are required to be settled in full within 30 days of receipt. In the case of a dispute regarding an invoice, Respondent is not entitled to withhold or set-off the disputed amounts. Rather, it must refer to the

---

[18] Email from GGK to Asiana dated 24 May 2019, at Exhibit C-8.
[19] Email from GGK to Asiana dated 24 May 2019, at Exhibit C-8.
[20] 23 Catch up invoice for the period of 1 January 2019 to 30 April 2019 dated 31, Ibid, Exhibit C-10.
[21] Exhibit C-12.

37



correction mechanism under Clause 8.3, which provides for the correction of invoices by mutual agreement only. The Catering Agreement further provides that the on-time payment of invoices due is "of the essence", and Respondent is to make payment even in a case where there is a disagreement as to the invoiced amount. Claimant argues that Respondent's failure to make payments of the invoices issued is in breach of the Catering Agreement.

4.6  **Respondent is in Breach of its Payment Obligations in the Catering Agreement as Properly Construed**

4.6.1  Claimant says that the Parties are largely agreed on the relevant factors to interpret a contract under Korean Law, in particular:

> (a)  the text of the contract has primacy where its objective meaning is clear; and

> (b)  only where the objective meaning of the text is ambiguous will the court (or tribunal) use subsidiary means of interpretation, such as commercial common sense concepts, the factual circumstances leading to the contract and the purpose of the transaction.

4.7  **The Business Plan and its Adjustments Are Not Subject to Further Agreement**

4.7.1  Claimant submits that the dispute between the Parties turns on the interpretation of Annex 1.4 of the Catering Agreement.[22] It contends that nothing in Annex 1.4 requires the Parties' further agreement to the Business Plan or its adjustment. On the contrary, it confirms that they had already agreed the Initial Business Plan and to a limited number of adjustments to that plan by updating the passenger and cost data. Claimant contends that it is not possible to read such "adjustments" as being a re-negotiation of the Business Plan.

---

[22] Claimant refers to the Initial Business Plan, the 2018 Business Plan and the 2020 Business Plan collectively as the ("**Business Plan**").



4.7.2    Claimant refutes Respondent's case that the Catering Agreement was no more than an "agreement to agree", noting that the Catering Agreement was carefully renegotiated by sophisticated commercial Parties with legal counsel over approximately 11 months.

4.7.3    Claimant further points out that under Korean Law, an agreement is only enforceable, if the parties had agreed on the essential terms, and the Catering Agreement satisfies this requirement, because it sets out a cost-plus pricing technology.

4.7.4    As regards Respondent's argument that other clauses of the Catering Agreement were subject to further discussion and agreement, Claimant contends that this proves the opposite point. The fact that the Parties chose to include such express language in some clauses, but not in Annex 1.4, suggests they did not want to subject the 2018 or 2020 Business Plans to further agreement. Otherwise, they would have said that the adjusted Business Plan "shall be discussed and mutually agreed".

4.7.5    Claimant rebuts Respondent's argument that Clause 2.13 of the First Amendment of the CA lists the Business Plan as one of the items that were subject to agreement between the Parties. Referring to the text of Clause 2.13, Claimant points out that the requirement for the Parties to "discuss and mutually agree" refers to a new schedule – not the 2018 Business Plan - for the completion of the Incheon Kitchen Unit, which schedule was to be substituted for the original schedule.

4.7.6    Claimant also rejects Respondent's argument that the Initial Business Plan was a mere "non-binding sample". It points out that not once does the CA refer to the Initial Business Plan as a "sample". The word "sample" is used only to describe the 2018 and 2020 Business Plans attached as Appendices 1(a) and 1(b). Claimant says that these had to be samples because the Parties had not yet collected the data required to adjust the Initial Business Plan. Indeed, they were expressly marked "prior to adjustment pursuant to this clause", (*i.e.,* with the same data as the Initial Business Plan).

4.7.7    Claimant says that the plain wording of Annex 1.4 also makes it clear that the Initial Business Plan was not a sample:

39



> *"The Parties have agreed to adopt the business plan as set out in Appendix 1 (the `Initial Business Plan`)."*

4.7.8   As regards Respondent's reliance on Annex 1.4.2, which states "that agreed prices shall remain unchanged" subject to the adjustment mechanisms mentioned therein, Claimant notes that certain price elements (*e.g.*, Handling prices and the mark-up on Contract Item prices were expressly subject to agreement in the Catering Agreement, but the 2018 and 2020 Business Plans were not. According to Claimant, this was because the Parties had already agreed a methodology to adjust the Initial Business Plan.

## 4.8   The Negotiating History Contradicts Any Requirement for Further Agreement

4.8.1   Claimant argues that the negotiation history confirms that the Parties considered, but discarded, language requiring further agreement on the pricing terms.

4.8.2   Claimant points out that in July 2016, Respondent proposed language in Clause 6.1.1 and Annex 1.4, that all prices "shall be agreed by the parties based on the pricing methodology to be mutually discussed and agreed by the parties prior to the Commencement Date". However, by the time the Parties finalised the Catering Agreement in October 2016, they had replaced this wording with an agreement that prices "shall be as set forth in Annex 1 and subject to the pricing methodology and adjustment mechanisms as set out in this Agreement and Annex 1".

4.8.3   In addition, earlier drafts had provided that the contribution per pax specifically "shall be determined and agreed" at least four months before the commencement date. However, in September 2016, after incorporating the Business Plan into Annex 1.4, the Parties revised this wording to delete the reference to an agreement and to provide, instead, that the contribution charge would be "determined in accordance with Annex 1.4".

4.8.4   As regards Respondent's argument that the 2018 Business Plan must be agreed by the Parties, Claimant says that the 2018 Business Plan is formed by taking the Initial Business Plan and adjusting it with actual costs and passenger data. Only Claimant's interpretation is supported by the wording of the CA and its negotiation history.

40



4.8.5   Claimant points out that the Initial Business Plan was derived from the Original Business Plan agreed in 2016. The record shows that this plan was subject to extensive discussion between Respondent and Spring Partners who provided the initial model and the LSGK data used to populate it. It was then reviewed by Ernst & Young as part of the due diligence process. The record shows that Gategroup discussed the Initial Business Plan with Spring Partners and Respondent and revised it, at Respondent's request, with the latest passenger data in September 2016.[23]

## 4.9   Commercial Common Sense Undermines Respondent's Argument that the Catering Agreement was an "Agreement to Agree"

4.9.1   Claimant counters Respondent's commercial common sense argument in favour of an interpretation of Appendix 1.4 that requires the Parties to agree on a revised and replaced Business Plan based on up-to-date data. It contends that it would defy commercial sense if the Parties had to reach further agreement on the Business Plan, including the net profit, within 14 months of signing the CA. Claimant points out that the net profit in the Business Plan is used to calculate the contribution charge and is thus not merely a projection but part of the price. In a cost-plus contract, it is the "plus".

4.9.2   Claimant says that the contribution charge determines Gategroup's return on its investment in the joint venture. It defies commercial logic that the Parties would agree the return only after Gategroup committed to provide meals for the next 30 years and had invested KRW 133 billion in start-up capital, plus KRW 165 billion interest free bonds.

4.9.3   Under the pricing methodology, the Parties did not need to agree the meal specifications when signing the CA in 2016. This is because Respondent would always reimburse Claimant the direct cost of the meals on a pass-through basis. By contrast, the contribution charge was calculated based on indirect costs, passenger numbers and the net profit. This

---

[23] Email from Gategroup (Mei Foong Chong) to Spring Partners (Steve Chough) with attached presentation and business plan dated 29 August 2016, at Exhibit C-28; Email within Gategroup from Yiming Jin to Mei Foong Chong and Tal Eisenberg dated 29 August 2016, at Exhibit C-179; Email from Asiana (Eun-suk Shin) to Gategroup (Mei Foong Chong) dated 1 September 2016, at Exhibit C-58.



means that, regardless of the menu specifications, Respondent would still pay Claimant the same net profit.

**4.10    The Parties' Post-Execution Conduct Does Not Assist Respondent**

4.10.1  Claimant recalls that Korean Law affords limited weight to post-execution conduct as a subsidiary means of interpretation. Such conduct is only relevant to the extent that it goes to show the Parties' intentions at the time of the conclusion of the contract, rather than being, for example, a later attempt at the amicable resolution of a dispute.

4.10.2  As regards Respondent's "understanding" that the "Parties were to agree an updated 2018 BP", Claimant points out that its only source for this claim is the evidence of two employees, neither of whom was part of the catering task force team that negotiated the CA or even attended the pricing presentation of August 2016.

4.10.3  Claimant rejects Respondent's claim that "since 2017, the Parties have been trying to reach agreement on a 2018 BP on the applicable CC [contribution rate] [contribution charge] rate." Claimant says that Respondent misrepresents the price training sessions as price negotiations. It points to Respondent's own witnesses' admission that "between March 2017 and June 2018, there was in effect no discussion on the contribution charge."[24]

4.10.4  In answer to Respondent's argument that Claimant had sought its agreement on pricing terms to be applied from September to December 2018 (referring to the draft Mutual Agreement and Second Supplemental Agreement), Claimant points out that it proposed these start-up pricing terms when Respondent was already disputing the contractual pricing methodology. The fact that it offered a commercial solution to appease a client to resolve a dispute does not mean that Respondent's consent was contractually required for adjustment to the Business Plan.

4.10.5  Claimant notes that it rejected Respondent's attempt in August 2018 to insert language in the Second Supplemental Agreement, requiring that the pricing methodology "shall be

---

[24] Witness Statement of Soo-Sung Lim dated 25 March 2020, p. 9 (para. 30). In fact, the first reference to the revised contribution charge appears in the Email from GGK (Yiming Jin) to Asiana (In-Won Lee and others) with attached presentation dated 16 August 2018, at Exhibit C-41.



determined reasonably and to the satisfaction of both parties" after consultation. If anything, it says that, Respondent's attempt to do so shows the Parties' understood that there was no such requirement already existing under the CA.

4.11    **Adjustments to the Business Plan Must Preserve the Net Profit as Agreed in the Initial Business Plan**

4.11.1  Claimant's case is that the Parties agreed the net profits in the Initial Business Plan and that subsequent adjustments to the Business Plan must preserve the net profit even if they varied the cost and passenger numbers elements.

4.11.2  As regards Respondent's argument that the net profit may change between different iterations of the Business Plan and that the Parties needed to agree the net profits in the 2018 and 2020 Business Plan, Claimant points out that the Parties agreed the net profit in the Initial Business Plan. It contends that subsequent adjustments to the Business Plan may vary the cost and passenger numbers elements, but such adjustments must preserve the agreed net profit.

4.11.3  Claimant relies on the wording of Annex 1.4, which sets out those elements of the Business Plan that are subject to change, and those which are not:

> *"The adjustments to the Business Plan shall be limited to any change to cost elements and passenger numbers based on the actual results during the relevant period. The net profit as committed in the Business Plan will be preserved."*

4.11.4  Claimant says that contribution per pax is calculated by reference to the total indirect costs, net profit and passenger numbers for any given years in the Business Plan. Thus, limiting adjustments to cost elements and passenger numbers necessarily means that the net profit remains the same. Further, Claimant notes that the term "preserved" in Annex 1.4 is commonly understood to mean "to keep something as it is".

4.11.5  Claimant notes that Annex 1.4 adjusts the Business Plan only in the ramp-up period to 2020, whereas the contribution charge adjustment under Annex 1.4.2 (6) is made annually throughout the Service Team. The latter adjusts the contribution charge payable by

43



Respondent, it does not adjust the figures in the Business Plan itself. The 2020 Business Plan is therefore the final version of the Business Plan.

4.11.6 Claimant argues that Respondent's assertion that Annex 1.4.2 (6) relates to "margin protection" is an after-the-fact invention which denudes the words "the net profits ... will be preserved" and the surrounding paragraph of their context.

4.11.7 As regards Respondent's claim that preserving net profit in the Business Plan would render the contribution charge adjustment in Annex 1.4.2 (6) "moot", Claimant argues that the two provisions work together: the Business Plan sets the base contribution charge and expected passenger numbers, whereas Annex 1.4.2 (6) adjusts the contribution charge in light of actual passenger numbers to protect Claimant's margin.

4.12 **The Negotiation History Contradicts Respondent's Interpretation**

4.12.1 Claimant notes that the Parties introduced the mechanism to adjust the Business Plan following Gategroup's presentation of 29 August 2016. Mr Fisch's and Ms Chong's accounts of the discussion confirm the Parties' understanding that Claimant would adjust the Business Plan based on changes to costs and passenger numbers recorded to date and thereby reserve the net profit figure committed in the Initial Business Plan. Ms Chong memorialised this understanding in a set of revised slides which – contrary to Respondent's claim, it received and approved.[25]

4.12.2 Claimant also points out that the Parties eventually discarded language proposed by Respondent in its draft of 5 September 2016 which would have amended the provisions relating to the adjustment of the Business Plan by adding the words "provided that the Parties shall use best efforts to maintain costs at a reasonable level and consult with each other in good faith when necessary". Claimant says that the Parties' consideration and rejection of this wording from the final text of the CA makes it clear that the Catering Agreement does not give Respondent any such consultation right, let alone a veto right over the adjustments to the Business Plan.

---

[25] Exhibit C-29.

44

4.13    **The Net Profit Figures in the Initial Business Plan Are Not Excessive and Do Not Lead to Excessive Rates of Return for Claimant**

4.13.1 Claimant's first point in response to Respondent's excessive profit argument is that the Tribunal should be loath to find that the Catering Agreement, read in accordance with its natural meaning, would somehow lead to an absurd or uncommercial result.  In such a case, Korean Law does not permit considerations of commercial reasonableness to undermine the plain wording of a contract.[26]

4.13.2 In any event, Claimant submits that Respondent's argument concerning a 30-year guaranteed profit is misleading as there is a risk for Claimant.  While its net profits are fixed for the purpose of calculating the contribution charge, this does not guarantee that Claimant will in fact realise these profits.  This is because Claimant bears the risk of any indirect cost over-runs and of any downturn in passenger numbers which is not fully offset under Annex 1.4.2 (6) (which is the case in the current pandemic).  Further, Claimant's financial results to date confirm the actual net profit can and does vary from the Business Plan and Claimant is currently suffering significant losses.

4.13.3 Claimant counters the opinion of Respondent's economic expert, Mr Rosen, who argues that the Initial Business Plan "does not properly balance" the Parties' interest in that it is "skewed" in favour of GGK".  Claimant points out that Mr Rosen fails to take into account the fact that Claimant and LSGK have different shareholding structures (with Respondent owing 40% of Claimant, but only 20% of LSGK) and the fact that Gategroup provided the entirety of Claimant's start-up funding, whereas Respondent received its 40% shareholding essentially free of charge.  Mr Rosen also fails to consider the KRW 160 billion in interest free bonds with warrants that Gategroup provided as part of its up-front investment.

4.13.4 Claimant also notes that both Mr Rosen and Mr Hayward use inappropriate comparators - comparing Claimant's profitability to that of the global holding companies of Gategroup and LSG Sky Chefs Korea.  However, the latter consist of averages across many different

---

[26] J. K. Choi, "The Justification of Formalism in Contract Interpretation and its Limit", (2012) 60 Civil Law 3, at Exhibit CLA-5.

45

markets which include additional cost centers at a group level and which makes such a comparison meaningless. A more relevant comparator would be LSGK, the previous caterer for Asiana in the same market and the subject of Respondent's "no less favourable" defence. In this regard, Claimant asserts that its profit margins are comparable to LSGK's.

4.13.5 Claimant further points to the Parties' contemporaneous assessment of the Interval Rate of Return (**"IRR"**) and payback period from the negotiations of the CA and the fact that both Parties evaluated carefully the investment and expected returns from the joint venture.

4.13.6 Claimant notes that at the end of the 16 February 2016 meeting in Seoul, Respondent and Gategroup had agreed an 8-year payback period for Gategroup's investment. This is recorded in the "key terms" sent by Spring Partners on 16 February 2016 and the cleaned-up business plan from the next day which sets out a payback terms of 8.3 years and an IRR of 18.5%.[27]

4.13.7 By the summer of 2016, with some minor changes to its commercial terms, the business plan shared with Spring Partners on 29 August 2018 included a payback term of 8 years and an IRR of 21% as well as various sensitivities.[28] Gategroup's slides presented to management describe the final agreed payback terms (as 8.6 years) and IRR (as 19.4%).[29]

4.13.8 Claimant also notes that Mr Rosen's estimate of an IRR of 24.6% and a payback period of five years is inconsistent with the Parties' own assessment in 2016. Claimant says that the discrepancies are due to the fact that the contemporaneous analysis included all aspects of the deal, including Asiana's 40% shareholding, Gategroup's bonds with warrants investment, the management fee and anticipated catering business at out stations.

---

[27] Email from Spring Partners (Steve Chough) to gate group (Tal Eisenberg) with attached key terms dated 16 February 2016, at Exhibit C-242; Email within Gategroup from Deno Ketheswaran to Xavier Rossinyol and others with attached business plan dated 17 February 2016, at Exhibit C-172, p. 2.
[28] Email from Gategroup (Mei Foong Chong) to Spring Partners (Steve Chough) with attached presentation and business plan dated 29 August 2016, at Exhibit C-28, p. 23.
[29] Presentation, "Project Spring: Expanding into Korea" dated 28 December 2016, at Exhibit C-248, p. 3, 5.

46



4.13.9 Claimant submits that the Parties' contemporaneous evidence as to their commercial rationale behind the deal is to be preferred to Mr Rosen's *ex post facto* arguments, based on incorrect assumptions and an overly narrow view of the transaction.

4.13.10 Claimant further rejects Respondent's exclusion of the bonds with warrants from its calculation on the basis that that transaction was unrelated to the Catering Agreement. Claimant points to the evidence that the Parties structured the suite of agreements as a single comprehensive package.

### 4.14 The Pass-Through Mechanism for Direct Costs is not Subject to Further Agreement

4.14.1 Claimant rejects Respondent's claims that Claimant's transparency obligations implicitly entail some form of approval procedure for Respondent to verify the "reasonableness" of direct costs before making payment.

4.14.2 Just as the Business Plan and its adjustments are not subject to further agreement between the Parties, Claimant asserts that the pass-through mechanism for direct costs found in Annex 1.4.1.1.1 requires no further agreement between the Parties for Claimant to charge meal prices to Respondent.

4.14.3 Claimant notes that the provisions in Annex 1.4.1.1.1 make no reference to reasonable or reasonably necessary costs or to direct costs "which Asiana has approved as necessary". Absent language to that effect, Annex 1.4.1.1.1 simply requires Respondent to pay the costs of the ingredients that Claimant incurs to prepare its meals.

4.14.4 The fact that Claimant must provide transparency to Respondent over its direct costs in no way entails an approval mechanism. Rather, it means that Respondent can verify Claimant's direct costs through access to SAC and supporting documents.

4.14.5 Claimant points out that there is no basis in the Catering Agreement's drafting history to support Respondent's arguments on this point. As Ms Chong explains, the Parties in 2016 never contemplated or agreed any kind of approval mechanism – nor were Claimant's transparency obligations ever meant to secure such a right. The Parties always understood

47





**Exhibit 1, Page 53**

that the latter obligations were a way to reassure Respondent that Claimant was passing on no more than the costs of its suppliers.

4.14.6 Claimant also notes that Respondent already approves the meal specifications for each menu cycle, including indicative cost, in advance. As Ms Chong explains, Claimant's operations simply could not function if Respondent also had an approval or veto right over each purchase order for more than 30,000 meals every day.

4.14.7 Finally, on this point Claimant notes that the CA contains procedures for Respondent to verify Claimant's direct material costs which Respondent has chosen not to use. Indeed, Respondent has shown little interest in monitoring Claimant's direct costs via access to Respondent's SACS' platform. Further, Claimant notes that Clause 8.3 allows Respondent to challenge an invoice if it believes it has been misbilled, but it has chosen not to use this procedure.

4.15 **Respondent Misinterprets and Mis-Applies the "No Less Favourable" Wording to Negate the Detailed Pricing Methodology**

4.15.1 Claimant points out that the "no less favourable" wording applies only during a 12-month "Initial Pricing Period" starting on the Commencement Date (*i.e.*, 1 July 2018). Thus, the effect of any such wording would have ceased to apply by July 2019 at the latest. Further, both Clause 6.1.1 and Annex 1.4 qualified this principle as subject to the pricing methodology and adjustments in accordance with the Annex. Claimant also argues that Respondent fails to explain how an obligation to maintain LSGK prices can be reconciled with the intricate pricing methodology in Annex 1.4. Had the Parties intended to cap Claimant's pricing under the CA, they would simply have used the wording featured in the Supplemental Agreement and the First Amendment, *i.e.*, an obligation for Claimant to bear any higher costs for like services as compared with the prices paid by Respondent immediately prior to the Commencement Date.

4.15.2 Claimant points out that the "no less favourable" wording was in fact intended to give Gategroup reassurance that Respondent would not use the imbalance in information to skew the base numbers underlying Claimant's prices as of the Commencement Date and thereby

48



impose less profitable terms on Claimant than LSGK. That is why Gategroup introduced this wording in the negotiations.

4.15.3   In any event, Claimant says that Respondent has not shown that the services provided by Claimant are "the same as or similar to" LSGK's services prior to the Commencement Date and it makes no attempt to compare the actual pricing components charged by Claimant with those of LSGK. Claimant further posits that if Respondent had wanted to draw any meaningful comparison, it would have invited the Tribunal to consider the types of meals provided by each caterer, the quality of their ingredients, the differences between each of the menus and all other factors necessary to determine whether Respondent is receiving its money's worth.

4.15.4   In fact, at Respondent's direction, Claimant designed its Narita Menus to be superior to LSGK's in many ways, using high-end products and gourmet techniques in its brand new kitchen and Respondent was willing to pay a premium for these improvements.

4.15.5   Claimant also relies on Clause 8.14 of the CA in support of its claim that Respondent must pay all amounts "without deduction set off or counterclaim of any kind". It says that in the case of a dispute over an invoice, Respondent agreed in Clause 8.2.4 that it "shall not be entitled to withhold or set off the disputed amounts" but must instead use the mechanism in Clause 8.3, which allows the Parties to correct and adjust retroactively an invoice within two months of the payment date. It notes that Respondent failed to invoke this mechanism and instead unilaterally withheld payment.

4.15.6   As regards Respondent's contention that, without its agreement to a Business Plan, Claimant cannot issue invoices for its services. Claimant points out that, this means it would be required to provide services under the CA but it would not be entitled to be paid for those services in the absence of an agreed Business Plan.

4.15.7   Claimant also says that Respondent cannot deny that Claimant has invoiced it for the charges set out in Annex 1.4 (namely, meal prices, contribution charges, handling fees and contract item prices) but it disputes the amount of the invoice. However, Clause 8.24 and 8.3 specifically and unambiguously address such a situation. There is also nothing to

49



Respondent's argument that Claimant could hypothetically invoice any amount it wished having regard to the Duty of Good Faith in contractual relationships under Korean Law.

4.15.8 Claimant's case is that Clauses 8.24 and 8.3, constitute a *lex specialis* on invoicing disputes which make it clear that Respondent must first pay the disputed amount and then invoke the correction mechanisms. There is nothing unreasonable about the "pay first, argue later" approach in Clause 8.24. Indeed, this was a deliberate decision to ensure that any invoicing disputes should not interrupt cash flow to the new joint venture.

### 4.16 Claimant's Claims for Meal Prices (Direct Costs)

4.16.1 Claimant's claim for its outstanding invoices for direct costs includes: (a) the unpaid Delta invoices; and (b) Respondent's under-payments since July 2019. Claimant notes that Respondent only addresses the Delta invoices (discussed below) in its defence. These constitute only KRW 1,355,975,028 out of KRW 16,814,728,744 outstanding for direct costs as of the date of Claimant's SoR.

4.16.2 Claimant states that Respondent's assertion that it has already paid the direct material costs for the preparation of the meals is incorrect. Claimant says it invoiced Respondent at the end of the month based on estimated direct material costs, followed by a Delta invoice for the difference between the estimated amount and the actual cost once known. Although Respondent has paid most of the estimated costs (although, since July 2019 it has withheld full payments of these invoices as well), but not the actual costs as reflected in the Delta invoice. Claimant says that Annex 1.4.1.1.1 makes it clear that material costs are based "directly" on the actual costs incurred by Claimant in accordance with the pass-through mechanism. There is no condition in the pass-through mechanism based on a vague "reasonableness" test. Moreover, the Delta invoices do not include double counting of wastage. This item, which relates to, *e.g.*, expired ingredients, is only included in the Delta invoices after stock-taking at month end.

50



4.16.3   Finally, on this item Claimant says that Respondent has no response to its claim for the remainder of the direct costs, coming to KRW 15,458,753,716.  Respondent must therefore pay the total outstanding balance of KRW 16,814,728,744.[30]

### 4.17   Claimant's Claim for Contribution Charges

4.17.1   Claimant claims the outstanding contribution charge amounting to KRW 16,426,181,458 as at 15 July 2020.[31]

4.17.2   Claimant points out that it has calculated the contribution charge based not on the Initial Business Plan, but rather the Adjusted Business Plan for the relevant period.  In doing so, it has maintained the net profit from the Initial Business Plan while updating the costs and passenger data as provided in the CA.

4.17.3   Claimant refutes Respondent's defence that, in the absence of an agreed 2018 Business Plan, it is entitled to pay the price that it "considers" appropriate whilst the dispute is pending.

4.17.4   As noted above, Claimant asserts that there is no requirement for agreement on the Adjusted Business Plan and nothing in the CA allows Respondent to set a price of its own choosing, even on a supposedly "provisional" basis.  On the contrary Clauses 8.2.4 and 8.3 require that invoice prices apply pending any dispute of the amount.

### 4.18   Claimant's Claim for Handling Prices and Contract Item Prices

4.18.1   Claimant's claim for its invoices for handling and contract item prices is based on a percentage handling fee agreed between the Parties.  Claimant says that Respondent has refused to pay these invoices, arguing that such charges are subsumed within the flat fee payment of KRW 15,700 per international pax.

---

[30] Table of outstanding amounts and interest as at 15 July 2020, Exhibit C-279.

[31] Table of outstanding amounts and interest as at 15 July 2020, Exhibit C-279.

51



4.18.2  Claimant states that it has, as a result, allocated Respondent's payment among its invoices pro-rata in accordance with the relevant provisions of Korean Law,[32] leaving an outstanding balance of KRW 516,570,045 for these handling and contract item prices.

4.19  **Claimant is Entitled to Declaratory Relief Regarding Future Invoices**

4.19.1  Claimant seeks a declaration to confirm the binding nature of the pricing terms, including any adjusted Business Plan, for the remainder of the Parties' 30-year relationship. Claimant says that the Adjusted Business Plan means that the 2020 Business Plan, since this is the Current Business Plan that will set the Contribution Charge for the remainder of the Service Term.

4.20  **Claimant's Entitlement to Interest Under the Catering Agreement**

4.20.1  Claimant claims interest under Clause 8.2.4 of the CA, noting that that Clause and Clause 8.3 apply expressly to disputed amounts. As of the date of its SoR, Claimant contends that it is entitled to a total of KRW 35,976,826,344 including interest.

4.21  **Defences to Respondent's Counterclaim**

*Respondent's Claims for Unjust Enrichment*

4.21.1  Claimant says that Respondent's claim for unjust enrichment (based on its asserted over-payment of Claimant for its services since 12 December 2019) fails because it rests on Respondent's interpretation assertion that the 2018 Business Plan is subject to further agreement and is constrained by LSGK's prices under the "no less favourable" requirement. These assertions have been refuted as above.

4.21.2  This claim also fails because Respondent has not demonstrated that its payments exceed the "correct prices determined in accordance with the provisions of the CA".

4.21.3  Claimant also relies on Article 7.42 of the Korean Civil Code which excludes unjust enrichment claims in respect of payments, unless such payments have been made in error

---

[32] SoC, p.67 et seq ¶186.

52



about the payer's obligation to pay the payee. Here, Respondent made payments to Claimant with the knowledge – in its view – that no such obligation existed.

4.21.4 Finally, Claimant relies on Clause 8.4 as providing for an exhaustive mechanism to resolve "Disputed Amounts" in Claimant's invoices requiring Respondent to object within a two-month time period. This clause would be nugatory if Respondent could simply revert to Article 7.41 of the Korean Civil Code instead.

*Respondent's Claims Arising out of the Contingency Period*

4.21.5 By entering into the Alternative Arrangement with SDCK, Claimant submits that Respondent accepted that SDCK would replace Claimant as of the Commencement Date and provide catering services in its stead. Moreover, the First Amendment to the CA expressly releases Claimant from such obligation. [33]

4.21.6 As regards Respondent's invocation of Clause 3 of the First Amendment which provides that Claimant "shall remain responsible for the obligations under the CA not withstanding the Alternative Arrangement", Claimant says that Clause 3 in no way qualifies Clause 2.10 (which provides that Claimant "shall be deemed to be in compliance with its obligations to provide their Services". Rather, it maintains Claimant's remaining obligations under the CA "notwithstanding the Alternative Arrangement".

4.21.7 Claimant further says that Respondent's claims under this heading are excluded because it accepted substitute payment from SDCK in lieu of performance. Claimant points out that the Parties negotiated a settlement agreement for all claims arising out of the Contingency Period in late 2018. SDCK and Respondent then executed a Settlement Agreement on 2 January 2019.

4.21.8 Claimant notes that Respondent not only accepted substitute performance through SDCK's provision of catering services and its payment of penalties, it also expressly confirmed in an

---

[33] First Amendment to the Catering Agreement, dated 15 June 2018, Exhibit R-1, Clause 2.10.

53



email of 22 November 2018 that SDCK's payment constituted "full and final settlement of all amounts from SDC and GGK" in relation to the Contingency Period.[34]

4.21.9 Claimant relies on the obligation under Article 2 of the Korean Civil Code (good faith) as precluding a party from contradicting its own prior conduct, akin to the doctrine of estoppel under common law.

4.21.10 Claimant refutes Respondent's interpretation of Mr John Kim's letter and states the reference to "penalty amounts" does not qualify the scope of the amounts being settled under the agreement. Rather, it describes a performance in return for which Respondent agrees to settle "all amounts … in relation to the Contingency Period" due from SDCK and GGK

*Respondent's Claim for Passenger Compensation*

4.21.11 As regards Respondent's claim for KRW 2,721,259,120 for compensation allegedly given to passengers as a result of the catering disruption, Claimant makes the point that this claim has already been settled – see above.

4.21.12 In any event, Claimant contends that Respondent's sole remedy for delays or meal shortages lies in liquidated damages, see Annex 2, Clause 3.4. To be applicable, the delay must be solely attributable to Claimant. Further, under Annex 2, Clause 3.7 where meal shortages arise, Claimant is obliged to credit double the cost of the missing meal to Respondent. These paragraphs provide contractual recourse for any claims Respondent may have regarding delays or meal shortages.

4.21.13 Claimant rejects Respondent's argument that the Annex 2 provisions do not expressly state they are exclusive remedies, noting that the Korean Supreme Court has held that where a contract provides for a sum payable in the event of breach, this is presumed to be a liquidated damages sum, unless a Claimant can show "special circumstances" which indicate that it must be a penalty.

---

[34] Email from Asiana's counsel, John M. Kim to GGK (Syma Zainab), 22 November 2019, Exhibit C-19.

54



4.21.14 Claimant points to Clause 3.8 of Annex 2 which concerns breaches of Claimant's quality assurances under Annex 2. That provision deals with breaches which are "solely attributable to Claimant". Claimant says that it is clear that the catering delays and shortages were not "solely attributable to it" and therefore do not fall within the scope of Clause 3.8 of Annex 2. Claimant points to Respondent's refusal to consider streamlining the Narita Menus at an early stage, despite Claimant's recommendations, as well as unreasonable decisions by Respondent's own quality control meal checkers. These factors break any chain of causation that would link the damages to Claimant's own actions.

4.21.15 Even if this claim were admissible, Claimant says that Respondent has not provided sufficient evidence of its alleged loss or a link with Claimant's or SDCK's services. Claimant points to Respondent's "breakdown" of compensation for the period of 1 to 6 July 2018 being an anonymous, undated document apparently prepared for the purposes of this arbitration – and a list of passengers allegedly "subject to compensation". Neither document shows any link between the passengers and flights allegedly affected and any meal shortages or delays.

4.21.16 In addition, to the lack of evidence, Claimant asserts that the amounts claimed by Respondent do not withstand scrutiny on their face.

4.21.17 Finally, Claimant relies on CA Clause 19.2 (a) which provides that Respondent shall not make any claim against Claimant in respect of "delay ... of persons carried or to be carried by Asiana". To the extent that Respondent's claim that this compensation is due to flight delays, this head of loss fall squarely within this exemption clause.

*Respondent's Claim for Loss of Business*

4.21.18 Claimant points out that Respondent's claim in the amount of KRW 23.7 billion (approximately USD 19.6 million) is deficient in that Respondent has not quantified its lost profits and has given only an "estimated" amount. The sole evidentiary basis for this amount is Exhibit R-19, a single page, anonymous piece of paper, which was prepared for the purposes of this arbitration, dated three weeks before the SoD. Absent source data on passenger bookings or cancellations, invoices, accounts or trial ledgers to support its lost profits claim, Claimant says the Respondent has failed to discharge its burden of proof.



Further, Respondent has failed to produce any evidence of a causal link between the catering disruptions in July 2018 and any alleged decrease in bookings. Respondent simply asserts that: (a) reservations in summer 2018 were lower than summer 2017; and (b) this must be entirely attributable to the short-lived issues with SDCK's catering. This assertion ignores other factors, such as increased competition from low cost carriers, Respondent's decreasing market share and extreme weather at the time.

4.21.19 Finally, Claimant relies on Clause 19.2(e) of the CA which provides that Respondent may not make any claim against Claimant for "any consequential loss or damage" unless such loss arises out of Claimant's "negligent act or wilful misconduct".

4.21.20 Claimant refutes Respondent's assertion that its claim is not for consequential loss because it does not refer to any business opportunity between itself and a third party. Claimant points out that this is exactly what Respondent is claiming: it alleges that the catering disruption cost it business opportunities with prospective passengers (*i.e.*, third parties). In this case, the alleged loss of business does not flow directly from any breach of contract by Claimant, and contrary to Respondent's assertion, it is not "the usual course of things" that some short-lived catering issues relating to SDCK would lead to a USD 20 million drop in business.

*Respondent's Claim Based on Reputational Damage*

4.21.21 Although Respondent attaches no monetary value to this claim and states that it will not be pursuing it further, Claimant makes the point that Respondent appears to acknowledge that its "reputational damage" is included within its loss of business claim arguing that "isolating the impact on reputational damage from profit loss is not practicably feasible".

4.21.22 In response to Respondent's assertion that the media had been "generally amicable and favourable to Asiana until July 2018" but then "abruptly changed their position", Claimant points out that Respondent had faced unfavourable publicity in the same period in 2018 in relation to accusations by its employees of sexual harassment by Chairman Park, allegations of nepotism by Chairman Park in favour of his family and Respondent's poor financial situation, leading to the resignation of Chairman Park in 2019 amongst other things.

56



*Respondent's Claim for Additional Costs*

4.21.23 Claimant notes that Respondent bases its KRW 3.85 billion claim (in respect of Additional Costs that it agreed to bear in the Asiana-SDCK Settlement Agreement) on a "shared understanding" that Claimant would bear any Additional Costs over and above the price of KRW 15,700 per international pax and KRW 71,800 per domestic flight during the Contingency Period.

4.21.24 Claimant explains that when Respondent agreed the Asiana-SDCK Settlement Agreement, it accepted substitute performance through SDCK's provision of catering services. Asiana's counsel also confirmed that this was in "full and final settlement of all amounts from SDC and GGK".

4.21.25 Claimant rejects Respondent's reliance on Clause 2 of the Supplemental Agreement and Clause 2.8 of the First Amendment to the CA (under which Claimant agreed to pay higher costs incurred by Respondent for like services as compared with the prices it paid to LSGK prior to the Commencement Date). Claimant says that the services provided under the alternative arrangements were different services from those provided previously by LSGK in which Claimant included premium ingredients.

4.21.26 Claimant asserts that KRW 3.86 billion of the gross KRW 4.185 billion Additional Costs claim relates to additional direct material costs. It says that these additional costs arose not from SDCK's provision of alternative arrangements, but were due to a change in the specifications.

4.21.27 As for laundry services which constitute KRW 283 million of the Additional Costs, laundry was never part of SDCK's service under the Asiana-SDCK Catering Agreement.

4.21.28 Finally, Claimant notes that the cost of airport taxes comprises KRW 41 million of the Additional Costs. However, Clause 15 of the Asiana-SDCK Catering Agreement provides that "the prices offered by [SDCK] under this agreement [...] shall not include charges, fees or taxes imposed or levied by any airport" and that Asiana, as customer, agrees to bear such costs.

57

*Contributory Negligence and Failure to Mitigate*

4.21.29 Claimant submits that the Tribunal should take into account any contributory negligence of Respondent in determining the extent of liability based on Article 396 of the Korean Civil Code. It also argues that Respondent had a duty, but failed, to mitigate any losses.

4.21.30 Claimant asserts that a large portion of the Additional Costs was due to the sudden switch to streamlined menus after the Commencement Date rather than when first recommended by Claimant. Had streamlined menus been accepted when first recommended, significant food wastage and additional costs would have been prevented. Claimant also points to Respondent's refusal to allow meals to board planes for minor reasons (such as a lack of lemon slices) which led to significant food wastage in the first few days of operations, as well as delay.

*Respondent's Claim for Alleged Poor-Quality Meals*

4.21.31 Claimant says that Respondent's claim of KRW 32,153,240 (USD 26,794) in respect of allegedly poor-quality meals should be rejected. Annex 2, Clauses 3.1 and 3.2 provide a specific remedy for complaints about quality of the meals. These are, in effect, liquidated damages clauses, requiring Claimant to provide a credit to three times the price of the affected meal. Claimant says it has already issued a credit note for these amounts at Respondent's request. This constitutes full satisfaction for this claim and no additional compensation is due.

4.21.32 Claimant rejects Respondent's claim that the amounts remain due because the relevant provisions do not state "expressly" that they are exhaustive remedies. It does so on the basis that, absent contrary intention, Korean Law presumes the sum payable in the event of breach is a payment of liquidated damages and therefore an exclusive remedy.[35]

*Respondent's Claim for Interest*

4.21.33 Claimant says that Respondent's counter-claims being groundless, it is not entitled to an award of interest. In any event, Respondent's claim for the default interest rate under the

---

[35] Supreme Court of Korea, Decision No. 2012Da65973, 14 July 2016, Exhibit CLA-108

58

Korean Commercial Act applies only to debt claims and claims for non-performance of a monetary debt (*i.e.,* a claim for a liquidated sum). The default rate is therefore not available in respect of claims for unliquidated damages arising from non-monetary obligations.

### 4.22   Claimant's Prayers for Relief

4.22.1   The Claimant respectfully asks the Tribunal:

    (a)    to ORDER Respondent to pay to GGK all outstanding invoices under the Catering Agreement, without deduction, set-off or counterclaim of any kind, together with interest of 8% p.a. above the three-month KORIBOR[36] from their respective due dates until full and final payment, and more particularly:

        (i)    to ORDER Respondent to pay KRW 35,779,240,103 to the Claimant as principal under the outstanding invoices for the period from 12 September 2018 to 30 October 2020; and

        (ii)    to ORDER Respondent to pay interest on the above sum at the contractually agreed rate of 8% p.a. above the three-month KORIBOR until full and final payment;

    (b)    to DECLARE that the pricing mechanism set forth in the Catering Agreement, including the contribution per passenger as calculated under both the Initial Business Plan and any subsequent Business Plan adjusted by the Claimant pursuant to Annex 1.4 of the Catering Agreement, including the 2020 Business Plan, is binding upon the Parties and does not require any further agreement between them;

    (c)    to DISMISS Respondent's counterclaims in their entirety; and

    (d)    to ORDER Respondent to pay all costs of this arbitration, including the administrative fee of the ICC, all fees and expenses of the Arbitral Tribunal,

---

[36] Claimant has used the term KORIBOR interchangeably with LIBOR (as used in the ToR and the Catering Agreement) as meaning the LIBOR rate for the Korean Won. The Tribunal uses this term where relevant.

59



and all costs and expenses incurred by the Claimant in prosecuting these proceedings, including legal fees, internal management costs, and all associated expenses, together with interest at the default rate of 5.33% p.a. from the date of the final award until full and final payment.

## 5. RESPONDENT'S CASE

### 5.1 The Essence of the Dispute

5.1.1 Respondent contends that this dispute is more than a dispute about invoices. Rather, it goes to the fundamentals of a long-term catering deal struck by two commercial parties in the context of a broader joint venture designed to generate synergies and to balance the risks and benefits between two corporate groups for the next thirty years.

5.1.2 From Respondent's perspective, the deal that it agreed with Claimant was intended to apply the following contractual framework:

(a) a "No Less Favourable" (**"NLF"**) principle, which obliges the Parties to apply the CA's pricing methodology in a manner that ensures that Claimant's prices are no less favourable than the pricing terms Respondent was paying its long-time caterer, LSGK. Respondent says that this was a mandatory requirement for Claimant to adhere to when formulating its pricing terms. Those pricing terms were also to be developed and agreed to be applied for the first 12 months after the commencement of Claimant's operations (known as the **"Initial Pricing Period"** or **"IPP"**) before the Parties could finally settle on the terms and conditions that they would be comfortable taking forward for the rest of the thirty-year term.

(b) as part of the first 18 months of Claimant's operation known as the **"Ramp-Up Period"**, which overlaps with the "Initial Pricing Period", the Parties were to work closely together to agree costs, passenger volumes and net profit objectives in the form of a business plan, which the Parties would continue to refine for purposes of application until the end of the service

60



term. These discussions were to take place in the context of giving effect to the NLF principle; and

    (c)    Claimant's prices were "not fixed" for 30 years. Rather they were subject to a detailed adjustment mechanism that would operate to ensure a fair and reasonable allocation of risk in respect to fluctuations in the market, including inflation, Consumer Price Index (**"CPI"**) changes and passenger numbers, amongst other things.

5.1.3    As regards the Initial Business Plan, Respondent says it was obvious to both Parties that the net profit projections applied through the pricing mechanism would generate prices during the Ramp-Up Period well beyond the prices that it had paid its previous caterer. Respondent says that the Claimant's position flatly ignored the contractual requirement that the NLF principle applied to prices. It further contends that Claimant's position that net profit amounts in the Initial Business Plan were treated as fixed made no commercial sense.

5.1.4    Respondent contends that, based on its misconstruction of the CA, Claimant refused its request to negotiate the details of the 2018 Business Plan that was to replace the Initial Business Plan. In the result, a 2018 Business Plan that was compliant with the NLF principle could not be established during the Ramp-Up Period.

5.1.5    Respondent further says that Claimant acted unilaterally, against the duty of good faith and cooperation under the joint venture, based on a post-contractual interpretation of the Catering Agreement that had no support in its express contractual terms or commercial reality.

5.1.6    Respondent argues that Claimant should not be permitted to rewrite the Catering Agreement through arbitration and its payment claims should be dismissed in their entirety.

## 5.2    Claimant's Claims for Payment are in Breach of the Agreed Pricing Mechanism

5.2.1    Respondent submits that Claimant's claims must fail because they pay no regard to the mandatory requirements of the NLF provisions, nor to the full transparency requirement that

61



must be complied with before costs can be charged to Respondent. The NLF provisions are found in Clause 6.1 of the CA and in Annex 1.4 thereto.

5.2.2 Respondent argues that the NLF provision set out in Annex 1.4 is all encompassing in terms of the subject-matter it covers. It applies to "all prices" which refers to the four separate components comprising chargeable prices under Annex 1.4.1.

5.2.3 By those provisions it is said that the Parties were obliged to give effect to the pricing terms that Respondent had agreed with LSGK. Specifically, Respondent asserts that it cannot be paying less favourable price, (*i.e.,* more) to Claimant than the prices that it had been paying LSGK immediately before the Commencement Date for comparable service.

5.2.4 Respondent says that the presumption underlying the NLF provisions was that the current pricing terms paid by it to LSGK were acceptable to the Claimant.

5.2.5 Respondent contends that the NLF principle was to apply to the pricing terms for the first twelve months after the Commencement Date, (*i.e.,* the Initial Pricing Period). After the Commencement Date, but prior to 1 January 2020, the Parties agreed a specific procedure for refining and agreeing the projections of the final pricing terms to be reflected in the 2020 Business Plan and which would be applied throughout the CA's service term of 30 years. That plan was intended to have reflected the prices that would be acceptable to both Parties.

5.2.6 The Parties always contemplated that the Initial Business Plan would be replaced with a "new business plan" (*i.e.,* the 2018 Business Plan). The 2018 Business Plan in turn was to be replaced with a further new plan that would become the 2020 Business Plan.

5.2.7 Respondent posits that the adjustments contemplated in Annex 1.4 to the Initial Business Plan and the 2018 Business Plan were intended to be "wholesale adjustments". Those adjustments were not without limits, however, as the 2018 and 2020 Business Plans were subject to the mandatory NLF provisions.

5.2.8 As regards the net profit component in the 2020 Business Plan, Respondent asserts that the Parties contemplated that the net profit figures would be "preserved" – but not guaranteed – in the sense that those figures would be target projections to be taken into account when

62



calculating the contribution charges where the variations in costs and passenger numbers stay within the reasonable parameters previously agreed in the 2020 plan. Respondent says that the principle that the net profit figure in the relevant business plan would be an aim to strive for – as opposed to a monetary figure that could be guaranteed, unchanged, or fixed, is expressly reflected in the terms of Annex 1.4.2(6)(b).

5.2.9 Respondent describes as absurd Claimant's position that the net profit amounts set out in the Initial Business Plan would remain unchanged for 30 years when considered in the context of the current downturn in the airline industry due to Covid-19. Moreover, without the specifications of the services that Claimant would provide to Respondent under the CA, it was impossible for the Parties to include an accurate projection of the costs of such service in the Initial Business Plan. This is another reason why they could not have an agreement to fix the net profit for 30 years in the Initial Business Plan.

5.3 **Claimant's Invoices Failed to Comply with the Requirements of the CA**

5.3.1 Respondent notes that Claimant's claims are premised on its entitlement to invoice for contribution charges based on the net profits contained in the Initial Business Plan. This is said to be wrong as a matter of contractual interpretation.

5.3.2 Respondent says that the Parties could not have intended that the term "Business Plan", as used in the last sentence of the last paragraph of Annex 1.4, referred to the Initial Business Plan. Respondent contends that the better interpretation is to read the last paragraph as prescribing a distinct, prospective adjustment to be made to the final business plan, *i.e.*, 2020 Business Plan. Respondent concedes that in order to do so this requires one to read the Business Plan definition in Annex 1.4 as a singular reference to the 2020 Business Plan.

5.3.3 Respondent also asserts that Claimant's present interpretation is inconsistent with the position in took during the negotiations leading up to the CA.

63



5.3.4    Respondent further contends that Claimant's post-contractual proposal to amend the
         Business Plan provision in Annex 1.4 undermines its interpretation of that provision in the
         CA.[37]

5.3.5    Respondent argues that the notion that the net profit figure in the Initial Business Plan was
         meant to be fixed for 30 years is commercially unreasonable. It says it would never have
         entered into the CA on this basis for the simple reason that the net profit figure in the Initial
         Business Plan would, by any measure, produce a return for Claimant that far exceeds what
         is reasonably expected in the industry, all at Respondent's expense.

5.3.6    In support of this proposition, Respondent points to: (a) the fact that Korean Courts are not
         bound by a literal interpretation of a contract and are free to favour one interpretation over
         another, because it is more commercially reasonable; (b) Mr Rosen's opinion that the net
         profit figure in the Initial Business Plan could not have formed a commercially reasonable
         basis for entering into the CA; and (c) Mr Hayward's opinion that a cost-plus contract that
         guaranteed net profits for 30 years is unprecedented in the aviation catering industry.
         Reliance is also placed on Mr Hayward's view that the guarantee of net profits as reflected
         in the Initial Business Plan would be commercially unjustified, having regard to his opinion
         that the Initial Business Plan was not sufficiently robust to be relied on by two commercial
         parties as a guarantee of the stated net profits for 30 years.

5.3.7    With respect to Claimant's assertion that the commercial reasonableness of its net profits
         being fixed for the 30-year term of the CA requires to be considered against the background
         of the suite of other agreements made at the same time amongst affiliated entities of
         Claimant and Respondent (*i.e.*, as part of a package deal), Respondent says that Claimant
         has submitted no evidence at all to prove that there ever was a link between the Catering
         Agreement and the BWA.

---

[37] Email from GGK (Yiming Jin) to Asiana (In-Won Lee) with attached draft mutual agreement dated 20 August 2018.

64

5.3.8   Respondent also contends that considering the BWA as part of the relevant factual background when construing the pricing mechanism in the CA would lead to an interpretation that would render the CA null and void under Korean law.

5.3.9   Respondent argues that, in circumstances where one party's interpretation would render the contract void while the counter-party's interpretation would give full affect to it, the Korean Courts are bound by the principles of effective interpretation to adopt the latter.

5.4   **Claimant's Invoices for Meal Prices (Direct Material and Direct Labour Costs) Do Not Comply with the Agreed Pricing Methodology**

5.4.1   Respondent says that Claimant was obliged to consult with it on direct costs and was obligated to seek its agreement on costs to ensure that the Parties adhered to the NLF standard.

5.4.2   Respondent contends that Claimant is wrong when it says that its transparency obligation is merely an obligation to ensure that Respondent can verify that it is not being charged any margins under the pass-through mechanism.  Respondent argues that such an interpretation would make the transparency requirement redundant as the pricing methodology already presumes and obliges Claimant to recover margins exclusively as contribution charges under Clause 1.4.1.2

5.4.3   Respondent also says that, as a matter of industry practice, there is nothing controversial about a pass-through regime that requires consultation and approval.

5.5   **Claimant Cannot Impose Payment Obligations on Respondent Where the Fundamental Basis for its Pricing is in Dispute**

5.5.1   Respondent submits that there is nothing in the CA that entitles one party to demand payment for charges levied that are in breach of the issuing party's obligations to comply with the pricing terms and methodology.

5.5.2   Respondent argues that its obligation to make payment is subject to resolving the dispute between the Parties as to whether charges levied by Claimant are in accordance with the agreed pricing methodology reflected in Annex 1.4.



5.5.3 Respondent rejects Claimant's argument that under such a construction of the CA it would be required to perform services without payment. Respondent points out that it has paid substantial amounts for Claimant's services to date, save those sums that are the subject of dispute.

5.5.4 As regards Claimant's reliance on Clauses 8.2.4 and 8.3, Respondent asserts that the latter provision deals only with situations of an administrative nature where the dispute is limited to the "accuracy of the details" set out in the invoice. However, where the dispute involves more than forensic corrections to certain invoiced figures, it makes obvious sense for payments to be held in abeyance pending determination of the dispute in accordance with the CA's dispute resolution clause (*i.e.*, arbitration).

5.5.5 Respondent also contests Claimant's invoices because: (a) they apply per pax contribution charge pricing terms that have no basis under the terms of the CA; (b) the direct cost invoices are based on a misinterpretation of the cost pass-through mechanism; and (c) the Delta invoices were prepared without prior consultation with Respondent in contravention of the provisions of Annexes 1.4.1.1.1 and 1.4.1.1.2 which require scrap yields to be discussed and mutually agreed.

## 5.6 Respondent's Counterclaims

5.6.1 Respondent asserts five principal counterclaims being: (a) a claim for repayment of the amounts it says it overpaid to Claimant for its catering services; (b) a claim for compensation for damages for loss suffered as a result of the so-called "no meal" incident in early July 2019; (c) a claim for reimbursement of additional costs that were incurred by SDCK (and charged to Respondent) when it was retained in July 2018 to provide the catering services that Claimant was unable to provide by the Commencement Date; (d) damage claims resulting from Claimant's provision of poor quality meals; and (e) claims for interest accruing on the sums owing on the foregoing claims.

66



5.7    **Claim for Repayment of Excess Payments**

5.7.1    Respondent's claim (*i.e.,* for restitution of the excess amounts paid as contribution charges invoiced by Claimant to date) is based on Claimant's alleged misinterpretation of the contractual terms governing the pricing methodology and the NLF provisions.

5.7.2    Respondent calculates the quantum of this claim using a price of KRW 15,700/pax as an approximate proxy for the price that would be consistent with the NLF principle and reasonably close to the per pax price of an NLF-compliant 2018 Business Plan which would have been in place, had Claimant complied with its obligations to agree to such a Business Plan.

5.7.3    Respondent bases this claim on Article 741 of the Korean Civil Code which provides that:

> *"a person who without any legal ground obtains a benefit from the property or services of another and thereby causes loss to the latter shall be obligated to return such benefit."*[38]

5.7.4    Respondent rejects Claimant's assertion as to the inappropriateness of using KRW 15,700 as the baseline price for its claim, arguing that such amount can be applied in circumstances where there has been a total breakdown in the pricing methodology and in the face of Claimant's systematic failure to abide by the NLF principle.

5.7.5    As regards Claimant's assertion that Article 742 of the Korean Civil Code undermines Respondent's repayment claim, it contends that the Korean Courts have held that Article 742 does not apply to cases where an obligor makes payment in order to avoid de facto damages.

5.7.6    Finally, as regards Claimant's submission that Clause 8.3 of the CA provides for an exhaustive mechanism to resolve disputed invoice amounts and that Respondent has refused to use that mechanism, Respondent contends that Claimant confuses statutory rights with contractual rights and the Parties have not agreed to exclude the former. In any event,

---

[38] Second Witness Statement of In-Won Lee, Appendix 2.

67

Respondent argues that Clause 8.3 is not applicable to disputes which go to the heart of the pricing methodology that underpin the charges reflected in the invoices in question.

5.7.7 Respondent values this counterclaim "in the amount of <u>around KRW 2 billion (approximately USD 1.66 million)</u>, subject to further quantification in the course of this arbitration."[39]

## 5.8 **Counterclaim Based on the "No Meal" Incident of July 2018**

5.8.1 Respondent says that the legal basis for this counterclaim is Claimant's failure to provide catering services pursuant to the Alternative Arrangement. Respondent contends that Claimant retained responsibility for the services provided by SDCK under the Alternative Agreement under the terms of the First Amendment to the CA. Clause 3 of that Agreement stipulates that Claimant "shall remain responsible for the obligations under the Catering Agreement not withstanding the alternative arrangement."[40]. Also, Clause 2.10 of the First Amendment provides that "for the avoidance of doubt, any alternative arrangement during the service terms shall be deemed to be part of the "services" for the purposes of this Agreement, and Gate Gourmet shall be deemed to be in compliance with its obligations to provide the services during the service term."[41]. Finally, Clause 2.8 of the First Amendment states that "should any alternative arrangement result in (*i*) higher costs for like services as compared with the prices paid by [Respondent] immediately prior to the Commencement Date or (ii) any additional costs to [Respondent] that would have not been incurred [by Respondent] but for the alternative arrangement, [Claimant] shall bear the additional costs resulting therefrom."[42]

5.8.2 For this counterclaim, Respondent claims KRW 2,721,259,120 being the total compensation it paid to its customers in meal coupons, cash and mileage as a consequence of SDCK's

---

[39] SoD, ¶249.

[40] See CA Amendment No. 1, Exhibit R-1, Clause 3.

[41] Exhibit R-1, Clause 2.10.

[42] Exhibit R-9, Clause 2.8.

68



failure to provide catered meals for 132 flights, for its provision of light meals for 47 flights and for causing delays for an hour or more to about 100 flights.

5.8.3   As regards Claimant's defence to this counterclaim based on the fact that Respondent settled claims arising out of the Contingency Period with SDCK, Respondent says regardless of any settlement agreement with SDCK, responsibility to compensate it for damages remains with Claimant.

5.8.4   With respect to Claimant's reliance on the email from Respondent's then counsel of 22 November 2019, which stated that "SDC's payment of the penalty amount will be in full and final settlement of all amounts from SDC and GGK",[43] Respondent says that the settlement only concerns "penalty amounts" accruing under CA clauses 3.5 and 3.7. Respondent argues that such penalties do not preclude a claim for compensation for damages suffered by it due to Claimant's breach of contract. Respondent further contends that its claim falls under Annex 2, Clause 3.8 of the CA which is beyond the scope of the Settlement Agreement and is thus not precluded

5.8.5   Respondent also rejects Claimant's contention that non-cash forms of compensation that it provided its customers (*i.e.*, mileage credits and travel vouchers, etc.) cannot be claimed as damages. Respondent claims that that form of compensation had economic value and it bore the loss corresponding to the amount of compensation provided to its customers.

5.8.6   As regards Claimant's argument that Respondent has failed sufficiently to quantify this claim, Respondent argues that there was a stark reduction in its business after, and attributable to the catering meal disaster and it is entitled to compensation for that reduction.

5.8.7   Respondent rejects Claimant's suggestion that it could not have suffered reputational harm from this incident, having regard to other negative press surrounding the airline and its management at the same time. Respondent contends that the negative media attention about

---

[43] Settlement Agreement, Exhibit R-3, Clause 2.1; email from John M. Kim to Gate Gourmet Co., Ltd., 22 November 2018, Exhibit C-19.

its in-flight services impacted its reputation as a service provider and that this was attributable to Claimant's breach.

5.8.8    To the extent that Clause 19.2(e) of the CA applies to preclude consequential damages, Respondent asserts that the catering meal disaster is clearly attributable to Claimant's negligence and thus the bar to consequential loss does not apply.

5.8.9    Finally, in addition to the above points, Respondent also notes that under the Alternative Arrangement, SDCK's actual role was merely to lend its facilities to and receive usage fees from, Claimant whereas Claimant performed all necessary catering tasks, including establishing catered meal production plans, cooking meals for catering purposes and loading them on trolleys and loading the meal trolleys onto Respondent's airplanes.  Respondent asserts that this point reaffirms that Claimant remained the service provider under the CA during the contingency period and fully responsible for the conduct of SDCK.

5.9    **Additional Costs Paid by Asiana to SDCK**

5.9.1    Respondent says that Claimant engaged SDCK to provide catering services during the Contingency Period (*i.e.*, until Claimant's kitchen unit became operational).

5.9.2    Respondent contends that Claimant is contractually obliged to cover the additional costs incurred by Respondent as a result of this arrangement in the amount of approximately KRW 3.85 billion (USD 3.36 million).

5.9.3    Respondent alleges that the Parties memorialised this obligation in Clause 2 of the Supplemental Agreement and Clause 2.8 of the First Amendment to the CA.  These provisions are said to prescribe that, should any Alternative Arrangement result in Respondent paying higher costs than originally expected, then the excess shall be borne by Claimant.

5.9.4    Respondent rejects the contention that this claim was settled by reason of the Asiana-SDCK Settlement Agreement and refutes Claimant's assertion that the additional costs were for products of better quality than would have been available those provided by LSGK and are thus not caught by the "like-service" provision.  Respondent says there was nothing

70

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

provided on the streamline menus that were used at this time that would prevent them from being deemed "like" services.

5.9.5 Respondent also rejects Claimant's suggestion that the compensation it seeks arose from changes in meal specifications, Respondent makes the point that such changes do not alter or exclude Claimant's responsibility to bear additional costs.

5.9.6 Respondent relies on the provisions of Clause 2 of the Supplemental Agreement to require Claimant to bear costs above KRW 15,700 per pax when, prior to the commencement date, LSGK's prices were around KRW 14,400.

## 5.10 Counterclaim for Damages Resulting from Claimant's Provision of Poor Quality Meals

5.10.1 Respondent seeks KRW 32,153,240 which, it says, is the sum that it paid to customers because of Claimant's poor quality meals provided between September 2018 and January 2020. Such payments included payments through TCV's, cash or air miles. Respondent's payments were made on a case by case basis to compensate customers for the presence of dead and live insects in meals on more than five occasions as well as the regular presence of hair, plastic and other foreign substances.

5.10.2 Respondent rejects Claimant's defence that its only remedy under the CA is to seek compensation pursuant to Clauses 3.1 and 3.2 of Annex 2. This is because those clauses were not intended to be Respondent's only remedy with respect to any low-quality meals or meals containing foreign objects. Respondent says it is entitled to pursue claims for "appropriate compensation" under Clause 3.8 of Annex C of the CA.

### 5.11 Entitlement to Interest

5.11.1 Respondent claims an award of interest on its counterclaims at the rate of 6% per annum.

5.11.2 Respondent refutes Claimant's argument that the interest rate specified under the Korean Commercial Act (**"KCA"**) applies only to debt claims. Respondent contends that so long as the breach of a non-monetary obligation leads to monetary damages, then the KCA interest

71



rate applies to such damages claims. Similarly, the KCA interest rate also applies to claims of unjust enrichment of claims.

## 5.12 **Request for Relief**

5.12.1 Respondent requests the Arbitral Tribunal to:

    (a)    dismiss Claimant's claims in their entirety;

    (b)    reject Claimant's request for declaratory relief (at paragraph 386(b) of the Reply);

    (c)    declare that Claimant is bound to negotiate and agree with Respondent the 2018 Business Plan by replacing the Initial Business Plan in its entirety and 2020 Business Plan by replacing the 2018 Business Plan in its entirety and to negotiate in accordance with the Respondent's interpretation of the NLF Provisions and the pricing mechanism in the CA;

    (d)    grant Respondent's counterclaims as follows:

        (i)    in respect of Respondent's counterclaim for repayment of excess payments, an order that Claimant make payment of the amount to be calculated once the pricing terms are agreed pursuant to the 2018 Business Plan and 2020 Business Plan;

        (ii)    in respect of Respondent's other counterclaims, an order that Claimant make payment of such counterclaims currently quantified at approximately KRW 30,303.4 million (equivalent to about USD 25.8 million), plus applicable pre- and post-award interest on such amount.

    (e)    order Claimant to reimburse Respondent for all costs incurred by it in connection with this arbitration, including but not limited to attorney's fees, experts' fees, and the fees and expenses of the arbitrators and the ICC;

72



(f)     order that the award shall be immediately enforceable; and

(g)     order any other or further relief that it deems appropriate in the circumstances.

## 6.     TRIBUNAL'S APPROACH TO THE CASE ON THE MERITS

### 6.1     Approach to be Followed / Issues for Consideration

6.1.1   The Tribunal starts its analysis by outlining in Section 7 below the principles of interpretation applicable to the CA, Supplemental Agreement to the CA, the First Amendment to the CA, the Asiana – SDK Catering Agreement and the Asiana-SDCK Settlement Agreement.  For the most part, the disputing Parties are in agreement on these principles.

6.1.2   The Tribunal then deals in Section 8, with the five principal substantial questions that require to be determined in this arbitration.

(1)     Are the pricing mechanism provisions set out in Annex 1.4 of the Catering Agreement properly to be construed so as to require the Parties to agree the adjustments of the Initial Business Plan and the 2018 Business Plan that are referred to in provisos (i) and (ii) of that Annex?

(2)     Are the pricing mechanism provisions set out in Annex 1.4 of the Catering Agreement properly to be construed such that the net profit figures set out in the Initial Business Plan are fixed for the term of the Catering Agreement?

(3)     Is the "no-less favourable" wording set out in Clause 6.1.1 of the Catering Agreement and in the Introduction to Annex 1.4 of the Catering Agreement properly to be construed as limiting Claimant's invoices to the price per pax Respondent says it paid to LSGK immediately prior to the Commencement Date?

73



(4)    Are the provisions of the Asiana – SDCK Settlement Agreement properly to be construed so as to:

        (a)    to release Claimant from any claim by Respondent for damages that it may have suffered as a result of the provision of catering services by SDCK during the Contingency Period; and

        (b)    to prevent Respondent from claiming back from Claimant the net payment of KRW 3.8 billion it made to SDCK under that agreement?

(5)    If the answer to either 4(a) or 4(b) is no, is Respondent estopped from asserting any further claims against Claimant in relation to the Contingency Period by reason of Mr John Kim's letter of 22 November 2018 (Exhibit C-19) in which he stated that the Asiana – SDCK Settlement Agreement operated as a "full and final settlement of all amounts from SDC and GGK in relation to the Contingency Period"?

6.1.3    The validity of Claimant's claims on its invoices and Respondent's counterclaims fall to be determined on the basis of the answers to these five principal issues.

6.1.4    Following its analysis of these five substantive questions, the Tribunal deals with costs in Section 9. The Tribunal's operative decision is set out in Section 10.

## 7.    INTERPRETATION PRINCIPLES APPLICABLE TO THE RELEVANT AGREEMENTS

### 7.1    Interpretation Principles

7.1.1    The relevant agreements are all to be construed in accordance with the laws of Korea.

74



7.1.2   From a review of the disputing Parties' written submissions, it is apparent that they agree that the following Korean law principles of contract interpretation apply[44]:

    (a)    The text of a contract has primacy where its objective meaning is clear.

    (b)    Where the objective meaning of the wording of the agreement is clear on its face, a party may not use subsidiary means to create ambiguity when none exists in the wording itself.

    (c)    Only where the objective meaning of the text is ambiguous, may the court or tribunal use subsidiary means of interpretation such as commercial common sense, the factual circumstances leading to the contract (including the drafting history), the purposes of the transaction(s); and prevailing business practice to ascertain the interactions of the parties.

    (d)    In construing a contract, the principle of "effective interpretation" applies, whereby an interpretation that renders contractual clauses effective takes precedence over an interpretation which does not.

    (e)    Any reasonable interpretation based on subsidiary means of interpretation must take into account comprehensively the context of the text, the motives and circumstances leading to the agreement, the purpose of the agreement and the true intent of the parties.

    (f)    Korean law applies a principle of "strict interpretation" to the effect that the text of a contract must be construed more strictly where it imposes a significant responsibility on the other party. However, this principle comes into play only where the meaning of the text is ambiguous. It does not operate to displace the ordinary meaning of the wording of the agreement.[45]

---

[44] *See* Statement of Claim, Section 3.1 and Statement of Defence and Counterclaim, Section 3.1.

[45] *See* Supreme Court of Korea. Decision No. 2012 Da 64253, 15 October 2015, Exhibit CLA-6 where the Supreme Court stated that "the substance of the text must be interpreted more strictly where an interpretation departing from the objective meaning of the text would have a material effect on legal relationship between the parties."

75



## 8. TRIBUNAL'S ANALYSIS

### 8.1 Do the Adjustments to the Business Plan Set Out in Annex 1.4 Require the Parties' Agreement?

8.1.1 Clause 6 and Annex 1 of the Catering Agreement set out how the agreed Initial Business Plan that was attached to the CA was to be adjusted in 2018 and 2020.

8.1.2 Clause 6.1.1 provides that:

> "All prices for meals and other Services to be provided under this Agreement shall be as set forth in _Annex 1_ and subject to the pricing methodology and adjustment mechanisms set out in this Agreement and _Annex 1_...; The pricing terms shall be adjusted in accordance with _Annex 1._"

8.1.3 Annex 1.4 sets out detailed provisions relating to prices, specifications, pricing methodology and price adjustments. The provisions relevant to the adjustment of the Business Plan are:

> "_**Introduction**_
>
> ... The pricing terms shall be adjusted based on inflation, CPI increases, cost pass-through and menu and service charges in accordance with this _Annex 1_.
>
> _**Business Plan**_
>
> _The Parties have agreed to adopt the business plan as set out in Appendix 1 (the **"Initial Business Plan"**)._
>
> _Provided that the Initial Business Plan shall be adjusted during the following periods:_
>
> > (i)  _The Initial Business Plan shall be adjusted in 2018 at least four (4) months prior to the Commencement Date and the Initial Business Plan shall be replaced with the new business plan starting from Commencement Date (the **"2018 Business Plan"**). A sample 2018_

76





**Exhibit 1, Page 82**

> *Business Plan (i.e., prior to adjustment pursuant to this clause) is set*
> *out in Appendix 1(a).*
>
> *(ii) Thereafter, the 2018 Business Plan shall be adjusted prior to January*
> *2020 and the 2018 Business Plan shall be replaced with the new*
> *business plan starting from January 2020 until the expiration of the*
> *Term (unless otherwise terminated in accordance with Clause 11.2 of*
> *the Main Agreement) (the "2020 Business Plan"). A sample 2020*
> *Business Plan (i.e., prior to adjustment pursuant to this clause) is set*
> *out in Appendix 1(b).*
>
> *The Initial Business Plan, the 2018 Business Plan and the 2020 Business Plan shall*
> *be collectively referred to as the "Business Plan".*
>
> *The adjustments to the Business Plan shall be limited to any changes to cost*
> *elements and passenger numbers based on the actual results during the relevant*
> *period. The net profit as committed in the Business Plan will be preserved."*

*The Parties' Differing Interpretations*

8.1.4 As set out in greater detail in Sections 4 and 5 above, the Parties' differing interpretations of these provisions can be summarised shortly. Claimant says that the wording of the relevant provisions is clear and requires no further agreement by the Parties to the adjustments leading to the 2018 or 2020 Business Plans, or to the plans themselves. On the other hand, Respondent argues that the adjustments specified in Appendix 1.4 (which are said to redraw the Business Plan wholesale on each of those occasions) are subject to negotiation and must be agreed by the Parties.

8.1.5 For the reasons set forth below, the Tribunal concludes that there is no requirement for further agreement on the required adjustments. Stated somewhat differently, the 2018 and 2020 Business Plans are not subject to the Parties' further agreement.

77



*The Business Plan Adjustment Provisions Are Not Ambiguous*

8.1.6   The Tribunal considers that the objective meaning of the provisions quoted above, insofar as they concern adjustments to the Business Plan, is reasonably clear. As pointed out by Claimant, there is no language in Annex 1.4 or anywhere else in the Catering Agreement, which requires the Parties to agree to either of the 2018 or 2020 Business Plans. The

8.1.7   where, if further agreement on a particular subject was needed, the Parties generally said so specifically. The provisions concerning Scrap Yields, Other Handling Prices and Mark-ups for Contract Items are illustrative:

   (a)   <u>Scrap Yields</u>:

           *"Any scrap yields (covering all waste and other losses between volumes purchased by Gate Gourmet from the supplier and volumes sold to Asiana, including amongst others "out of date" losses, breakage) for finished goods and relevant processes shall be further discussed and mutually agreed by the Parties at least four (4) months prior to the Commencement Date".[46]*

   (b)   <u>Other Handling Prices:</u>

           *"Other handling prices for the following services shall be discussed and mutually agreed by the Parties at least four (4) months prior to the Commencement Date".[47]*

   (c)   <u>Mark-ups for Contract Items:</u>

           *"Mark-ups for Contract items (covering purchasing and sourcing if applicable, ordering and call-offs, receiving, incoming inspections and*

---

[46] Exhibit C-1, Catering Agreement, Annex 1.4.1.1.1

[47] Exhibit C-1, Catering Agreement, Annex 1.4.1.3

78



*dispatch to production) shall be discussed and mutually agreed by the Parties at least four (4) months prior to the Commencement Date".*[48]

8.1.8    Respondent's assertion that the Parties used the word "adjusted" as a synonym for "re-negotiated" or "agreed" is inconsistent with the usual dictionary definition of adjustment, which is a small or limited alteration or modification to achieve a desired result.

8.1.9    That the Parties' further agreement was not a prerequisite to making the adjustments that would produce the 2018 and 2020 Business Plans is supported by the language of the final paragraph of the Business Plan provisions which specifies that:

> *"The adjustments to the Business Plan shall be limited to any change to cost elements and passenger numbers based on the actual results during the relevant period. The net profit as committed in the Business Plan will be preserved."*
> (Tribunal's emphasis)

8.1.10  The requirement that "net profit[s] as committed in the [Initial Business Plan] will be preserved" (Tribunal's emphasis) is very nearly the antithesis of an interpretation of the relevant provisions of Annex 1.4 which would condition the inclusion of the net profit figures for the 2018 and 2020 Business Plan on their further agreement by the Parties.

8.1.11  The absence of such a requirement for further agreement is also in contextual harmony with the fact that the Parties agreed (as set out in the balance of Annex 1.4) a detailed methodology for the adjustment of the Business Plan.

*The Negotiating History is Consistent with No Further Agreement Being Required*

8.1.12  Had the Tribunal concluded that the relevant provisions of the CA were ambiguous, it would have been permitted to use subsidiary means of interpretation such as the factual circumstances leading to the CA, including the history of the Parties' negotiations.

---

[48] Exhibit C-1, Catering Agreement, Annex 1.4.1.4

79

Exhibit 1, Page 85

8.1.13 Contrary to Respondent's contention that the negotiations which led to the final version of the Catering Agreement point to the necessity of further agreement on the adjustments and the Business Plans, the Tribunal finds the opposite to be the case.

8.1.14 As noted in Section 3 (at 3.4 et seq), earlier drafts of the Catering Agreement and Appendix 1 called specifically for changes in pricing methodology and subsequent price adjustments to be based on agreement between the Parties.[49] However, commencing with Claimant's draft of 29 July 2016, any references to further agreement on prices and adjustments to the pricing provisions (including contribution charges) were removed.[50]

8.1.15 Importantly, after Claimant's introduction of the new adjustment-based approach to price changes in the draft CA, it made a presentation to Respondent on the pricing mechanism it was then proposing on 29 August 2016. An updated version of the slides used in that presentation contained a detailed example of how Claimant would make the adjustment that was called for by, *inter alia*, recalculating the contribution charge under the 2018 and 2020 Business Plans based on changes in indirect costs. The relevant slides (a complete set of which was sent to Respondent on 2 September 2016) made no reference to further agreement and it is clear from the worked example that no agreement to the adjustment was called for from the Parties.

8.1.16 The Tribunal also considers that Respondent's contended interpretation of the provisions of the Catering Agreement is inconsistent with commercial common sense. It would seem highly unlikely that Gategroup and its affiliates would have invested over USD 200 million in Claimant and the Kumho Group, and that Claimant would have taken on a 30-year obligation to provide Respondent with costs plus catering services in circumstances where it was dependent on Respondent's subsequent agreement to the 2020 Business Plan that would determine Gategroup's return on its investment.

---

[49] *See* for example, Exhibits R-70 and Exhibit C-114.

[50] *See* for example, Exhibit R-17 and Exhibit C-114, p. 10.

80

**Exhibit 1, Page 86**

8.1.17 In all of these circumstances, Respondent's proposition that adjustments to the Initial Business Plan and the 2018 to form the 2020 Business Plan required both Parties' further agreement is rejected.

## 8.2 Are the Net Profit Figures Set out in Initial Business Plan Fixed for the Term of the CA?

8.2.1 Respondent's position (in a nutshell) on the proper interpretation of the wording of Annex 1.4 concerning the preservation of net profits in the Business Plan's adjustment mechanism is that Claimant's contention, that the amounts set out in the Initial Business Plan are fixed for the contract term, lacks any contractual support and is clearly unreasonable from a commercial perspective. [51]

8.2.2 For the reasons set out below, the Tribunal considers that these propositions are inconsistent with the language and intended meaning of the Business Plan provisions of Annex 1.4. The Tribunal thus concludes that the prescription which limits adjustments to the Business Plan to changes to cost elements and passenger numbers based on the actual results of the relevant period requires that the net profit figures set out in the Initial Business Plan are preserved. The effect of this is that the net profit figures set out in the Initial Business Plan are fixed for the term of the CA and are to be used in all adjustments to the Business Plan required under the provisions of Annex 1.4.

8.2.3 Moreover, had the words found in the last sentence of the Business Plan provisions of Annex 1.4 been ambiguous (and in the Tribunal's view they are not), Respondent's propositions cannot be reconciled with the negotiation history that led to their inclusion. Nor has Respondent shown that the fixing of the net profit amounts set out in the Initial Business Plan makes no commercial sense, or that the relevant net profit figures, if applied through the price mechanism, would generate prices during the Ramp Up Period well beyond the price that Respondent had paid its previous caterer, contrary to the NLF provisions of the Contract.

---

[51] SoD, ¶ 181.

81

*The Objective Meaning of the Text is Clear*

8.2.4   The last paragraph of the Business Plan section of Annex 1.4 provides that:

> *"The adjustments to the Business Plan shall be limited to any changes to cost elements and passenger numbers based on the actual results during the relevant period. The net profit as committed in the Business Plan will be preserved."*

8.2.5   This paragraph is to be understood with reference to the fact that the Parties (as stated in the first sentence of the section) agreed to adopt the business plan as set out in Appendix I (*i.e.,* the Initial Business Plan). That plan, which covered each of the 30-years of the term of the Catering Agreement, set out a net profit figure for each year. For 2019, the first full year of operations under the agreement, the net profit figure was stated to be CHF 7.3 million.

8.2.6   The meaning of the paragraph is also to be understood, having regard to the limited contractual role played by the net profit figures in making adjustments to that plan and, thereafter, the 2018 Business Plan so as to finalise the 2020 Business Plan. That role was simply as a necessary component of the formula used to calculate the contribution charge (per pax and crew) which itself was one of the four components of the price for meals and other services for which Claimant was entitled to invoice Respondent.[52]

8.2.7   Moreover, the last paragraph of the Business Plan provisions sets out expressly which of the figures in the Business Plan are subject to adjustment and those that are not – the latter being net profits. On a plain reading, this language rules out any adjustment to the net profit figures set out in the Initial Business Plan, the 2018 Business Plan and the 2020 Business Plan.

8.2.8   The fact that the Catering Agreement was made between two highly sophisticated commercial parties with each being represented by experienced external counsel also militates against the suggestion of ambiguity.

---

[52] Catering Agreement, Exhibit C-1, see particularly Annex 1.4.1, 1.4.1.2, 1.4.2 (5)(a) and 1.4.2(6)(a) Step III.

82

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF C...

**Exhibit 1, Page 88**

8.2.9 The Tribunal rejects Respondent's early submission (it was not pressed at the Hearing) that the use of the word "will" rather than "shall" and the word "preservation" rather than "guaranteed", "fixed" or "unchanged" makes the provision ambiguous.

8.2.10 Respondent's further contention that the words used refer not to the adjustment of the Business Plan, but to the adjustment of the contribution charge which is dealt with at Annex 1.4.2(6), is also unpersuasive.

8.2.11 The same is so regarding Respondent's submission in its Rejoinder that the wording applies only to prospective adjustments which are to be made to the 2020 Business Plan in 2021 and thereafter. In the Tribunal's view, such a construction ignores (and contradicts), the definition of "Business Plan" as a collective term which includes the Initial Business Plan, the 2018 Business Plan and the 2020 Business Plan.[53]

8.2.12 In these circumstances, the Tribunal concludes that the objective meaning of the relevant wording is clear and that it requires that the yearly net profit amounts as set out in Annex 1(*i.e.*, in the Initial Business Plan) are to be used in the relevant yearly calculation of the applicable contribution per catered passenger for the Review Year as required under Annex 1.4.2(6)(a) Step 3.

8.2.13 Although the use of subsidiary means of interpretation is not called for in this connection, the Tribunal notes that the evidentiary record supports the above conclusions.

*Respondent's Original Offer Contemplated a 30-Year JV With Claimant Earning a 30% IRR*

8.2.14 On 12 January 2016, Mr Jann Fisch (Gategroup's President, Asia Pacific) wrote to Mr Xavier Rossinyol (Gategroup's CEO) to report on an initial meeting he and Mr Tal Eisenberg (Gategroup's Head of Business Department, Asia Pacific) had in Korea with Spring Partners regarding a possible joint venture between Gategroup and the Kumho Group

---

[53] *See* also the testimony of Mr John Kim at the hearing (in response to a question from Arbitrator Beechey), that there is no reason why the term Business Plan as used in the last paragraph of the Business Plan provisions in Annex 1.4 should be regarded as meaning anything other than as defined.

83

in relation, *inter alia*, to a possible catering contract between a new joint venture vehicle and Respondent. In it, he said, *inter alia*, that:

> *"Tal and myself had 2 very interesting meetings in Korea. There is the following opportunity:*
>
> *Asiana will not continue with LSG as of June 2018. They want to select the new partner by March this year and have engaged springpartners who helped them to restructure the Asiana business and are now helping them to implement ...*
>
> *The offer is:*
>
> *100 Mio CHF Asiana yearly turnover in Seoul*
> *30% Ebitda margin*
> *30 year contract*
> *gategroup majority 50,1%*
> *costs of the new kitchen 60 Mio CHF*
>
> *for which their expectation is, to get now 250 Mio CHF, of which 60 go into the new facility".[54]*

8.2.15 The offer set out in this email which contemplates a 30-year catering agreement between Asiana and a joint venture vehicle which would earn a 30% EBITDA margin over the term of the agreement, is consistent, rather than inconsistent, with Claimant's proposed interpretation of the "preservation of net profits" discussed above. A valuation of the joint venture prepared on 18 July 2016 by Respondent and Spring Partners was based on a 30-year catering agreement with an EBITDA annual margin ranging between 30-35%.[55]

*The 16 February 2016 Original Business Plan*

8.2.16 A good deal of time was spent in the Parties' written submissions and at the Hearing on the question of whether or not Kumho's Chairman, Mr Sam-Ku Park (also co-CEO of Asiana) and Mr Rossinyol had approved a business plan (the Original Business Plan) for the

---

[54] Exhibit C-146.

[55] Exhibit C-23, Email Spring Partners to Mr Tal Eisenberg, 19 Jan 2016.

84



proposed joint venture. Despite the testimony of Mr H. S. Park (Kuhmo Group's EVP at the relevant time and now President) and that of Mr John Kim (Kumho's outside counsel at the time) to the contrary, the Tribunal accepts as accurate, the testimony of Messrs Fisch and Eisenberg that Chairman Park and Mr Rossinyol in fact reviewed and approved in principle a detailed 30-year business plan (the Original Business Plan). Their testimony is consistent with the very fast-track originally contemplated for completion of the transaction, as well by a variety of contemporaneous documents.[56] The Tribunal is also confident that the document described as the "cleaned up BP" that Mr Deno Ketheswaran sent to Mr Rossinyol (and others) the day after the 16 February 2016 meeting is the version of the Original Business Plan that was approved the previous day.[57]

8.2.17 The Tribunal notes that the Original Business Plan covered 30-years and for each year set out figures for the JV's contemplated net profits and its EBITDA and % margins.

8.2.18 It is common ground that the P&L statement of the Original Business Plan, as refined and modified over the ensuing negotiations, became the Initial Business Plan that is attached to the Catering Agreement as Annex 1.

8.2.19 On 29 August 2016, the Gategroup Asia Pacific Team made a presentation to Respondent to explain the proposed catering agreements' mechanism. The slide presentation that was made was led by Ms Mei Foong Chong, Gategroup's Asia Pacific CFO.

8.2.20 The presentation summarised the following aspects of the pricing mechanism under the Catering Agreement:

    (a)    direct material and direct labour costs would be charged to Asiana on a pass-through basis.

    (b)    the contribution charge was to be based on a business plan that had been developed jointly between Gategroup and Asiana – based on a high-level

---

[56] *See* Exhibits C-23, C-28, C-29, C-150, C-174, C-242, C-253, C-260 & C-264.

[57] Exhibit 172, p.2, Final P&L (CHF).



overview of LSGK's pricing data made available by Asiana – and specifically approved by Gategroup's CEO and Asiana's Chairman.

   (c)    the contribution charge was intended to recover specific overheads of the joint venture. In order to maintain the earnings (*i.e.*, the net profit) set out in the business plan, the contribution would increase or decrease where the actual number of passengers for a given year differed from that foreseen in the business plan. Ms Chong pointed out that Claimant and Respondent had discussed and negotiated this adjustment mechanism over the preceding weeks, during which Asiana and its counsel had offered input on the relevant thresholds and adjustment percentages.

8.2.21 In response to Respondent's request (during the presentation) for more detail on the mechanics of the proposed pricing mechanism, and the suggestion that Claimant should use Asiana's most up-to-date figures for the business plan, Ms Chong sent an updated copy of the 29 August presentation to Spring Partners on 2 September 2016. The update to the presentation added a detailed write-up of the mechanics starting at slide 10 and following. For present purposes, it is sufficient to note that the updated presentation provided indicated that:

   (a)    the proposed pricing mechanism for the Catering Agreement reflected the financials projected in an attached business plan;

   (b)    the Original Business Plan had been developed jointly by Gategroup and Respondent and had been approved by the Gategroup's CEO and Kuhmo Group's Chairman Park;

   (c)    the Original Business Plan contained EBITDA margins which ranged from 28.9% - 31.6% and set out annual net profit numbers over the term of the proposed Catering Agreement;

   (d)    the estimated total cost per pax of CHF 14.5 was said to be in line with Gategroup's estimate of the LSGK's pricing to Respondent (estimated at CHF 14-15 per pax); and

86

      (e)      when the Parties came to reset (adjust) the Initial Business Plan in 2018 and 2020, the net profit as committed in the Initial Business Plan (*i.e.,* the business plan that was attached to the presentation at slide 4), will be preserved.

8.2.22  Ms Chong testified (and her testimony was not controverted) that at no point during or after the presentation did Respondent or Spring Partners raise questions or concerns about: (a) the Original Business Plan having previously been approved by Chairman Park and Mr Rossinyol; (b) the proposed costs per pax of CHF 14.5; (c) the estimate of LSGK's current pricing; or (d) the proposal that annual net profits set out in the attached business plan were to be preserved during the adjustments which would result in the 2020 Business Plan.

8.2.23  The Tribunal accepts Ms Chong's testimony as a truthful record of what occurred during and after the presentation and finds it to be consistent with its finding above as to the proper construction of the "preservation" of net profits wording of Annex 1.4 and is inconsistent with Respondent's contended for interpretation.

*The Preservation of Net Profits is Not Commercially Unreasonable*

8.2.24  In support of its submission as to the correct interpretation of the "preservation of net profit" wording, Respondent argued that it would have been unreasonable from a commercial and business practice perspective to interpret the Catering Agreement in a way to suggest that it had committed to guarantee the net profit amounts in the Initial Business Plan for the 30-year term of the agreement.

8.2.25  In doing so, it relied principally on:

      (a)      Dr Rosen's opinion that, Claimant's interpretation of the Initial Business Plan would allow it to recover its initial investment in less than five years and that its net profit was projected to increase as high as 32.1% in a single year; and

      (b)      Mr Hayward's opinion that the acceptance of a preserved net profit concept as alleged by Claimant would be unprecedented; that no reasonable airline board

87



would approve such a contract; and that he could see no reason why Respondent would have agreed to such a term.

8.2.26 The Tribunal considers that the evidentiary record in relation to the genesis and negotiation of the Catering Agreement, coupled with Dr Rosen's and Mr Hayward's ignorance of that record, undermines the value to the Tribunal of their opinions in its assessment of the commercial reasonableness of the CA.

8.2.27 In particular, neither Mr Hayward, nor Dr Rosen was aware that:

    (a) the Kumho Asiana Group's first offer to Claimant contemplated a 30-year Catering Agreement which would see Gategroup's investment paid back in eight years with an EBITDA margin of between 30-36%;[58] and

    (b) the Initial Business Plan was based on data provided by Respondent and Spring Partners which were set out in the Original Business Plan that had been approved in principle by Chairman Park and Mr Rossinyol.

8.2.28 Moreover, Dr Rosen did not compare Claimant's so-called "excessive" IRR to the IRR of LSGK or other caterers and neither of the experts was made aware that the Catering Agreement was part of a suite of interconnected agreements[59] involving Gategroup and the Kumho Group in which the Catering Agreement was contractually linked to the BWA transaction in which Gategroup lent KRW 160 billion to the Kumho Group through the purchase of zero-coupon bonds carrying a potential pay-back period of as long as 21 years.[60]

8.2.29 During his cross-examination, Mr Hayward also conceded that: (a) the Catering Agreement does not contain any guarantee that Claimant would realise the annual net profit figures set out in the Business Plan; and (b) a well-negotiated Catering Agreement would enable the

---

[58] Exhibit C-23, email from Spring Partners to Gategroup with attachment, 19 January 2016; Exhibit C-242, email from Spring Partners to Gategroup with attached Key Terms, 16 February 2016.

[59] Gategroup had to make a substantial upfront investment of KRW 53.33 billion in exclusivity fees, KRW 80 billion in GGK's facilities and KRW 160 billion in the form of interest-free bonds to Kumho Asiana. Gategroup could only recover its investment by ensuring that the net profit agreed in the Business Plan would be preserved – which Asiana would also share in through its 40% shareholding.

[60] Bonds with Warrants Subscription Agreement between Gategroup Financial Services S.à.r.l. and Kumho & Company Inc. dated 10 March 2017, at Exhibit C-113, Recital, Article 2.1.



airline to flex discretionary costs (e.g., by cutting back catering service levels), but at the same time ensure that the caterer continues to get its agreed return on investment.

8.2.30 Against this factual background, had the Business Plan provisions of Annex 1.4 been shown to be ambiguous as regards the preservation of net profits, the Tribunal considers that:

    (a)    the negotiating history of the Catering Agreement is consistent with Claimant's interpretation that the net profit figures set out in the Initial Business Plan were fixed for the term of the Catering Agreement; and

    (b)    Respondent has not established that it would have been commercially unreasonable for the Parties to have agreed such a term.

## 8.3    Do the No Less Favourable Provisions Limit Claimant's Prices to the Per Pax Prices LSGK Charged Asiana Immediately prior to the Commencement Date?

*Genesis of the NLF Provisions*

8.3.1    In its written submissions and at the Hearing, Respondent stressed that:

    (a)    the inclusion in the Catering Agreement of the NLF provisions was based on its concern that LSGK had been over-charging for its services;

    (b)    the NLF principle was a non-negotiable prerequisite and the foremost premise for any catering agreement with Claimant;

    (c)    in considering the move to a new caterer, its directors were driven by their fiduciary obligation not to switch to a caterer, which would charge more than LSGK;

    (d)    in switching to a new caterer it was of paramount importance to ensure continuity of its existing terms with LSGK; and

89



<blockquote>
(e)    in these circumstances, it was only logical that it would have insisted on the NLF provisions to apply when setting the pricing conditions with a new caterer.[61]
</blockquote>

8.3.2    For its part, Claimant pointed out that it had introduced the NLF principle into the Catering Agreement with its draft of 21 March 2016, not Respondent.[62] It did so, it says, because it lacked information on LSGK's pricing and wanted the reassurance that Respondent would not use the imbalance in information available to it to impose less profitable terms on Claimant, and the NLF provisions were anything but fundamental from the perspective of Respondent.

8.3.3    Given that the NLF provisions were ultimately included in the CA as executed, and that, as the Tribunal concludes below, their meaning is clear, it is not strictly necessary to come to a view as to their genesis. Nevertheless, given Respondent's reliance on the history of the negotiation of these provisions, it is sensible to set out the Tribunal's view as to their disputed history.

8.3.4    In brief, the Tribunal is satisfied that Claimant's explanation of how the provisions came to be incorporated into the Catering Agreement is the correct one. The Tribunal is also satisfied, based on the contemporaneous documentary record and the testimony of Mr Tal Eisenberg, whom Respondent declined to cross-examine, that Respondent's explanation is incorrect. There is no documentary evidence that supports a conclusion that the inclusion of such a provision in the Catering Agreement was of fundamental importance to Respondent. Indeed, after it was first introduced, Respondent deleted it twice in its responsive drafts and it fell to Claimant to reintroduce the provision.[63]

8.3.5    Nor is there reference in any contemporaneous document to the alleged concern of Respondent's directors as to their fiduciary duty concerns. Moreover, a review of the

---

[61] SoD, ¶¶21-24, 122, Fn 169; Rejoinder, ¶¶5-7, 33 & 38; Witness Statement of Mr Ja-Joon Goo, ¶¶16, 18-20; Witness Statement of Mr John Kim, ¶33.

[62] *See* Exhibit C-140, Clause 6, Annex 1.4.

[63] *See* Exhibit C-142. Respondent's position on the importance of the NLF provision is also inconsistent with the un-contradicted evidence that it was prepared to pay a higher price for Claimant's services that LSGK's. See First Witness Statement of Mr Joo-Hyun Paik, ¶10 and Witness Statement of Mr Tal Eisenberg, ¶¶28-29, 31-32 & 34-35.

90

minutes of the Respondent's board meeting in which it considered and approved the Catering Agreement, establishes that there is no reference in those minutes to the need for, or importance of, having achieved the inclusion of such a provision.[64]

8.3.6    In short, where the evidence of the Parties differs as to the genesis and importance of the NLF provisions, the Tribunal accepts the evidence proffered by Claimant as representing the true facts surrounding the genesis of these provisions.

*The Plain Meaning of the NLF Provisions*

8.3.7    The NLF provisions are set out in Clause 6.1.1 of the Catering Agreement and in the Introduction to Annex 1.4.

> *"6.1    Prices for the Services*
>
> > *6.1.1    All prices for meals and other Services to be provided under this Agreement shall be as set forth in <u>Annex 1</u> and subject to the pricing methodology and adjustment mechanisms set out in this Agreement and <u>Annex 1</u>: provided that, at any time after the Effective Date, <u>Asiana shall provide information requested by Gate Gourmet that Gate Gourmet deems, in its sole discretion, reasonably necessary for it to formulate the pricing terms for the first 12 months after the Commencement Date (the "Initial Pricing Period"), which shall be no less favourable to either Party than the current pricing terms paid by Asiana for any services provided at the Stations that are the same as or similar to the Services;</u> provided, that, Asiana shall not be obligated to provide any information that is subject to confidentiality; provided, further, that Gate Gourmet shall use any information furnished by Asiana solely for purposes of formulating the pricing terms for the Initial Pricing Period<u>. The pricing terms shall be adjusted in accordance with Annex 1.</u>"* (Tribunal's emphasis)

---

[64] Exhibit R-44.

**"Annex 1.4**

**Price Adjustments Prices, Specifications, Pricing Methodology**

*<u>Introduction</u>*

> *"<u>The **terms and conditions** for all prices for meals and other Services</u>*
> *<u>as of the Commencement Date shall be no less favourable to either</u>*
> *<u>Party than the current pricing terms paid by Asiana for any service</u>*
> *<u>provided at the Stations that are the same as or similar to the</u>*
> *<u>Services</u>. The pricing terms shall be adjusted on inflation, CPI*
> *increases, cost pass-throughs and menu and service charges in*
> *accordance with this <u>Annex 1</u>."* (Tribunal's emphasis)

8.3.8 The provisions require to be construed with reference to the Annex 1.4 Business Plan provisions which follow them. This is because the Parties' agreed Initial Business Plan sets out, *inter alia*, details of Claimant's pass-through cost per meal and per pax, as well as the price that Claimant expected to charge (per pax) in the Initial Pricing Period.

8.3.9 Put shortly, these Business Plan provisions oblige the Parties to adjust the Initial Business Plan in 2018 (prior to the Commencement Date). The Initial Business Plan as thus adjusted becomes the 2018 Business Plan. This, in turn, is adjusted prior to January 2020 to become the 2020 Business Plan. The 2020 Business Plan is the Business Plan under which Claimant is then to operate until the expiration of the term of the Catering Agreement.

8.3.10 In this contractual context, the Tribunal considers that the objective meaning of the text of the NLF provisions is clear. They mandate that, as at 1 July 2018 (the date that Claimant was to start providing catering services to Respondent) and for 12 months thereafter, all else being equal, Claimant's pricing terms and conditions for its meals and services were not to exceed the pricing terms that were charged by LSGK for meals or services that were the same as, or similar to, Claimant's meals or services, provided that such pricing did not result in Claimant being treated less favourably than was LSGK before the Commencement Date.

92



8.3.11 Respondent's concept that the NLF provisions cap Claimant's prices to those previously charged by LSGK is irreconcilable with Claimant being treated no less favourably than it. This is because such a price cap would not allow Claimant to pass through increases in costs (e.g., for different ingredients or resulting from different service requirements) that LSGK would have been able to pass through had it remained as caterer. This highlights the importance of the Parties' use of the words "pricing terms and conditions", not just "prices", and points to the reason for an "all else being equal" component of the NLF principle.

8.3.12 The temporal limit on the requirement for Claimant to charge and receive no less favourable prices is also crucial. The NLF provisions apply only to the 12-month period after the Commencement Date – *i.e.,* during the Initial Pricing Period (from 1 July 2018 to 1 July 2019).

8.3.13 The reason for such a temporal limit is apparent from the operation of the Pricing Methodology and the permitted price adjustments.

8.3.14 This is because, if NLF pricing terms are reflected in the cost per pax set out in the Initial Business Plan, then, through the process of the prescribed adjustments (*i.e.,* limited to any changes to cost elements and passenger numbers based on the actual numbers in the relevant period), the pricing terms in the 2018 Business Plan and, ultimately, the 2020 Business Plan will reflect the no less favourable "base" prices per pax set out in the Initial Business Plan.

8.3.15 If, however, the pricing terms reflected in the Initial Business Plan are not compliant with the NLF provisions, Respondent will be obliged to provide Claimant with the information on LSGK's prices that Claimant needs to formulate NLF-compliant pricing terms for the Initial Pricing Period. Such compliant prices will, by way of the Business Plan adjustment process, then be reflected in the 2018 and ultimately, the 2020 Business Plan.

8.3.16 And as the pricing methodology and adjustment provisions make clear, the pricing terms of the 2020 Business Plan are fixed for the entire term of the Catering Agreement, subject only to change in six specified circumstance, being:

> *"(1)      change in the Services or specifications*

93



*(2)    adjustment for unforeseen circumstances*

*(3)    price adjustments based on Consumer Price Index charges*

*(4)    adjustments for currency fluctuation*

*(5)    based on a pass-through basis*

*(6)    contribution per catered passenger"[65]*

8.3.17 The temporal limit of the application of the NLF principle turned out to be common ground between the Parties. This was made clear in Respondent's Skeleton Argument. At Section 1.1.1, sub-paragraphs (e) and (f), Respondent stated:

> *"(e)   **NLF provision was to apply to a specific temporal scope***
>
> *13.   GGK was obliged to formulate the "pricing terms" that complied with the NLF Principle for the first 12 months after the Commencement Date (known as the **"Initial Pricing Period")** ...*
>
> *(f)    **Once determined prices undergo an adjustment process***
>
> *14.   Both Clause 6.1.1 of the CA (Main Agreement) and Annex 1.4 recognize the distinction between pricing methodology (price determination) and pricing adjustment (accounting for various internal and external factors that may affect the price).  Once determined, prices undergo an adjustment process set out in Annex 1.4.2."*

8.3.18 Later at Section 1.1.4, sub-paragraph (a)(iv), Respondent emphasised that prices, once set in accordance with the NLF principle, were subject only to limited, prescribed adjustments.

---

[65] Catering Agreement. Annex 1.4.2 states specifically that apart from the six adjustments that are to be allowed to prices after 2020, prices for the meals and services provided under the Catering Agreement "… shall remain unchanged and in force during the Service Term …".

94



> *"(iv)* ***Limited adjustments to the 2020 Business Plan***
>
>> *48. Once the 2020 Business Plan was in place, the Parties provided for limited adjustments to be made prospectively to the 2020 Business Plan throughout the Service Term ... "*
>
> \*\*\*
>
> These were discretionary adjustments that could be made if these were necessary due to changes to cost and passenger numbers.

8.3.19 Both of Respondent's lead counsel, Mr Kevin Kim and Dr Wolfgang Peter confirmed this point in answer to questions from the Tribunal during their closing argument[66].

8.3.20 Having reached the conclusions and findings in Sections 8.1 - 8.3 above, the Tribunal turns in Section 8.4 below to a determination of whether Claimant's invoices were rendered in accordance with the pricing terms of the Catering Agreement. Thereafter, in Section 8.5 we consider the merits of Respondent's Counterclaims.

## 8.4 Are the Amounts That Remain Unpaid on Claimant's Invoices Now Due and Payable?

8.4.1 As set out in the Tribunal's findings of fact (Section 3 above), Claimant has invoiced Respondent for the four price components of its services (Meal prices, Contribution per passenger and crew, Handling prices and Contract Item prices) covering the 2nd invoice period of September 2018 through the 1st invoice period of September 2020.[67]

8.4.2 The mathematics of Claimant's calculations of its invoiced amounts are not disputed. Nor does Respondent dispute the figures for the amounts outstanding, either for principal or interest.

8.4.3 Rather, Respondent disputes the validity of invoices on the following five grounds:

---

[66] Transcript, Day 5, pp. 98/8-99/13 and 100/15-101/18. *See also* Statement of Rejoinder, ¶5(a).

[67] Exhibit C-336, Invoices and Interest, Allocation of overpayments.

95



(a)      they are said to be based on calculations that completely disregard the NLF provisions of the CA;[68]

(b)      they are said to be based on net profit amounts in the Initial Business Plan that were not agreed to be used for such calculations;[69]

(c)      only those invoices for direct costs (Labour and Materials) which have been verifiable as reasonably necessary for the preparation of the meals are payable, which excludes payment for the Delta invoices, for which Respondent has been unable to verify the adequacy or reasonableness of the sums claimed;[70]

(d)      on the basis that Claimant's contribution charge is calculated with reference to the Business Plan and on the basis that the Business Plan requires to be agreed by the Parties, and there being no such agreement, Claimant's invoices for its contribution charges are not payable[71]; and

(e)      as regards Handling prices and Contract Item prices, Respondent asserts that they have been paid in the invoice payments it made of KRW 15,700/pax, as that, it says, is the amount that would result from applying all the relevant pricing elements in the CA;[72]

*Do Claimant's Meal Prices Set Out in the Initial Business Plan Disregard the NLF Provision?*

8.4.4    Having regard to Claimant's use of the overhead, revenue and net profit assumptions set out in the Initial Business Plan (as adjusted by it in October 2018 and May 2019) as the basis for each of the invoices here at issue (including, for the purpose, *inter alia*, of calculating the appropriate contribution charge per pax and the price to be charged per pax per meal),[73] the

---

[68] SoD, ¶225.

[69] *Ibid.*

[70] *Ibid,* ¶¶144, 146, 147, 149, 229-235.

[71] *Ibid,* ¶151-159 & 221.

[72] *Ibid,* ¶236-238.

[73] *See* First and Second Witness Statement of Mr Quin Liang Lin.



96

first question to be addressed is whether the Initial Business Plan (as adjusted) reflects (or has been shown by Respondent not to reflect) a proper application of the Catering Agreement's NLF principle.

8.4.5    As noted above, the Initial Business Plan evolved from the Original Business Plan that had been approved in principle by Kumho's Chairman Park and Gategroup's CEO, Xavier Rossinyol in mid-February 2016 and was refined and finalised as a result of the Parties' further discussions over the course of the balance of 2016.

8.4.6    As part of these further discussions, as noted above, on 29 August 2016, Claimant made a presentation to Respondent to explain Gategroup's proposal for a pricing mechanism to be used in the Catering Agreement. Slide 5 of the presentation, which was entitled "Projected Price per Passenger" set out the assumptions for an updated version of the Original Business Plan which were said to be "Based on Business Plan Volumes".[74] That slide projected a meal charge (*i.e.,* price) per pax of CHF 17.8 which included a contribution charge per pax of CHF 8.5. The slide also highlighted in red that the projected meal charges per pax were "in line with our estimates of the current pricing Asiana is incurring with the incumbent caterer (estimated to be CHF 17.-18 per pax) – see Appendix Slide 13."[75]

8.4.7    Appendix Slide 13 set out Claimant's understanding of Asiana's current pricing (*i.e.,* what Respondent was paying to LSGK). It indicated that Claimant's calculations were based on "historical info provided by Spring Partners":

> *"Based on the P&L developed by Spring Partners, 2014 was the starting point of the P&L of the JV using historical LSG info:*
> *...*
> *Revenue per pax =*
> *CHF 11.3 x 1.6 CHF – CHF 17-18 per pax"*

---

[74] The Business Plan set out at Slide 5 was an updated version of the Original Business Plan

[75] Exhibit C-28, p. 5.

8.4.8 In the course of the presentation, Respondent suggested that Gategroup should use the most recent passenger numbers to bring the Business Plan up-to-date. Respondent provided Claimant's Ms Chong with this information on 1 September 2016.[76]

8.4.9 Following the 29 August 2016 presentation, the Parties exchanged further mark-ups of the draft Catering Agreement. It is apparent from these drafts that the Parties had reached a mutual understanding that the Business Plan that had been part of the presentation on 29 August 2016 would be adopted as the business plan for the joint venture. This is evident from Claimant's inclusion of the language "The Parties have agreed to adopt the Business Plan as set out in Appendix 1" in the drafts of the Catering Agreement that followed these discussions.[77]

8.4.10 In his email of 31 August 2016, Respondent's outside counsel, Mr John Kim, indicated that he considered the enclosed revisions to the Catering Agreement to be final based on his meeting earlier that day with Claimant's General Counsel. Both Claimant's draft of 30 August 2016 and Respondent's draft of 31 August 2016 attached the business plan that had been presented in the 29 August 2016 meeting.

8.4.11 On 2 September 2016, Ms Chong sent an updated version of the presentation to Spring Partners (which set out the mechanics of how the proposed pricing mechanism would work). In her covering email she said, *inter alia*, that:

> *"You and the Asiana team have asked for the mechanics of how it will work. I attach in the attached document a write-up of the mechanics (see page 10 onwards). I would like to sent [sic] this out to Asiana today and aim to have a phone discussion on Monday for questions they may have.[78]*

---

[76] Exhibit C-58, email from Respondent (Eun Suk Shin) to Gategroup (Mei Foong Chong), 1 September 2016.

[77] *See* draft Annex 1 to the Catering Agreement (Gategroup comments in redline (dated 30 August 2016, Exhibit C-181, p. 11; see also Mr John Kim's email to Gate Group, 31 August 2016 which covered Respondent's draft of that date, Exhibit C-178.

[78] Exhibit C-29.

98



8.4.12 Ms Chong also invited Spring to make any comments it wished. For present purposes, the most relevant differences in the updated presentation from the 29 August 2016 presentation were:

    (a)    a reduction in the program meal costs per pax to CHF 14.5 from CHF 17.8 and a reduction of the contribution charge to CHF 6.9 from CHF 8.5. This was as a result of Respondent having provided more up-to-date information on LSGK's actual figures. The slide indicated that this CHF 14.5 total cost per pax was "in line with our [Claimant's] estimate of the current pricing Asiana is incurring with the incumbent caterer (estimated to be CHF 14-15 per pax) – see Appendix slide 17"; and

    (b)    starting at page 10, Gategroup set out detailed "Mechanics, Adjustments and Illustrations" concerning how the contribution charges per passenger should be calculated and how the Baseline in the updated Business Plan (which was eventually to become the Initial Business Plan) should be updated in 2018 and in 2020. Importantly, at slide 11, it stated plainly its proposal that "The net profit as committed in the Business Plan (as per slide 4) will be preserved."[79]

8.4.13 It is common ground that, following receipt of the updated slide presentation, and despite having been asked for its comments, Respondent at no time raised any question about Claimant's proposed meal charges per pax or its expected contribution charge nor did it raise any concern that such a charge rate would be inconsistent with the NLF principle or the prices actually being charged by LSGK for its meals and services.

8.4.14 Having regard to the imbalance between the Parties' knowledge as to what LSGK was charging for meals and services, the Tribunal considers that this was the moment for Respondent to have raised a concern about the inclusion in any business plan for the new joint venture vehicle of a projected price for its meals and services in the first year of

---

[79] Exhibit C-29.

99

operation at CHF 14.5, if it believed (or knew) such a charge-out rate to be inconsistent with the NLF principle that was then part of draft catering agreement.

8.4.15 The Initial Business Plan that was agreed by the Parties as set out in Appendix 1 of the executed Catering Agreement is, for all relevant assumptions and figures, identical to the update of the business plan found at Slide 5 which had been sent to Respondent by Ms Chong on 2 September 2016. It contains a figure for net profit of CHF 7.1 million and a charge (or price) for meals of CHF 14.5 per pax for 2018. For 2019, the respective figures are CHF 14.9 and CHF 20.4 million and for 2020, they are CHF 15.5 and CHF 22.1 million.

*Comparison of Claimant's Meals and Services with Those Provided by LSGK*

8.4.16 As a prerequisite to establishing what Claimant would charge for its meals and services, the Parties needed to agree on exactly what meals and services were required, *i.e.,* the nature, the frequency of service and the quality of the meals that Respondent wanted to provide to its passengers. This they did over a four-day series of meetings in Gategroup's catering facilities in Narita, Japan in late January 2017 in the course of which Claimant, presented to Respondent the menus it proposed to use from 1 July 2018. During these meetings, Respondent provided its comments and approved the menus which the Parties referred to subsequently as the "**Narita Menus**".

8.4.17 As regards Respondent's role in relation to the preparation and approval of the Narita Menus, the Tribunal accepts as accurate and truthful the testimony of Mr Andreas Webber, Gategroup's then General Manager for Northeast Asia and Hong Kong. In late 2017 and early 2018 Mr Webber led Claimant's various teams that met with their counterparts at Respondent to: (a) explain the operations of the Catering Agreement's pricing methodology; (b) the run-through application in practice of the pass-through pricing mechanism; (c) to design the Narita Menus; and (d) to obtain the approval of those menus by Respondent's senior catering managers in January 2018.[80]

---

[80] The Tribunal found Mr Webber to be a forthright and honest witness and we have no hesitation in accepting the entirety of his testimony as accurate. Moreover, neither of Respondent's witnesses who could speak to the matters covered by Mr Webber's testimony sought to contradict his relevant evidence.



8.4.18 Specifically, the Tribunal finds that:

    (a)    before the Narita Menus were presented, Respondent made it clear to Gategroup that it expected better (*i.e.*, upgraded/of higher value) menus, featuring higher quality ingredients vis-à-vis those that had been provided by LSGK;

    (b)    Respondent's chefs played a key role (*i.e.*, by working with Claimant's chefs) in the design of the Narita Menus. This was essential because at this stage Claimant and its chefs had limited knowledge of the LSGK menus and relied on Respondent and its chefs as to what Respondent required and what LSGK had been providing;

    (c)    the Narita Menus that were presented to Respondent's senior catering managers in Narita[81] featured an improved range of higher quality and more expensive ingredients across all classes of service than those comprising LSGK's menus;[82]

    (d)    although Claimant was unable to provide Respondent with an accurate cost of the Narita Menus during the January 2018 meetings (it did not then have Korean suppliers), it provided Respondent with a rough idea of meal cost based on Japanese market prices. However, both Parties understood that Claimant would provide more accurate meal cost estimates once it had more detailed information on the likely costs it would incur in Korea and further input from Respondent on LSGK's costs and charges.

---

[81] These included Mr Ja-Joon Goong, Respondent's Head of Cabin Service Department, Mr Huene, Respondent's Deputy Vice President of In-flight Service and Mr Joo-Hyun Paik, Respondent's Manager of In-Flight Services Team

[82] The fact that Respondent wanted a higher quality menu offering from Claimant than that provided by LSGK is corroborated by the un-contradicted testimony of Tal Eisenberg (who stated that Spring Partners advised him that Respondent was prepared to pay a premium to work with Gategroup) and Respondent's witness, Mr Joo-Hyun Paik (who testified that it would not be bad to replace LSGK with a caterer which would provide a service at a price that was not "particularly higher" than LSGK's).

101

*Has Respondent Shown that Claimant's Price for Meals and Services Charged During the Initial Pricing Period Are Non-Compliant with the NLF Principle?*

8.4.19  As regards Respondent's defence that Claimant's invoices are non-compliant with the pricing provisions of the Catering Agreement because: (a) they "completely disregard the 'no less favourable' provisions of the Agreement"; and (b) the correct application of this principle would require Claimant to invoice for meals at KRW 15,700 per pax,[83] the onus is on Respondent (as the party that asserts such a positive defence) to establish the evidentiary basis for the defence on the balance of the evidence (*i.e.,* on the balance of probabilities).

8.4.20  To do so, Respondent is bound to make a requisite showing that:

  (a)  it was paying LSGK no more than KRW 15,700 per pax for its meals and other services immediately prior to the Commencement Date;

  (b)  the meals and services provided by Claimant during the initial pricing period (the first 12 months after the Commencement Date) were "the same or similar to the Services" that LSGK had been providing; and

  (c)  Claimant's unpaid invoices are based on a higher price than KRW 15,700.

8.4.21  For the reasons set out below, the Tribunal concludes that Respondent has not established its NLF defence. The Tribunal notes, however, that the question ultimately does not turn on Respondent's onus. This is because the Tribunal is in a position to conclude (for the reasons described below) that the meals and services provided by Claimant were: (a) considerably upgraded from and used more costly ingredients than those provided by LSGK; and were (b) provided at a time and in an environment in which Claimant was obliged to bear a considerable increase in other underlying costs.

8.4.22  However, even if it were assumed that the meals and services that were provided by Claimant during the relevant period were the same as, or similar to those of LSGK, it is by

---

[83] Statement of Defence and Counterclaim, ¶¶225-226.

no means clear on the evidence that Respondent's benchmark price per pax of KRW 15,700 is the correct price comparator.

8.4.23  First, it was not apparent on the record before the Tribunal exactly what Respondent paid to LSGK at the relevant time and how KRW 15,700 related to that price.  Second Mr Soo-Sung Lim testified that LSGK used a different calculation method to set its catering prices from Claimant.  And third, there is some doubt about whether LSGK's actual per pax prices between 2015 and the first half of 2018 (see table below) included its contribution charges per pax which for those years would have added between  KRW 7,044 to KRW 5,614 to its per pax fee.[84]

■ Scenario : Year record + LSGK claimed amount

| ICN,GMP only | 2015 | 2016 | 2017 | 2018(1st half) |
|---|---|---|---|---|
| Revenue | 129,222,712,455 | 133,122,701,164 | 128,720,169,810 | 64,344,877,989 |
| Direct Material | 43,265,399,668 | 44,232,495,080 | 43,449,736,975 | 22,321,198,928 |
| Direct Labor | 28,093,333,561 | 33,143,615,440 | 36,358,414,205 | 17,918,453,995 |
| Indirect Labor | 8,288,718,725 | 8,828,182,388 | 8,846,675,233 | 4,359,891,558 |
| Overheads | 26,111,353,546 | 23,753,597,075 | 20,809,213,652 | 10,255,368,548 |
| Net Profit | 23,462,906,955 | 23,164,811,229 | 19,256,129,746 | 9,489,964,909 |
| Passenger & Crew | 8,214,217 | 8,767,054 | 8,299,775 | 4,293,587 |
| Per PAX Fee | 15,732 | 15,184 | 15,520 | 14,986 |
| Contribution Per PAX | 7,044 | 6,359 | 5,897 | 5,614 |

8.4.24  The table above, which was produced by Respondent as Exhibit R-53, is described in Mr Soo-Sung Lim's Second Statement as "Pricing Data for LSGK (amount claimed by LSGK)".  The problem with it is that the last two lines are bolded, which carries with it the suggestion that LSGK was claiming, for example, in the first half of 2018, the sum of KRW 14,986 (as its per pax fee) plus KRW 5,614 (as its contribution charge per pax).

8.4.25  However, having regard to the Tribunal's conclusion (discussed below) that the meals and services provided by Claimant in the Initial Pricing Period were substantially different than those provided previously by LSGK, the validity of Respondent's NLF defence need not

---

[84] Second Witness Statement, Soo-Sung Lim, ¶¶15-17 and Exhibit R-53, Pricing Data for LSGK (amount claimed by LSGK).

turn on whether or not KRW 15,700 is the proper price comparator. Nevertheless, the Tribunal also considers that there is not sufficiently reliable evidence of a comparator price for LSGK for the 2017-2018 (first half) to sustain this aspect of Respondent's NLF defence.

8.4.26 As to whether meals and services which Claimant had been requested to (and did provide) during the Initial Pricing Period were the same as, or similar to, those provided by LSGK, the evidence before the Tribunal leaves no doubt that they were not.

8.4.27 Based on Mr Webber's testimony, the Tribunal finds that Claimant was directed by Respondent to (and did) provide a considerably upgraded and diverse series of menus (the Narita Menus) that required it to incur higher direct and indirect costs than would have been incurred by LSGK.

8.4.28 And as Mr In-Won Lee (Deputy General Manager of Respondent's Catering Development team) rightly accepted during the Hearing, a higher quality menu would justify a higher price per meal.[85]

8.4.29 In addition, a comparison of the nature of flights that had to be catered by LSGK in 2017 with those catered by Claimant in 2019 shows that Claimant was obliged to cater for a substantially increased number and percentage of long haul flights (10.7%) which Respondent accepted would increase Claimant's average price per pax.[86] This is because long haul flights feature more and more expensive meals, than those provided on medium and short haul flights. In his testimony at the Hearing, Mr In-Won Lee also accepted that charging a higher price per pax because of having to cater more long haul flights was not a proper consideration in determining whether or not Claimant's pricing terms were more or less favourable than LSGK's.[87]

8.4.30 Finally, to the extent that Claimant's price for meals and services was shown to exceed LSGK's prices, an assessment of whether they were NLF would have to make allowance for

---

[85] Transcript, Day 3, p. 28/13-17.

[86] Exhibit C-298, Summary of LSGK & GGK catered flights for 2017 and 2019.

[87] Transcript, Day 4, p. 113/2-10.



increases due to inflation, as well as the reported 27% increase in minimum wages in Korea over the period 2018-2019.

8.4.31 In all of these circumstances, the Tribunal concludes that Respondent has not established a sufficient basis for its non-payment of the outstanding invoices by reason of Claimant's alleged non-compliance with the no less favourable provisions of the Catering Agreement.

8.4.32 Stated in positive terms, having regard to the fact that:

(a) the contested invoices are based on the overhead, revenue and net profit assumptions set out in the agreed Initial Business Plan as adjusted in 2018 and 2019;

(b) those assumptions were based on the most up-to-date passenger numbers and historical LSGK data that had been provided by Respondent;

(c) Respondent, having being asked to comment, never suggested that the assumptions used were wrong or that Claimant's "Projected Price per Passenger" would not comply with the NLF provision; and

(d) Respondent directed Claimant to provide upgraded menus and to cater a greater number of long haul flights

the Tribunal is satisfied that Claimant's prices reflected in the contested invoices are not to be faulted for non-compliance with the NLF provisions of the Catering Agreement.

*Respondent's Net Profits Not Agreed Defence*

8.4.33 In light of the Tribunal's conclusions at 8.1 and 8.2 above (respectively, that: (a) the adjustments to the Initial Business Plan and the 2018 Business Plan do not require the Parties' further agreement; and (b) the net profit figures set out in the Initial Business Plan were fixed for the term of the Catering Agreement for the purpose of calculating the contribution per catered passenger for the Review Year), the Tribunal is satisfied that Claimant's prices reflected in the contested invoices are not to be faulted on the basis that

105



the net profit amounts were not agreed to be used to calculate the contribution charges as used in these invoices.

*Respondent's Assertion that the Delta Invoices are not Payable*

8.4.34 In each invoice period, Claimant initially charged estimated direct material costs based on historical averages. The estimated invoices were then followed up with so-called Delta Invoices, which reflect the actual costs Claimant had incurred during the invoice period. This is because Claimant could only do a full accounting of certain costs (and savings) about a week after the close of the relevant month.

8.4.35 Respondent says that it is not obliged to pay any of Claimant's Delta Invoices for two reasons. First, it contends that Claimant has not been fully transparent with these costs and it has not been possible to verify their adequacy or reasonableness.[88] Second, it says that the premise of full transparency requires Claimant to consult Respondent and to seek its agreement to such costs to ensure that both Parties adhere to the NLF principle, and that such costs are necessary for the preparation of meals.[89]

8.4.36 For the reason set out below, the Tribunal rejects Respondent's assertion that it is not obliged to pay the outstanding Delta Invoices.

8.4.37 Under Clause 6.4.1 of the Catering Agreement, the Parties agreed that:

> "... *material costs should be based on a pass-through basis* ..."

8.4.38 Annex 1.4.1.1.1, which covers the detailed pricing methodology for Direct Material Costs, specifies that:

> "*The direct material costs cover the material* costs necessary for the preparation of meals. *The material price shall be based directly on the material costs that Gate*

---

[88] SoD, ¶¶231 & 232.

[89] Respondent's Skeleton, ¶¶81, 83-84

CHAMBRE DE COMMERCE INTERN...
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

*Gourmet has to pay to the corresponding suppliers in relation to fulfilling its obligations to Asiana.*

*Asiana shall get full transparency ... about such costs by having access to relevant supplier invoices and other information as may be reasonably requested by Asiana.*

*Any scrap yields (covering all waste and other losses between volumes purchased by Gate Gourmet from the supplier and volumes sold to Asiana, including others "out of date" losses, breakage) for finished goods and relevant processes shall be further discussed and mutually agreed by the Parties at least four (4) months prior to the commencement date."* (Tribunal's emphasis).

8.4.39 Respondent does not deny that the Delta Invoices represent the actual direct material costs Claimant incurred to prepare the meals it catered.

8.4.40 As to whether it received "full transparency" in the terms provided for in Annex 1.4.1.1.1, the Tribunal is satisfied that it did, based on the un-contradicted testimony of Mr Qin Liang Lim and contemporaneous correspondence on the subject between Ms Mei Fong Chong (for Claimant) and Mr Joo-Hyun Paik (for Respondent).[90]

8.4.41 In his Second Statement, Mr Lim recalled that:

    (a)    Claimant made a presentation to Respondent on 27 November 2018, the day after it rendered its first Delta Invoice, to explain the various line items underlying the Delta amount;

    (b)    on 3 December 2018, Claimant provided Respondent with a category-by-category breakdown of the monthly Delta costs in individual spreadsheets which tied back to its earlier presentation; and

    (c)    at Respondent's request, Claimant held additional presentations at Respondent's offices on 12 and 17 December 2018, which included

---

[90] SoC, p. 60 (para. 169); Reply, p. 118 *et seq.* (para. 293); Email from GGK (Mei Foong Chong) to Asiana (Joo-Hyun Paik) dated 25 December 2018, at Exhibit C-202; Second Witness Statement of Qin Liang Lim dated 13 July 2020, p. 9 *et seq.* (paras. 19–24).

107



comprehensive tables illustrating variations in estimated prices for individual items.

8.4.42 In her email to Mr Paik of 25 December 2018, Ms Mei Fong Chong recalled all that data that had been provided to Respondent, noting that Claimant had "invested close to 100 hours from the various departments for this purpose and had responded to all queries from Asiana's pricing team."[91]

8.4.43 Having regard to this testimony, Ms Chong's email and the fact that Respondent had at the time (and continues to have) full access to SACS, the Tribunal considers that Claimant fulfilled entirely its obligation to provide "full transparency" in relation to its Delta Invoices. Such transparency should have been sufficient to allow Respondent to assess the adequacy and reasonableness (and necessity for) the direct material costs in Claimant's Delta Invoices. More to the point, perhaps, is the fact that Respondent has led no evidence to suggest that Claimant's material costs were unreasonable or not necessary for the preparation of its meals.

8.4.44 As regards Respondent's asserted right to be consulted and to agree to Claimant's direct material costs, apart from the provision in Annex 1.4.1.1.1 relating to scrap yields, nothing in the relevant provisions of the Catering Agreement provides such a right. The only other provision for prior consultation with Respondent in relation to its costs is found in Clause 6.4.1 and that is clearly limited to adjustments to "Labour Costs" for increases to labour rates, a matter which has no relevance to the Delta Invoices.

8.4.45 There remains Respondent's point that Annex 1.4.1.1.1 provides for further discussions and mutual agreement on scrap yields and that this had not occurred.

8.4.46 However, the Tribunal considers that this provision does not disentitle Claimant from passing through (*i.e.,* charging Respondent for) direct material costs of raw ingredients that are purchased to fulfil its obligations to Respondent, but which were not so used, for

---

[91] Exhibit C-202, p.1.

108

example, because they had passed their use-by-dates, or were no longer required, because of a menu change required by Respondent.[92]

8.4.47 The purpose of the Parties' agreement to discuss and agree on scrap yields before the Commencement Date was clearly to put in place a process through which they could attempt to agree a measure (such as a % of direct material costs) which could properly be charged (*i.e.,* as a necessary cost) for the preparation of meals for Respondent.

8.4.48 As matters developed, no such discussion on the scrap yields took place until well after the Commencement Date. This occurred when the Parties met on 27 November 2018 and Claimant made a presentation to explain the different line items underlying its Delta Invoices.

8.4.49 As the minutes of that meeting show, Asiana had requested to be charged "only for the materials consumed by the passengers according to the Final Meal Order" and it had expressed concern over unnecessary wastage. In response, Claimant explained how each of the categories reflected the actual costs of materials used to prepare Respondent's meals, including wastage – a certain percentage of which is inevitable in the industry. Claimant recalled that the listed fluctuations were all in line with industry standards and part of the price that Asiana consistently paid to its other caterers.[93]

8.4.50 The fact that the Parties were unable to agree that the amount charged by Claimant for waste was appropriate is not to the point. The issue for the Tribunal is whether Respondent has made an adequate showing that it was not appropriate, *i.e.,* that the amount charged was "not necessary for the preparation of meals" or not a "material cost that Gate Gourmet [paid to] suppliers in relation to fulfilling its obligation to Asiana".

8.4.51 As to this, as indicated above, the Tribunal considers that Claimant provided Respondent with full transparency regarding its Delta invoices. Also, Mr Kim Liang Lim testified that each of the line items of the invoices was "… in line with industry standards and part of the

---

[92] Claimant included a line item in its Delta Invoices for "waste" which has the same meaning as scrap yields in the Catering Agreement.

[93] Minutes of meeting between GGK Claimant and Respondent, dated 27 November 2018 at Exhibit C-194, p.1, p.1.



price Asiana consistently pays to its caterers".[94]   Mr Lim was not cross-examined on this point and Respondent has offered no evidence to suggest that Claimant's charges for wastage were out of line or unnecessary, or an otherwise inappropriate component of its direct material costs.

8.4.52  In these circumstances, the Tribunal is satisfied that Claimant's prices reflected in the Delta Invoices are not to be faulted on the basis that: (a) Respondent has not been able to verify their adequacy or reasonableness; or (b) Respondent has shown that Claimant's direct material charges for "waste" were unnecessary for the preparation of its meals; or (c) Respondent has shown that Claimant failed to provide full transparency in relation to them. Respondent is therefore responsible to pay Claimant's outstanding Delta's Invoices in full.

*Respondent's Business Plan Not Agreed Defence*

8.4.53  Respondent's contention that the contested invoices are not payable because the adjusted Business Plans upon which they are based were not agreed by the Parties can be dealt with shortly.

8.4.54  Having regard to the Tribunal's conclusion (at 8.1 above) that the adjustments to the 2018 and 2020 Business Plans were not subject to the Parties' further agreement, this defence is to be rejected.

*Respondent's Defence that it has Already Paid the Handling and Other Contract Item Prices*

8.4.55  Claimant's right to invoice Respondent for Handling prices and Other Contract Item prices is provided for in Annex 1.4.1 (Prices), Annex 1.4.1.3 (Handling prices) and 1.4.1.4 (Other Contract Item prices).

8.4.56  Claimant's Handling prices and Other Contract Item prices invoices cover laundry services and products purchased on-board and include a percentage handling fee that had been agreed by the Parties.

---

[94] Second Witness Statement, Mr Kim Liang Lim, ¶22.

110

8.4.57 Respondent's only basis for asserting that it is not obliged to pay Claimant's invoices for Handling and Other Contract Item prices is that it has already done so, because it "considers that the price of KRW 15,700/pax would constitute the amount that would result from applying all the relevant pricing elements at the Catering Agreement."[95]

8.4.58 Having regard to the Tribunal's conclusion (at 8.3 above) that Claimant's invoices for Meals and Services are not to be faulted on the basis that they were less favourable than LSGK's pricing prior to the Initial Pricing Period, it follows that Respondent's payment of KRW 15,700 cannot properly be regarded as an appropriate, all-inclusive payment of the prices Claimant was entitled to invoice under Annex 1.4.1.

8.4.59 In the circumstances, Respondent is liable to pay, and shall pay all of Claimant's outstanding invoices for Handling prices and Other Contract Item price, as well as the amounts outstanding on all of Claimant's other contested invoices, together being in the amount of KRW 35,799,240,103 as at 30 October 2020.

## 8.5   Claimant's Claim for Interest

8.5.1   Having regard to Respondent's non-payment of Claimant's invoices when they were due and the provisions of Clause 8.2.4 of the CA, the Tribunal considers that Claimant is entitled to an award of interest on its outstanding invoices, running from their respective due dates, at the contractual rate of 8% p.a. above the three-month KORIBOR rate until full and final payment.

## 8.6   Respondent's Counterclaims for Repayment and Damages

*Respondent's Claim for Repayment of Excess Payments made to Claimant*

8.6.1   In its first counterclaim, Respondent seeks restitution of the excess amounts paid as contribution charges incorrectly invoiced by Claimant.

---

[95] Statement of Defence and Counterclaim, p. 73, ¶237.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

8.6.2   The claim is dependent on the Tribunal determining that the correct prices to be charged by Claimant under the Catering Agreement have resulted in an overpayment by Respondent to Claimant.

8.6.3   It follows that this counterclaim must be dismissed, based on the Tribunal's decision above that Claimant's outstanding invoices reflect a correct application of the pricing mechanism set out in the Catering Agreement.

*Respondent's Claim for Damages Based on Claimant's Failure to Provide Meals by the Commencement Date*

8.6.4   There are four components to this counterclaim for damages. They comprise:

    (a)   KRW 1,463,845,760, being the value of meal coupons and travel vouchers issued by Respondent to its passengers in July 2018;

    (b)   KRW 1,045,727,600, being cash compensation paid by Respondent to its passengers in July 2018;

    (c)   KRW 211,685,750, being the equivalent value to the mileage compensation given to its passengers on account of delayed or poor quality meals in July 2018; and

    (d)   KRW 23.7 billion, being the approximate amount of the lost business profits Respondent estimates it suffered as a result of Claimant's failure to provide meals in July 2018.

8.6.5   Each of these claims concerns services provided (or, as alleged, not provided) by SDCK at the beginning of the Contingency Period for which Respondent says Claimant retained responsibility under Clauses 2.8, 2.10 and 3 of the First Amendment to the CA.[96]

---

[96] Statement of Defence and Counterclaim, p. 76, ¶253.



8.6.6    In defending against this counterclaim, Claimant contends that Respondent must succeed on several threshold issues, one of which being whether the email exchange between the Parties (set out in Exhibit C-19) precludes this counterclaim.

8.6.7    That exchange begins with an email dated 22 November 2018 from Ms Syma Zainab (Gategroup) to Mr John Kim (Respondent's outside counsel) bearing the subject line, "Proposal on outstanding issues". The email reads in pertinent part:

> *"Dear John,*
>
> *Oki had a call from Mr Paik saying that Asiana would like to offer a gross amount of KRW 3.8 BN, being their contribution towards the additional contingency costs.*
>
> *We spoke to Jann and would like to propose the following:*
>
> *1.      **Net amount** of KRW 3.8 BN, to be received from Asiana with respect to all issues relating to the contingency. This will be contingency cost of KRW 4.185 BN less penalties of KRW 385 MIO. Asiana has to agree to this sum as full and final settlement of all amounts from SDC and GGK in relation to the contingency period;"*
>
> \*\*\*
>
> *"If Asiana are agreeable, we can work on and discuss putting this agreement briefly down in writing.*

8.6.8    Mr Kim replied later the same day. He said:

> *"Dear Syma:*
>
> *Thank you for your email and proposal below. I have discussed your proposal with my client, AA, and have provided responses below:*
>
> *AA is positively considering your proposed amount of KRW 3.8 BN, subject to the following:*

113





(i)    *Rather than a straight set-off of the contingency cost of KRW 4.185 BN and the penalty of KRW 385 MIO, there must be separate payments of the additional contingency cost and the penalty amount (i.e., AA pays KRW 4.185 BN for the additional contingency cost and SDC pays KRW 385 MIO for the penalty); and*

(ii)   *Payment of the additional contingency cost (KRW 4.185 BN) must be supported by detailed evidence breakdown of the additional contingency costs provided by GGK and/or SDC.*

*AA agrees that SDC's payment of the penalty amount will be in full and final settlement of all amounts from SDC and GGK in relation to the contingency period."*

8.6.9   On 2 January 2019, Respondent and SDCK entered into the Asiana-SDCK Settlement Agreement,[97] the relevant terms of which may fairly be summarised as follows:

    (a)   the settlement was a full and final settlement of all claims of the Parties arising out of the Asiana-SDCK Catering Agreement of 15 June 2018, and specifically: (i) SDCK's obligation to pay certain penalties for delays in the delivery of services and shortages of meals; and (ii) Respondent's obligation to reimburse SDCK for additional costs it incurred in providing services under the catering agreement;

    (b)   to complete the settlement, SDCK agreed to pay to Respondent a penalty amount of KRW 385,000,000 by 14 January 2019; and

    (c)   Respondent agreed to pay SDCK a settlement amount of KRW 4,185,000,000 as full and final settlement of SDCK's claim for Additional Costs by the same date.

8.6.10  The settlement was completed by the required payments being made.

---

[97] Exhibit C-3.

114

8.6.11 Although Claimant was not itself party to the Asiana-SDCK Settlement Agreement, that agreement contains payment terms which mirror exactly the conditions set by Respondent (as reflected in Mr Kim's email exchange with Claimant) which, if satisfied, would release Claimant from any claim by Respondent confirming the Contingency Period (i.e., "SDC's [separate] payment of the penalty amount [of KRW 385 million] will be a full and final settlement of all amounts from SDC and GGK in relation to the contingency period.").

8.6.12 Following the separate payments made by Respondent and SDCK on 14 January 2019, and until Respondent filed its Answer and Counterclaim in these proceedings, there was no evidence on the record that Respondent had sought restitution from Claimant of the payment it made to SDCK on account of Additional Costs pursuant to the Asiana-SDCK Settlement Agreement.

8.6.13 In these circumstances, the Tribunal is persuaded by Claimant's submission that it would be contrary to the doctrine of good faith and *venire contra proprium* in Korean law – akin to estoppel or preclusion in common law systems – for Respondent to assert these claims now.

8.6.14 Accordingly, the Tribunal concludes that Respondent's counterclaim for damages based on Claimant's alleged failure to provide meals by the Commencement Date is to be dismissed.

*Respondent's Counterclaim for Additional Costs*

8.6.15 Respondent's Counterclaim for Additional Costs is for restitution of the amount it paid to SDCK pursuant to the Asiana-SDCK Settlement Agreement. That being the case, this counterclaim is to be dismissed for the same reason as the immediately preceding counterclaim for damages.

*Respondent's Damages Claim for Poor-Quality Meals*

8.6.16 Respondent's last substantive counterclaim is for KRW 32,153,240 in damages for poor quality meals allegedly provided by Claimant between September 2018 and January 2020 (*i.e.,* after the Contingency Period).

8.6.17 Respondent rejects Claimant's assertion that: (a) Clauses 3.1 and 3.2 of Annex 2 of the Catering Agreement provide a specific remedy for these breaches; (b) any right to claim

115



additional compensation is limited to situations where Respondent establishes that the poor quality of meals provided has had a significant effect on its business (Clause 3.8 of Annex 2); and (c) the compensation claimed under Clause 3.8 must be jointly agreed.

8.6.18 The Tribunal considers that this counterclaim, which is of relatively limited value (approximately USD 26,100), can be dealt with shortly.

8.6.19 First, having regard to Respondent's contractual right to claim compensation under Clause 3.8, it is clear that the Clause 3.1 and 3.2 penalty provisions do not constitute an exclusive remedy. This is evident from the wording of Clause 3.8:

> *"In the event that Gate Gourmet breaches of its quality assurance under this <u>Annex 2</u>, which is solely attributable to Gate Gourmet and has significant effect on Asiana's service or business, Gate Gourmet shall give appropriate compensation to Asiana and such compensation shall be jointly agree."*

8.6.20 Second, the Parties having failed to agree what an appropriate figure for compensation should be (as required by Clause 3.8) in order for this Tribunal to make an award for compensation, Respondent must establish (also as required by the clause) that Claimant's "breaches of it quality assurances" have had a "significant effect on [its] service or business."

8.6.21 It is on this latter point that this counterclaim founders. The only testimonial evidence adduced by Respondent in support of its counterclaim based on poor quality materials is through Mr Joo-Hyun Paik. In neither of his statements did he suggest that the quality issues he described had any effect on Respondent's service or business, let alone a significant effect.

8.6.22 In these circumstances, this last substantive counterclaim is to be dismissed.

*Respondent's Counterclaim for Interest*

8.6.23 Respondent's counterclaim for pre-and-post award interest is contingent of it succeeding on one or more of its counterclaims for monetary relief. Here, where each of such counterclaims is to be dismissed, so, too, must its counterclaims for awards of interest.

116



## 9. COSTS

### 9.1 Introduction

9.1.1 Pursuant to Article 38(4) of the ICC Rules, this Final Award shall determine the costs of the arbitration and decide the allocation of the costs incurred in connection with the proceeding.

9.1.2 Pursuant to Article 38(1) of the ICC Rules, the costs of the arbitration are comprised of the fees and expenses of the Arbitral Tribunal and the ICC administrative expenses, as well as the reasonable legal and other costs of the Parties.

9.1.3 Article 38(5) of the ICC Rules explains that in making decisions as to costs, the Arbitral Tribunal may take into account such circumstances as it considers relevant, including the extent to which a party has conducted the arbitration in an expeditious and cost-effective manner. It is well understood that arbitral tribunals retain a broad discretion in determining the costs of an arbitration.

9.1.4 Under Clause 8.2.4 of the Catering Agreement, Respondent agreed to reimburse any losses incurred by Claimant as a result of late payment of its invoices, including legal fees, on a full indemnity basis:

> *"In addition, Asiana shall reimburse Gate Gourmet on a fully indemnified basis for losses incurred by Gate Gourmet, including fees and expenses of legal counsel with regards to late payments."*

9.1.5 Each of the Parties in its costs submissions sought an award of costs in its favour on the assumption that it would prevail in its case. In doing so, the Parties adopted the prevailing principle followed by most commercial arbitration tribunals that "costs follow the event" – in other words, costs are awarded to the winning party.[98]

---

[98] Emmanuel Gaillard and John Savage, "Fouchard Gaillard Goldman on International Commercial Arbitration at 686; José Rosell, Arbitration Costs as Relief and/or Damages, 28(2) *Journal of International Arbitration* at 116(2)(001) ("some arbitration decisions hold that the principle of 'costs should follow the event' is becoming a governing principle in international arbitration."; *see also* Queen Mary, University of London, 2012 International Arbitration Survey: Current and Preferred Practices in the Arbitral Process at 3, 38 (2012) ("Tribunal's allocate costs according to the result

117



9.2 **Determination and Apportionment of the Costs of Arbitration**

*Fees and Expenses of the Arbitral Tribunal and ICC ("ICC Costs of Arbitration")*

9.2.1　On 3 October 2019, the ICC Court fixed the advance on the costs of the arbitration as USD 570,000.00.

9.2.2　On 7 May 2020, the ICC adjusted and increased the advance on costs to USD 690,000.00.

9.2.3　On 26 November 2020, the ICC readjusted and increased the advance on costs to USD 1,450,000.00. Such an advance on costs has been paid by the Parties equally, *i.e.*, Claimant USD 725,000.00 and Respondent USD 725,000.00, respectively.

9.2.4　On 4 February 2021 the ICC fixed the Arbitral Tribunal 's fees and the ICC administrative costs respectively at USD 1,275,000.00 and USD 150,000.00.

9.2.5　The Arbitral Tribunal's expenses were fixed at USD 15,000.00.

9.2.6　Therefore, the total amount of the costs of the arbitration, excluding the legal and other costs of the parties, *i.e.*, the ICC costs of the arbitration, are USD 1,440,000.00.

9.2.7　The advance on costs, fixed by the ICC Court at USD 1,450.000.00 was entirely paid by the parties. Accordingly, the ICC costs of arbitration have been paid in full.

*Costs Claimed by the Parties, Including Legal Fees and Other Costs*

9.2.8　In its Submission on Costs dated 21 December 2020, Claimant claims legal fees and other costs in an amount of GBP 1,474,523.26, USD 1,520,340.87 and SGD 6,948.05. This total claim comprises GBP 1,474,523.26, and USD 362.340.87 for legal representation and disbursements, SGD 6,948.05 for Maxwell Chamber's use of a witness room, USD $433,000.00 for Claimant's management time and USD 725,000.00 being Claimant's

---

in 80% of arbitrations" and "there is a desire for tribunals to allocate costs according to the results more frequently than they are currently doing.").

118

share of the advance on costs. Claimant's total claim for costs amounts to approximately USD 3.5 million.

9.2.9 In its Submission on Costs dated 21 December 2020, Respondent claims legal fees of KRW 3,054,125,000.00 on account of Bae, Kim & Lee LLC and KRW 1,135,869,265.00 and CHF 231,305.00 on account of legal fees of Peter & Kim. In addition, expenses of KRW 103,913,993.00 and GBP 24,660.10 are claimed on account of Bae, Kim & Lee LLC and KRW 15,982,166.00 and CHF 160.00 are claimed on account of Peter & Kim. Experts' fees and expenses were claimed in the amount of USD 479,519.93.00 on account of Howard Rosen, GBP 63,375.00 on account of Mr Lance Hayward and KRW 30,000,000.00 on account of Professor Young Joon Kwon. Finally, USD 725,000.00 is claimed on account of Respondent's payments to the ICC for its share of the deposit. Thus, Respondent's total claim for costs approximates USD 5.5 million made up of KRW 4,339,890,424.00, USD 1,204,519.93.00, GBP 88,035.10 and CHF 231,465.00.

*Assessment and Allocation of Costs*

9.2.10 In the event that its claims should succeed, Claimant requests that the Arbitral Tribunal make an award of costs in its favour.

9.2.11 Claimant argues that its costs are reasonable, given the value and complexity of the dispute. Furthermore, it says that it brought these proceedings as a result of Respondent's failure to pay its invoices as they fell due and, as a contractual matter, it was agreed that Respondent should reimburse Claimant on a fully indemnified basis for losses it incurred (including fees and expenses of legal counsel) with regard to the late payment.

9.2.12 In the event that it was not to succeed in full on its claims, Claimant sought its costs arising out of Respondent's applications dated 6 August 2020 and 17 November 2020, totalling GBP 14,320.00, for which the Tribunal directed that it should have its costs arising in any event.

9.2.13 In its Reply Submission on Costs, dated 8 January 2021, Claimant points out that the total costs Respondent seeks are considerably higher than Claimant's costs (approximately USD 5.5 million compared with approximately USD 3.5 million), despite the fact that Claimant

119



incurred significant expenses as a result of Respondent's late filing of untimely evidence. Claimant argued that Respondent's conduct of the case added considerably to both of the Parties' costs and it noted that Respondent had not provided a breakdown of its hours as requested by the Tribunal. Claimant also asserted that the claim of almost USD ½ million for Mr Rosen's fees should be disallowed, as he did not opine on Asiana's damages claims which was the only part of Respondent's case that fell within his expertise as a quantum expert.

9.2.14 Respondent requests the Tribunal to make a costs award in its favour in the event that its defences should succeed and/or it should succeed on its counterclaims.

9.2.15 In support of its request, Respondent argues that, having regard to the economic value and financial implication of this dispute, the complexity of the issues involved, and the number of expert and fact witnesses concerned, the amount of fees and expenses incurred by Respondent to its legal representatives are reasonable and must be reimbursed by Claimant in full.

9.2.16 Pointing to the core issue in the dispute being the proper and reasonable interpretation and application of certain terms in the Catering Agreement and the importance of the commercial reasonableness, Respondent argues that it was appropriate to retain Mr Rosen to prepare two reports and to testify at the Hearing. On the same basis, the retainer of industry expert Mr Lance Hayward is said to have been reasonable and appropriate as was the retainer of its Korean legal expert concerning the governing law of the contract.

9.2.17 In light of the foregoing, Respondent requests that the Tribunal order Claimant to reimburse it for all costs it incurred in connection for the arbitration.

9.2.18 In its Reply Submission on Costs of 8 January 2021, Respondent argued that Claimant's claim for its own management's time was unreasonable in that a party's internal costs are not usually allowed in arbitral proceedings. It noted that of the management members involved, most only appeared as witnesses. Of the two that were not witnesses (Messrs Maurhofer and Lin), no attempt was made to explain what role they had played in the case, other than the fact that they were identified as Respondent's representatives and that Mr Lin



attended as an observer during the cross-examination of Claimant's witnesses in Singapore. Respondent also pointed out the Claimant gave no explanation for the very high hourly rates which were claimed for the members of management. In the circumstances, Respondent submitted that any costs award in favour of Claimant should exclude its claim for management's time.

*Rationale for the Tribunal's Allocation of Costs*

9.2.19 Having regard to the Tribunal's conclusions that Claimant's claims are to be allowed and that Respondent's Counterclaims are to be dismissed in their entirety, the Tribunal sees no reason why not to apply the principle of "costs follow the event". Thus, Claimant having prevailed on all issues, it should be awarded compensation for its "reasonable legal and other costs".[99]

9.2.20 As it developed, the case turned out to be a high value (USD 1,757,713,100.00 being the amount at issue), complex dispute, involving over 650 pages of primary submissions, testimony from 14 witnesses and experts (including conflicting evidence on key points) as well as multiple interlocutory applications. In the circumstances, it is neither surprising nor unreasonable to see claims for legal and other costs ranging between approx. USD 2.4m for Claimant's legal fees (USD 2.8m if Claimant's management's fees are included) and approx. USD 4.8m for Respondent's legal fees.

9.2.21 In these circumstances, and subject to the Tribunal's conclusions below regarding its claim for management time, Claimant's costs claims are reasonable on their face.

9.2.22 The reasonableness of Claimant's costs may also properly be assessed by their comparison with Respondent's claimed costs, which are argued by Respondent to be reasonable. In this case, Claimant's pure legal and other costs are approximately half of those claimed by Respondent. That being so, and having regard to the extensive defences and counterclaim raised against it, the Tribunal has no hesitation in finding these costs of Claimant to be reasonable.

---

[99] Article 38(1) of the ICC Rules reuqires the parties' legal and other costs to be "resaonable".

121



9.2.23  On the other hand, the Tribunal considers that Claimant's claim to be compensated for its management's time does not constitute a "loss… with regard to late payments" as provided for in Clause 8.2.4 of the Catering Agreement. Nor, in the Tribunal's view, does management time as such (which is an indirect cost) generally fall within the scope of "legal and other costs of the parties" as provided for in Article 38(1) of the ICC Rules.

9.2.24  An exception to this exclusion of management time might properly be made for the time of internal counsel spent in relation to the dispute or for the use of management expertise to reduce the external costs of litigating a case. Here, however, none of the seven members of Claimant's management whose time is the subject of this claim is so identified. Five were simply members of line management who gave evidence in these proceedings and the other two, whose only known role was as party representatives, were not shown to have played a role in the case which might qualify for reimbursement in a costs award.

9.2.25  In the result, Claimant shall be reimbursed by Respondent for its legal and other costs in the following amounts:

| | |
|---|---|
| Lalive fees and disbursements | GBP 1,474,523.26 |
| Kim & Chang fees and disbursements | USD 362,340.87 |
| Maxwell Chambers disbursements | SGD 6,948.05 |
| Its cost of arbitration | USD 720,000.00 |

9.2.26  The Tribunal agrees that Claimant's legal and other costs should bear interest, to run commencing two weeks from the date of this Award until paid. The Tribunal is also of the view that interest should run at the contractually agreed rate of 8% per year above the three-month LIBOR for each of the currencies in question and that compounding half yearly would also be appropriate.

9.2.27  Respondent shall bear its own legal and other costs as well as the fees and expenses of the Arbitral Tribunal and the ICC administrative expenses.



**FINAL AWARD**

9.3     **Tribunal's Final Award**

9.3.1   Based on the foregoing, the Tribunal hereby **CONCLUDES, DECLARES, ORDERS and AWARDS** that:

        (a)     Respondent shall pay to Claimant the sum of KRW 28,335,526,067.00 on account of principal under the outstanding invoices for the period 12 September 2018 to 30 November 2019;

        (b)     Respondent shall pay to Claimant the sum of KRW 562,901,664.00 on account of interest owing at 10 January 2020, on the principal amount outstanding on Claimant's invoices at 10 January 2020;

        (c)     Respondent shall pay to Claimant further simple interest on KRW 28,898,427,731.00, being the sum of the principal and interest amounts outstanding on 10 January 2020, accruing at a rate of 8% p.a. above the 3-month KORIBOR from 10 January 2020 until full and final payment.

        (d)     The pricing mechanism set forth in the Catering Agreement, including the contribution per passenger as calculated under both the Initial Business Plan and any subsequent Business Plan adjusted by the Claimant pursuant to Annex 1.4 of the Catering Agreement, including the 2020 Business Plan, is binding upon the Parties and does not require any further agreement between them.

        (e)     Respondent's counterclaims are dismissed in their entirety

        (f)     Respondent shall pay to Claimant the sums of  GBP 1,474,523.26, USD 1,087,340.87 and SGD 6,948.05 on account of its reasonable costs of these proceedings, (including its contribution to the administrative expenses of the ICC and the fees and expenses of the Arbitral Tribunal), such sums to bear simple interest from two weeks from the date of this Award at 5.33%,

123



the default rate provided for, and claimed, under the Singapore International Arbitration Act, S.20(3), until the date of full payment.

LEFT BLANK INTENTIONALLY

124

Place of Arbitration:  Singapore

Date: _18 February_   2021

John Beechey CBE

J. William Rowley QC
(Presiding Arbitrator)

Gary Born



CERTIFIED TRUE COPY OF THE ORIGINAL
PARIS, 30 JANUARY 2024

**Alexander G. FESSAS**
Secretary General
ICC International Court of Arbitration