DAVID J. FARKAS (SBN 203821)
dfarkas@nossaman.com
NOSSAMAN LLP
777 S. Figueroa Street, 34th Floor
Los Angeles, CA  90017
Telephone: (213) 612-7800
Facsimile:  (213) 612-7801

DAVID C. LEE (SBN 193743)
dlee@nossaman.com
NOSSAMAN LLP
50 California Street, 34th Floor
San Francisco, CA  94111
Telephone: (415) 398-3600
Facsimile:  (415) 398-2438

Attorneys for Respondent
ASIANA AIRLINES, INC.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GATE GOURMET KOREA CO., LTD., a Korean company,<br><br>Petitioner,<br><br>v.<br><br>ASIANA AIRLINES, INC., a Korean company,<br><br>Respondent. | Case No. 2:24-cv-01265-RGK-PD<br><br>**RESPONDENT ASIANA AIRLINES, INC.'S CORRECTED OPPOSITION TO PETITIONER GATE GOURMET KOREA CO., LTD.'S PETITION TO ENFORCE ARBITRAL AWARD**<br><br>Date:    June 3, 2024<br>Time:   9:00 a.m.<br>Place:   Courtroom 850, 8th Floor<br>            Roybal Federal Building and<br>            U.S. Courthouse |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION. ...............................................................................1

II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY. .............................1

    A.     The Catering Agreement Upon Which the Award is Based Resulted From a Criminal Scheme That Has Led to Multiple Criminal Convictions in Korea. ...............................................................................1

    B.     Petitioner and Gategroup Took Full Advantage of the Criminal Scheme and Now Seek to Shamelessly Profit Through Recognition and Enforcement of the Award. ...............................................................9

    C.     The Arbitration in Singapore and Civil Proceedings in Singapore and Korea. ...............................................................................9

III.   STANDARD OF REVIEW...............................................................................10

IV.    THE AWARD SHOULD NOT BE RECOGNIZED OR ENFORCED BECAUSE DOING SO WOULD BE CONTRARY TO PUBLIC POLICY.......11

V.     THE AWARD SHOULD NOT BE RECOGNIZED OR ENFORCED BECAUSE THE ARBITRATION AGREEMENT IS NOT VALID UNDER APPLICABLE KOREAN LAW. ...............................................................15

VI.    TO THE EXTENT THE COURT ELECTS TO RECOGNIZETHE AWARD, THE FOREIGN CURRENCY AMOUNTS INCLUDED THEREIN SHOULD BE CONVERTED INTO U.S. DOLLARS AT THE EXCHANGE RATES IN EFFECT ON THE DATE OF THE COURT'S JUDGMENT.......................................................................................................16

VII.   CONCLUSION...............................................................................................18

-i-

RESPONDENT ASIANA AIRLINES, INC.'S CORRECTED OPPOSITION TO PETITIONER GATE GOURMET KOREA CO., LTD.'S PETITION TO ENFORCE ARBITRAL AWARD

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Constr. Mach. & Equip. Corp. v. Mechanised Constr. of Pak.*,
   659 F.Supp. 426 (S.D.N.Y.1987) ...................................................................15

*Changzhou AMEC E. Tools & Equip. Co. v. E. Tools & Equip., Inc.*,
   No. EDCV 11-00354 V, 2012 WL 3106620 (C.D. Cal. July 30, 2012),
   *aff'd sub nom. Xuchu Dai v. E. Tools & Equip., Inc.*, 571 F. App'x 609
   (9th Cir. 2014) ...........................................................................11, 13, 14

*China Nat'l Metal Prod. Imp./Exp. Co. v. Apex Digital, Inc.*,
   379 F.3d 796 (9th Cir. 2004) .........................................................................10

*Cont'l Transfer Tech. Ltd. v. Fed. Gov't of Nigeria*,
   932 F. Supp. 2d 153 (D.D.C. 2013) ..............................................................17

*Die Deutsche Bank Fialiale Nurnberg v. Humphrey*,
   272 U.S. 517 (1926) .......................................................................................17

*EGI-VSR, LLC v. Coderch Mitjans*,
   963 F.3d 1112 (11th Cir. 2020) .....................................................................16

*Guth v. Loft, Inc.*,
   5 A.2d 503 (Del. 1939) ..................................................................................16

*Linley Invs. v. Jamgotchian*,
   2014 WL 12665812 (C.D. Cal. Apr. 16, 2014) .............................................16

*Michel v. Moore & Associates, Inc.*
   (2007) 156 Cal.App.4th 756 ..........................................................................14

*Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v.*
   *Cubic Def. Sys., Inc.*,
   665 F.3d 1091 (9th Cir. 2011) .......................................................................11

*Shaw, Savill, Albion & Co. v. The Fredericksburg*,
   189 F.2d 952 (2d Cir. 1951) ..........................................................................17

**Statutes**

9 U.S.C. § 207 ...................................................................................................10

18 U.S.C. § 218 ......................................................................... 13

18 U.S.C. § 225 ......................................................................... 13

18 U.S.C. § 371 ......................................................................... 13

18 U.S.C. § 666 ......................................................................... 13

18 U.S.C. § 1001 ....................................................................... 13

18 U.S.C. § 1952 ....................................................................... 12

18 U.S.C. § 1962 ....................................................................... 12

Pen. Code, § 641.3 ..................................................................... 12

**Other Authorities**

Restatement (Third) of Foreign Relations Law § 823 ........................................ 17

-iii-

RESPONDENT ASIANA AIRLINES, INC.'S CORRECTED OPPOSITION TO PETITIONER GATE GOURMET
KOREA CO., LTD.'S PETITION TO ENFORCE ARBITRAL AWARD

## I.      INTRODUCTION.

Petitioner Gate Gourmet Korea Co., Ltd. ("Petitioner" or "GGK") seeks herein to enforce a foreign arbitral award ("Award") issued in its favor against Respondent Asiana Airlines, Inc. ("Asiana") that is based on a catering agreement between GGK and Asiana ("Catering Agreement") that would have never been consummated but for adjudged criminal misconduct by Asiana's former chairman.  GGK and its affiliate companies took full advantage of these criminal acts and extracted massive, guaranteed profits under the 30-year Catering Agreement from an unwitting and innocent Asiana. GGK now wants this Court to approve the manifestly unjust Award so it can attempt to collect profits to which it should not be entitled under any objective standard of morality.

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), as incorporated in the Federal Arbitration Act, allows this Court to refuse to recognize or enforce the Award under these circumstances, because doing so would be contrary to fundamental American public policy. This Court can also refuse to approve the Award because of the invalidity of the Catering Agreement and its incorporated arbitration clause. Asiana respectfully requests that the Court exercise its discretion in these two regards and deny the Petition.

## II.     STATEMENT OF FACTS AND PROCEDURAL HISTORY.

### *Factual Background*

### A.     The Catering Agreement Upon Which the Award is Based Resulted From a Criminal Scheme That Has Led to Multiple Criminal Convictions in Korea.

As detailed below, unbeknownst to Asiana at the time, the Catering Agreement was orchestrated by Asiana's now-disgraced and criminally convicted former Chief Executive Officer, Park Sam-Koo ("Chairman Park"), to be a *quid pro quo* for substantial financial benefits conferred on him, personally, by Gategroup Financial Services S.à.r.l. ("GGFS"), an affiliate of GGK, in exchange for a Catering Agreement that guaranteed unheard of profits to GGK for 30 years. Chairman Park was convicted of

-1-

a multitude of crimes for his gross misconduct, though not until after the subject arbitration proceedings had concluded. Meanwhile, GGK and its parent, Gate Gourmet Switzerland GmbH ("GGS") (the Gategroup companies are collectively referred to as "Gategroup"), no innocent parties as explained below, have realized extreme and unjustified profits and seek, in this proceeding, to have this Court effectively sanction the criminal enterprise carried out in Korea by Chairman Park and his co-conspirators. (*See* attached Declaration of Jin Kim ("Kim Decl.") attached, ¶ 3.)

Asiana respectfully submits this Court should exercise its discretion under the Federal Arbitration Act and New York Convention and refuse to enforce or recognize the Award.

### Parties

Asiana is one of Korea's largest airlines and part of Kumho Asiana Group, one of Korea's largest conglomerates. Kumho Industrial Co. Ltd ("Kumho Industrial"), currently known as "Kumho Engineering & Construction Co., Ltd." or "Kumho E&C", holds around 31.1% of the shares in Asiana. Asiana, in turn, owns multiple key subsidiaries in Kumho Asiana Group. Kumho Industrial is the effective parent of Kumho Asiana Group. (*Id.*, ¶ 4.)

Chairman Park was the Chairman of Kumho Asiana Group and CEO of Asiana. Chairman Park also previously held key positions in other companies of Kumho Asiana Group and operated the Strategic Management Office ("SMO"), a department of Kumho Industrial. The SMO carried out Chairman Park's directions and reported the affairs of the companies within Kumho Asiana Group to Chairman Park. (*Id.*, ¶ 5.)

Starting in 2003 and continuing until GGK started supplying Asiana's flights under the Catering Agreement in 2018, LSG Sky Chef Korea ("LSGK") exclusively supplied inflight catering services to Asiana. This was a very lucrative contract, as it generated annual net profit of around 30 billion Korean won ("KRW"). (*Id.*, ¶ 6.) Meanwhile, sometime in 2006, during Kumho Asiana Group's acquisition of Daewoo Engineering and Construction Co., Ltd., Kumho Asiana Group experienced liquidity

issues. This led to Kumho Industrial entering into a debt workout program in 2009, which caused Chairman Park to lose ownership control of Kumho Asiana Group. As described below, to regain control, Chairman Park (through Kumho Corporation Co. Ltd. ("Kumho Corporation")), entered into certain financing arrangements where he obtained funds required to purchase 46.5% of the shares in Kumho Industrial from its creditors. Thereafter, he devised a criminal plan and enterprise to raise KRW 672.8 billion to repay said funds by selling Asiana's exclusive inflight catering license at a discounted price to GGK in return for investment of KRW 200 billion in Kumho Corporation. Kumho Corporation was a special purpose vehicle owned and controlled by Chairman Park and his family. (*Id.*, ¶ 7.)[1]

*Package Deal*

From May 2015 to the end of 2016, the SMO, through an investment advisory firm, Spring Partners, proposed to multiple foreign inflight service suppliers that in exchange for an investment of KRW 200 billion in Kumho Corporation, they would be granted the exclusive license to provide inflight catering services to Asiana for 30 years after Asiana's catering license with LSKG expired (the "Package Deal"). Gategroup, which operated (and still operates) GGS, an inflight catering service supplier, was approached. (*Id.*, ¶ 8.) Many caterers, including Singapore's SATS Ltd, declined the Package Deal proposal. LSGK also declined the offer because it considered investing money in Kumho Corporation in return for profits under the Catering Agreement could violate the law. Asiana was not aware of these discussions because Chairman Park and his co-conspirators kept them private and concealed them. (*Id.*, ¶ 9.)

Only Gategroup expressed interest in the Package Deal. Gategroup was keenly interested in entering the Asia-Pacific region, and securing an exclusive license to supply catering services to Asiana would have allowed entry into Incheon International Airport, one of East Asia's major hubs. When Gategroup learned SATS' and Asiana's

---

[1] Kumho Corporation is currently known as Kumho Buslines Co. Ltd..

negotiations to supply catering services had broken down because of the issue of investment in Kumho Corporation, Gategroup, through its CEO, Xavier Rossinyol Espel ("Mr. Rossinyol"), and its CCFO, Christoph Schmitz, seized on the opportunity and, ignoring the serious legal issues raised by the Package Deal, told Chairman Park what he wanted to hear – it can invest in Kumho Corporation through its finance affiliate, GGFS. (*Id.*, ¶ 10.)

In 2016, there were further discussions between Gategroup and Chairman Park's co-conspirators, Park Hong-Seok (head of the SMO) and Kim Ho-Gyun (SMO's financial and planning officer and Asiana's financial officer), regarding the Package Deal. Gategroup prepared a business plan used to carry out Chairman Park's and his co-conspirators' criminal scheme and further their criminal enterprise, where Gategroup would recoup its investment in Kumho Corporation by earning massive and unprecedented profits through an exclusive license to provide inflight catering services to Asiana. When Chairman Park met Mr. Rossinyol on February 16, 2016, they agreed to the following terms: (1) Gategroup's investment of approximately CHF 165 million (or KRW 200 billion) will be retrieved over 8 years, (2) respective shareholding in the joint venture company will be 6:4, and (3) a management fee of 5% will be paid from June 2018 to June 2025. This was very different from what Chairman Park proposed—a retrieval period of 19.5 years, a shareholding ratio of 50:50, and no management fee. Chairman Park should have not approved the business plan, but he was in dire need of cash to cement his control over Kumho Group. Other competitors of Gategroup, like LSGK and SATS, that Chairman Park contacted for the Package Deal turned him down because of the obvious legal risk of such a one-sided deal orchestrated to benefit Chairman Park at Asiana's great expense. Chairman Park excluded Asiana's executives and other working-level personnel from these negotiations. (*Id.*, ¶ 11.)

Upon conclusion of the parties' discussions in late 2016/early 2017, the following contracts were executed as part of the Package Deal:

- A Joint Venture Agreement ("JVA") between GGS and Asiana, through which Asiana acquired 40% of GGK's shares (GGK had been previously incorporated by GGS on October 5, 2016.  GGS and Asiana thus hold, respectively, 60% and 40% of GGK's shares;
- The Catering Agreement;
- A Bonds with Warrants Agreement ("BWA") between GGFS and Kumho Corporation, where GGFS paid KRW 160 billion to Kumho Corporation to purchase bonds with warrants issued by Kumho Corporation with maturities up to 20 years and 0% interest; and
- A Management Services Agreement ("MSA") between GGS and GGK , which included the 5% management fee to be paid to GGS.

(*Id.*, ¶ 12, Exhs. 1-4.)[2]

*Asiana is the Innocent Victim*

Asiana was unaware of Chairman Park's criminal scheme and enterprise and has been accordingly victimized. It was only after Chairman Park was indicted in May 2021, three months <u>after</u> the Award, that Asiana learned it was a victim of Chairman Park's criminal exploits. (*Id.*, ¶ 15.) While it is true GGK put forth an interpretation of the Catering Agreement's pricing mechanism in the arbitration ("CA Arbitration") that effectively guaranteed GGK fixed net profits for 30 years, relying on the existence of a purported (at the time) package deal designed to repay Gategroup for its investment in

---

[2] Gategroup not only led negotiations with Chairman Park but restarted them after they had broken down, to ensure it could recoup its investment in Kumho Corporation in less than nine years. Gategroup and GGK were left with over 21 years of criminally-created and grossly excessive profits . In the restarted negotiation, Gategroup noted a legal risk of breach of duty but plowed forward, executing a side letter with Chairman Park to conceal the illegal activities. Gategroup's intentional tactics heightened Asiana's damages and the damage to the government of Korea, which poured trillions of public funds into Asiana. In 2023, Asiana paid to GGK approximately KRW 137 billion because of the illegal profits clause in the Catering Agreement —<u>more than</u> the KRW 128.2 billion  paid GGK in 2019 for far higher passenger volumes. (*Id.*, ¶¶ 13-14, Exh. 5.)

GGK and Kumho Asiana Group, Asiana had no reasonable basis to believe this contention. The Package Deal was secretly negotiated by Chairman Park and his co-conspirators from the SMO. GGK's assertion there was a package deal, if true, would have meant a fraud had been perpetrated on Asiana because Asiana was unwittingly paying, through the Catering Agreement, for benefits conferred on Chairman Park's special purpose vehicle, Kumho Corporation. Asiana noted at the arbitration that accepting GGK's assertion as true would have rendered the Catering Agreement null and void under Korean law under the doctrine of "abuse of power of representation." This is evidenced at paragraph 5.3.8 of the Award. (*Id.*, ¶¶ 16-17.)[3]

Asiana participated in the arbitration and did not directly challenge the arbitrators' authority because it did not know at the time the Catering Agreement (and the arbitration clause therein) was consummated as part of the illegal Package Deal. Had the truth of the matter not been concealed as part of Chairman Park's and his co-conspirators' criminal scheme and enterprise, Asiana would have objected to the arbitration's propriety given the illegality of the Catering Agreement, including its arbitration clause. (*Id.*, ¶ 20.)

---

[3] Kim Soo-Cheon and Ja-Joon Goo, who executed the JVA and Catering Agreement, respectively, for Asiana, did not know of there was a Package Deal. The Asiana BOD meeting minutes dated December 30, 2016 and  other related materials make no mention of the BWA or the Package Deal. Messrs. Kim Soo-Cheon and Ja-Joon Goo approved the JVA and Catering Agreement because they were misled to believe the terms were more favorable to Asiana than the previous catering agreement with LSGK. The Korean Public Prosecutor did not pursue charges against Asiana or its other board members, noting Asiana's compliance system could not properly function because the Package Deal was covertly consummated through Chairman Park's instructions and Kim Soo-Cheon was not included in the negotiation or chain of command. (*Id.*, ¶¶ 18-19, Exhs. 6-7.)

RESPONDENT ASIANA AIRLINES, INC.'S CORRECTED OPPOSITION TO PETITIONER GATE GOURMET KOREA CO., LTD.'S PETITION TO ENFORCE ARBITRAL AWARD

*Chairman Park's Criminal Package Deal is Uncovered in May 2021, and He is Convicted in August 2022*

Chairman Park, Park Hong-Seok and Kim Ho-Gyun were indicted for violating Korea's Act on the Aggravated Punishment of Specific Economic Crimes in May 2021. The Indictment alleged, in pertinent part:

[A]round August 19, 2016, Defendants Park Sam-Koo and Park Hong-Seok executed the "Agreement regarding Bond with Warrant Subscription" according to which the 30-year exclusive catering business license would be granted to the Gate Group in exchange for its investment in Kumho Corporation. The value of the catering business license was *arbitrarily* determined at roughly KRW 133.3 billion to match KRW 80 billion that the Gate Group set as a domestic facility investment cost (based on the joint venture ratio of 60:40, KRW 80 billion : KRW 53.3 billion, total: KRW 133.3 billion); and, around December 30, 2016, the Defendants transferred the exclusive catering business license at a price *considerably lower* than the actual value via a private contract to the Gate Group that agreed to fund KRW 160 billion (20 years, 0% interest rate) to Kumho Corporation in the form of acquiring BWs, whereas contractual terms *unfavourable* to Asiana Airlines were determined such as the agreement that guaranteed minimum net profit for the Gate Group. The Defendants conspired in the above order and breached their duty to have Asiana Airlines transfer the 30-year exclusive catering business license *valued at roughly KRW 505 billion (if not reflecting the agreement on guaranteeing net profit, a minimum of KRW 266.9 billion) to the Gate Group for roughly KRW 133.3 billion*, whilst Asiana Airlines would have to pay additional profit for 30 years to the Gate Group pursuant to the "agreement on preservation of minimum net profit" and, in exchange, Kumho Corporation that Defendant Park Sam-Khoo

controls would reap pecuniary gain corresponding to receiving funds from the Gate Group worth KRW 160 billion at zero (0%) interest rate for 20. years. In so doing, Asiana Airlines incurred pecuniary damages equivalent to the difference between the fair transfer price of the exclusive catering business license and the forgoing transfer price of KRW 133.3 billion.

(*Id.*, ¶¶ 21-22, Exh. 8; emphasis added.)[4]

On August 17, 2022, the Seoul Central District Court found Chairman Park, Park Hong-Seok and Kim Ho-Gyun guilty of various crimes, including embezzlement, and sentenced Chairman Park to ten years, and each of his co-conspirators to three years, of imprisonment. The decision effectively adjudged the Package Deal and its negotiations as violating Korea's criminal laws. (*Id.*, ¶ 23, Exh. 9.) The court's decision noted Gategroup's efforts to unabashedly leverage its position with respect to the Package Deal, including to press Chairman Park to accept the profit guarantees in the Catering Agreement to ensure it would recoup its investment in only eight years.

---

[4] Petitioner contends Asiana was aware of Chairman Park's criminal misdeeds as of August 27, 2020, citing to inadmissible hearsay in a news article reporting Korea's Fair Trade Commission had referred Chairman Park for criminal *investigation* based on the Package Deal. (Petition, ¶ 68.)  Petitioner ignores that Chairman Park and Kumho Corporation disputed the Commission's findings, vehemently denied wrongdoing, and disclaimed existence of the Package Deal. Kim Ho-Gyun of the SMO, who led the negotiations for the Package Deal, denied the Catering Agreement was connected to the BWA. It took nine months for the Public Prosecutor to complete its investigation and issue the indictment. Even then, Kumho Corporation still denied there was nefarious activity. (*Id.*, ¶ 24.) There was nothing definitive for Asiana to rely upon at the time of the arbitration to make, in good faith, the arguments it is presenting here.

**B.     Petitioner and Gategroup Took Full Advantage of the Criminal Scheme and Now Seek to Shamelessly Profit Through Recognition and Enforcement of the Award.**

Gategroup was far more than a passenger in the Package Deal. Gategroup drove the negotiations forward after they reached a standstill, evidently recognizing the opportunity to secure unheard of profits for 30 years was too good to be true (alas, it was too good to be lawful). Gategroup is far from an innocent party.

The Seoul Central District Court recognized this, documenting "Gate Group endeavored to secure guaranteed net profits from the catering agreement by employing *circumventive* tactics such as the 'minimum guaranteed volume' (amendment dated July 1, 2016), and the 'revenue at least equal to the EBITDA stated in the Business Case' . . . " (*Id.*,  Exh. 9, at p. 105; emphasis added.) The court noted Gategroup left "no room for discussion about the specifics of  configuring the contribution fee determination, including the minimum net profit guarantee." (*Id.*, Exh. 9, at p. 106.)

*Procedural History*

**C.     The Arbitration in Singapore and Civil Proceedings in Singapore and Korea.**

GGK commenced the arbitration proceedings in June 2019, and the Award was issued in February 2021. (*Id.*, ¶¶ 16, 25.) Asiana filed a set-aside action in the Singapore International Commercial Court ("SICC") on June 11, 2021. The SICC ruled against Asiana , and Asiana's appeal was dismissed . (*Id.*, ¶ 25.)

In Korea, Asiana initiated two actions to recover damages caused by Chairman Park, his co-conspirators, and/or Gategroup and certain of its officers:  (1) Incheon District Court Case No. 2022 Gahap 51122 ("Korea CA Proceeding"), where Asiana sought a declaration the Catering Agreement is null and void; and (2) Seoul Southern District Court Case No. 2022 Gahap 109880 ("Korean Compensation Proceeding"), where Asiana sued GGS, its former CEO, Mr. Rossinyol, and its prior CFO and current CEO, Mr. Schmitz, for damages.  (*Id.*, ¶ 26.)

-9-

On June 28, 2023, GGK, GGS, and Messrs. Rossinyol and Schmitz filed an anti-suit injunction ("ASI") in Singapore, seeking to halt these two proceedings. The SICC granted the ASI on December 1, 2023, which decision Asiana appealed and is pending. (*Id.*, ¶ 27.)

GGK filed an application for recognition and enforcement of the Award in the Seoul Southern District Court of Korea on May 20, 2021. The court granted recognition and enforcement on February 16, 2024. Asiana contends that decision was in error and filed an appeal on March 4, 2024 that is pending. (*Id.*, ¶ 28.)

## III.   STANDARD OF REVIEW.

Under the FAA, the "court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207. The New York Convention's enumerated grounds/defenses are incorporated by reference in section 207. *China Nat'l Metal Prod. Imp./Exp. Co. v. Apex Digital, Inc.*, 379 F.3d 796, 799 (9th Cir. 2004). Article V of the New York Convention identifies seven, separate possible grounds/defenses:

- The parties to the agreement were, under the law applicable to them, under some incapacity, or the agreement is not valid under the law to which the parties have subjected it or under the law of the country where the award was made;

- The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case;

- The award deals with a difference not contemplated by or falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award containing decisions on matters submitted to arbitration may be recognized and enforced;

-10-

- The composition of the arbitral authority or the arbitral procedure was not in accordance with the parties' agreement or the law of the country where the arbitration took place;

- The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made;

- The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

- The recognition or enforcement of the award would be contrary to the public policy of the country where recognition and enforcement is sought.

Art. V.1(a)-(e) and V.2.(a)-(b). The first five grounds place the burden of proof on the party opposing enforcement, but the latter two grounds can be decided sua sponte, thus making these latter defenses effectively non-waivable. *Id.* at Art. V.2(a)-(b); see also *Changzhou AMEC E. Tools & Equip. Co. v. E. Tools & Equip., Inc.*, No. EDCV 11-00354 V, 2012 WL 3106620, at *8 (C.D. Cal. July 30, 2012), *aff'd sub nom. Xuchu Dai v. E. Tools & Equip., Inc.*, 571 F. App'x 609 (9th Cir. 2014) (grounds based on Article V.2(a) and (b) may be granted by the court sua sponte).

## IV.  THE AWARD SHOULD NOT BE RECOGNIZED OR ENFORCED BECAUSE DOING SO WOULD BE CONTRARY TO PUBLIC POLICY.

As set forth above, Article V(2)(b) of the New York Convention provides "[r]ecognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds . . . recognition or enforcement of the award would be 'contrary to the public policy' of that country." As Petitioner notes, this ground applies when enforcement "would violate the forum state's most basic notions of morality and justice." *Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1096-97 (9th Cir. 2011). While it is true there is a strong public policy favoring confirmation of foreign arbitration awards (*id.* at 1098), that policy certainly

-11-

can be overcome based on the circumstances here and United States public policy designed to exact punishment for, and deter, financial crimes, not reward such crimes, as well as allow for civil and monetary redress for losses occasioned by such crimes and related activities.

The record here establishes that adjudged, criminal activity related to various financial and contractual dealings caused Asiana to be an unwitting party to a Catering Agreement GGK and Gategroup have weaponized to Asiana's (and the Korean government's) grave financial loss. In this country, there are numerous federal laws covering this type of criminal misconduct, as well as state laws governing corporate fiduciary duties and breaches thereof, which evince public policies in obvious conflict with recognizing the Award.

For example, 18 USC section 1952, addressing racketeering, provides that any person who travels in interstate or foreign commerce or uses the mail in interstate or foreign commerce, intending to "distribute the proceeds of any unlawful activity" or "otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," and who thereafter performs or attempts to perform such unlawful activity, may be imprisoned for up to five years.  Unlawful activity is defined to include bribery in violation of the laws of the State in which committed or of the United States. *Id.* In California, Penal Code section 641.3 makes criminal commercial bribery, which occurs when an employee "solicits, accepts, or agrees to accept money or anything of value from a person other than their employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person."

18 USC section 1962, part of the RICO federal statute, subjects a person to criminal liability when receiving income derived from a pattern of racketeering activity and using or investing any part of such income, or proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which

-12-

is engaged in interstate or foreign commerce. Racketeering activity includes bribery chargeable under State law and punishable by imprisonment for more than one year. California Penal Code section 641.3 includes punishment of up to three years imprisonment.

18 USC section 218 gives the President or the head of any department or agency the right to declare void and rescind any contract involving any such agency "in relation to which there has been a final conviction for any violation of this chapter."[5] 18 USC section 371 protects the United States from a conspiracy to defraud, punishing criminal actors with imprisonment of up to five years. 18 U.S. Code section 1001 governs fraud generally and punishes criminal actors with up to five years of imprisonment for concealing or covering up "by any trick, scheme, or device a material fact." 18 USC section 666 punishes persons who embezzle, steal, obtain by fraud, or otherwise without authority knowingly convert property valued at $5,000 or more from organizations that receive more than $10,000 in federal funds in a given year with up to ten years of imprisonment.

Internationally-recognized defenses to contract formation like fraud, mistake, and duress, which undermine enforcement of an arbitration agreement under Article II(3) of the New York Convention, separately serve to support a defense to enforcement of a foreign arbitral award based on public policy under Article V(2)(b). See *Changzhou AMEC E. Tools & Equip. Co., supra,* 2012 WL 3106620, at \*11-12 (citing *DiMercurio v. Sphere Drake Ins. PLC,* 202 F.3d 71, 79 (1st Cir.2000) [fraud, mistake, duress, and waiver grounds to invalidate arbitration clauses under Article II(3)]; *Bautista v. Star Cruises,* 396 F.3d 1289, 1302 (11th Cir.2005) [breach-of-contract defenses "such as

---

[5] The reference to "this chapter" is to Title 18, Chapter 11, Bribery, Graft, and Conflicts of Interest. Within Chapter 11, 18 U.S.C. section 225 subjects a person who "organizes, manages, or supervises a continuing financial crimes enterprise" and receives $5,000,000 or more in gross receipts from such enterprise during any 24-month period to a punishment of up to life in prison.

fraud, mistake, duress, and waiver" apply under Article II(3)]). As Judge Phillips noted in *Changzhou AMEC E. Tools & Equip. Co.*, if an agreement is "null and void" under Article II(3), the underlying agreement to arbitrate is unenforceable and the Court cannot compel arbitration. 2012 WL 3106620, at *11 (citing *Chloe Z Fishing Co. v. Odyssey Re (London) Ltd.*, 109 F.Supp.2d 1236, 1258-59 (S.D.Cal.2000). Judge Phillips ultimately concluded a contract defense of duress under California law provided a sufficient basis to refuse to recognize enforcement of a foreign arbitral award for reasons of public policy under Article V(2)(b) of the Convention. *Changzhou AMEC E. Tools & Equip. Co.,* 2012 WL 3106620, at *19.[6]

Petitioner concedes "the United States imposes fiduciary duties on corporate officers and directors to avoid conflicts of interest." (Petition, ¶ 70.)  The fact those duties may be enforced through civil suits for monetary damages does not somehow render insignificant the fundamental public policies underlying those duties – namely to ensure the continued viability of the corporate form, "directors must be unselfishly loyal to the corporation and cannot use their position of trust and confidence to further their private interests."  See, e.g., *Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del. 1939).

Asiana submits the federal and state laws and cases described above evince an unmistakable public policy in the United States to not only punish and redress financial crime and other financial wrongdoing, including arising out of racketeering, embezzlement, fraud and/or fraud-like circumstances, but concomitantly avoid taking actions that would perversely allow (or incentivize) other parties involved in the transactions at issue to receive (or seek to receive) significant financial benefits at the great expense of the innocent victim.  It would be contrary to such public policy and this country's basic notions of morality and justice to recognize or enforce the Award and

---

[6] As for fraud, a "fiduciary must tell its principal of all information it possesses that is material to the principal's interests. A fiduciary's failure to share material information with the principal is constructive fraud, a term of art obviating actual fraudulent intent." *Michel v. Moore & Associates, Inc.* (2007) 156 Cal.App.4th 756, 762

-14-

1   permit Gategroup and GGK to unjustly, unreasonably, and illogically retain profits from

2   the Catering Agreement at Asiana's considerable expense which, absent Chairman

3   Park's criminal conduct, would have never been realized.[7]

4   **V.      THE AWARD SHOULD NOT BE RECOGNIZED OR ENFORCED**

5   **BECAUSE THE ARBITRATION AGREEMENT IS NOT VALID UNDER**

6   **APPLICABLE KOREAN LAW.**

7          Article V(1)(a) of the New York Convention provides another sound basis to

8   refuse recognition or enforcement of the Award, as the Catering Agreement (including

9   its arbitration clause) is not valid or enforceable under the law the parties agreed it was

10  subject to, i.e., Korean law. (Kim Decl., Exh. 2 [Catering Agreement], at p. 21, clause

11  28.)[8] Professor Hongki Kim, a highly-qualified expert on Korean law, explains in his

12  attached declaration the events leading to consummation of the Catering Agreement

13  establish the Catering Agreement and all of its provisions are null and void, and thus

14  unenforceable, under Korean law.

15         Petitioner wrongly contends Asiana forfeited its right to contest the validity of the

16  Catering Agreement by not objecting to the arbitrators' jurisdiction at the arbitration.

17  This overlooks that Asiana did not have a reasonable factual basis to dispute validity of

18  the Catering Agreement and its arbitration clause until learning of Chairman Park's

19  indictment in May 2021, three months _after_ the Award was issued in February 2021.

20  This explains why Asiana only addressed the Package Deal in the context of contract

21

22  ────────────────

23  [7] Petitioner claims refusing to enforce the Award will give Asiana a windfall.  (Petition,
    ¶ 71.) To the contrary – it will allow Asiana to stop hemorrhaging losses related to the

24  Catering Agreement. (Kim Decl., ¶ 14.) Such a decision will also prevent Gategroup
    from continuing to reap its own windfall, which the Korean Public Prosecutor correctly

25  observed allowed Gategroup to secure the exclusive license to provide catering services
    to Asiana for far less than its true value, at excessive, locked-in profits. (_Id._, ¶ 22, Exh.

26  8.)

27  [8] The "law to which the parties have subjected" the agreement is the law specified in the
    underlying agreement's choice-of-law provision. See, e.g., _Am. Constr. Mach. & Equip._

28  _Corp. v. Mechanised Constr. of Pak.,_ 659 F.Supp. 426, 428–429 (S.D.N.Y.1987).

interpretation.  (*See* Petition, ¶ 64.) There was no argument regarding validity of the parties' agreement to arbitrate in the Catering Agreement for Asiana to forfeit or waive in the first instance.[9]

As for Petitioner's citation to federal cases addressing  severability of a valid arbitration clause, Petitioner overlooks this issue must be evaluated under Korean law, not U.S. law, because of the parties' choice of Korean law in clause 28 of the Catering Agreement. To the extent the Court determines the Catering Agreement is not valid under Korean law, Asiana requests leave to provide briefing and/or other materials (including through expert testimony) regarding principles of severability under Korean law to allow the Court an opportunity to make an informed decision on this issue.

## VI. TO THE EXTENT THE COURT ELECTS TO RECOGNIZETHE AWARD, THE FOREIGN CURRENCY AMOUNTS INCLUDED THEREIN SHOULD BE CONVERTED INTO U.S. DOLLARS AT THE EXCHANGE RATES IN EFFECT ON THE DATE OF THE COURT'S JUDGMENT.

The Honorable John A. Kronstadt previously, and appropriately, ruled that where an obligation is performable in a foreign country in the money of that country, as was the case under the Catering Agreement, the "judgment day rule" commands an award in foreign currency shall be converted into dollars using the applicable exchange rate in effect on the date the court enters judgment for the plaintiff. *Linley Invs. v. Jamgotchian*, 2014 WL 12665812, at *4 (C.D. Cal. Apr. 16, 2014). One of the cases Petitioner cited is in accord. See *EGI-VSR, LLC v. Coderch Mitjans,* 963 F.3d 1112, 1123-24 (11th Cir. 2020) ("judgment day" rule applies when the suit is based entirely on an obligation existing under a foreign country's laws and the debt is payable in that country's

---

[9] In any event, Asiana preserved its argument when it raised at the arbitration that consideration of the BWA in construing the pricing mechanism in the Catering Agreement would lead to an interpretation  rendering the Catering Agreement null and void under Korean law. (*See* Award [Bradshaw Decl., Exh. 1] at paragraph 5.3.8.)

currency). As for *Cont'l Transfert Tech. Ltd. v. Fed. Gov't of Nigeria,* 932 F. Supp. 2d 153, 158-162 (D.D.C. 2013), that out-of-district case ignored clear precedent, including from the Supreme Court, that Judge Kronstadt and the 11th Circuit relied upon to find breaches of foreign obligations require application of the "judgment day" rule.[10] As the Second Circuit observed in *Shaw, Savill, Albion & Co. v. The Fredericksburg*, 189 F.2d 952 (2d Cir. 1951), the "judgment day" rule is based "on the ground that 'an obligation in terms of the currency of that country takes the risk of currency fluctuation.' " *Id.* at 955 (citing *Die Deutsche Bank Fialiale Nurnberg v. Humphrey*, 272 U.S. 517, 519 (1926)).

While the Restatement (Third) of Foreign Relations Law § 823 states neither party should receive a windfall or be penalized as a result of a currency conversion, the fact the dollar strengthened against the KRW since the Award is pure happenstance. Further, because Petitioner waited almost three years to file its Petition, it is the author of its own misfortune in this regard.

Both Supreme Court precedent and the equities clearly favor converting foreign currency amounts in the Award into U.S. dollars using the applicable exchange rates in effect on the date of any judgment entered by this Court, should it elect to enforce the Award.

---

[10] The court in that case observed the flexibility endorsed by the Restatement (Third) of Foreign Relations Law § 823 with regard to foreign currencies that have appreciated or depreciated relative to the dollar is arguably "in conflict with the approach dictated by both *Hicks* and *Deutsche Bank.*" *Continental Transfert Technique Ltd.*, 932 F. Supp.2d at 160.

-17-

1

## VII.   CONCLUSION.

2          Asiana respectfully requests that this Court refuse to recognize or enforce the

3     Award.

4

5     DATED:  May 3, 2024                    NOSSAMAN LLP
                                             DAVID J. FARKAS
6                                            DAVID C. LEE

7

8                                            By:____/s/ David J. Farkas_____
                                                    DAVID J. FARKAS
9
                                             *Attorneys for Respondent*
10                                           *ASIANA AIRLINES, INC.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-18-

RESPONDENT ASIANA AIRLINES, INC.'S CORRECTED OPPOSITION TO PETITIONER GATE GOURMET
KOREA CO., LTD.'S PETITION TO ENFORCE ARBITRAL AWARD

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Respondent Asiana Airlines, Inc., certifies that this brief contains 5,570 words, which:

__ complies with the word limit of L.R. 11-6.1.

_x_   complies with the word limit set by this Court's Standing Order dated May 2023.

DATED:  May 3, 2024                        NOSSAMAN LLP
                                                         DAVID J. FARKAS
                                                         DAVID C. LEE


                                                         By:_____/s/ David J. Farkas_____
                                                                  DAVID J. FARKAS

                                                         *Attorneys for Respondent*
                                                         *ASIANA AIRLINES, INC.*