# EXHIBIT 6

**Exhibit 6, Page 4**

**OPUS2**

ICC Case No. 24544/HTG, Gate Gourmet Korea Co., Ltd. v. Asiana Airlines, Inc.

Day 5

November 28, 2020

Opus 2 - Official Court Reporters

Phone: 0203 008 6619

Email: transcripts@opus2.com

Website: https://www.opus2.com

November 28, 2020                    ICC Case No. 24544/HTG, Gate G [...] Ltd. v. Asiana Airlines, Inc.                    Day 5

So in February 2016, President Park might have been shown numbers, and he might have seen projections. And I think that if we look at the next slide, I understand that he was looking over the shoulder of Mr Ketheswaran together with Mr Rossinyol, and looking —— Mr Ketheswaran was editing a spreadsheet on a laptop.

So if we figure these conditions. I mean, there's a giant leap from there to say that he accepted, understood and agreed with the profit numbers as they are are spelled out a month later in the IBP. I think it's just not serious. What at best could be said is that he understood the principle that was proposed.

And, yes, we want to highlight that this gentleman, Ketheswaran, he gave no evidence, and that the spreadsheet that Chairman Park was looking at, at the demonstration on 16 February, is not on the record.

So moving from there, we have given you a list here of documents at that time where we believe there's no evidence on record of any alleged Business Plan that was really discussed in detail and would have been approved by Mr Park at the time.

Therefore, we say it is highly unlikely and not even clearly documented that Mr Park has entered into a firm and binding agreement on precise figures which we see now in the IBP. Assuming this, it's just, in our

77

opinion, unreasonable.

We believe that the next slide, if you look at it, where we see Asiana Airline ICN in—flight contract to kick in July 2018 offer is contingent to financial and legal due diligence. There was a process of discussion throughout 2016, which is normal because this was a very important contract for both parties, and there were a lot of financial stakes, operational stakes. Asiana's reputation is very much linked to the way its caterer operates, the figures are big.

As you know, the profit figures sum up to US$234 million over the 30—year period. So it's clear that the parties were in the process of discussing and adjusting.

But saying that in 2016, as I understand it, Chairman Park would have agreed to these figures and that they became binding as of then is unrealistic and it's undocumented.

MR BEECHEY: Mr Chairman, I wonder if I may put a question to Dr Peter. In light of what you just submitted, Dr Peter, and the earlier comments you have made about the NLF, do you accept that this isn't a straightforward switch from one caterer to another, there's more to this deal or are we to look at it strictly on the basis it was a switch from Lufthansa to Gate Gourmet?

78

DR PETER: As I understood it, at some stage Asiana wanted to have a new caterer and it had a 15—year relationship with Lufthansa and wished to enter into a contractual agreement with a new caterer. That's my understanding. But if you say it was not a straightforward switch, if I understand you correctly, you seem to say that this is, of course, a negotiation which was extended over some time, but it was started well ahead of the end of the agreement with Lufthansa because Lufthansa contract or catering came to an end, I believe, in end of June 2018, and the parties were starting these discussions much earlier on in 2016 for the simple reason that it's not simply the financial issues that had to be worked out but also, I think, a huge logistical challenge as an understanding.

And if you apply the NLF principle, I think also GGK had to see that they were not being asked to suddenly produce more luxurious meals for the former —— they wanted to check that they were safeguarding their rights and so was Asiana. It was a process over months and months. And I don't think that Chairman Park formally, in a legally binding fashion can be said to have agreed to figures in a Business Plan which appeared much later.

MR BORN: You're on mute.

MR BEECHEY: Thank you, Dr Peter, that's helpful. I will

79

leave it there, I won't interrupt you again, I'm sorry.

DR PETER: Okay. I will move on then, thank you.

Yes. So as the slide here, which —— where Mr Fisch is being asked that:

"... a signed contract creates a legal and binding obligation, not a handshake between the chairmans; isn't that right?" {Day1/98/24}

Of course, in the understanding that if there's a signed and legally binding contract, or clearly spelled out and agreed point by point, then a handshake is the final point of that, but —— to that process.

But what we say here is that there was a discussion, there was —— figures were shown, discussed apparently. I mean, we have seen the slide from claimant where they say that Mr Rossinyol and Mr Park looked over the shoulder of the gentleman who was processing an Excel sheet on his laptop. So that's a process. And that Mr Park was interested for various reasons which have been discussed today and that he has seen figures, and that he may have, may have, agreed, although I don't think we have clear proof on this, but that he may have agreed to the principle of preservation of profits is something that is conceivable. But this is where I leave it.

And the gentlemen, when they finally left the

80

meeting, would have a handshake doesn't mean that the handshake means all of the contractual details figures and so forth were agreed at that meeting, and after looking over the shoulder of Mr Ketheswaran working on his Excel sheet on a laptop.

We have on the next slide key references which we believe will or might be useful for the tribunal in dealing with this matter.

I will now come to the Korean law principles.

The issue is whether there's an interconnection between the BWA and the CA in financial terms. We say there's none because the interconnection between these two agreements —— let's put it this way more simple, these two agreements function separately from each other. In other words, there is no trigger in one agreement that would generate obligations or payments under the other, it has no shared income, nothing. They function separately one from the other.

But what we say is that the —— one agreement has been made, which is the catering agreement by Asiana, and it has given or favoured another company of the group. And this, depending on the circumstances and what the conditions are, could have triggered the doctrine of abuse of power of representation because a director of a company assumes a duty of care towards

81

the company and he can abuse his power of representation by executing a contract with a counterparty with a view to conferring a benefit to himself or itself or a third party against the parties —— company's party interests.

I think we all understand the principle, of course. What is specific here in the point I am making is whether in Korea there's that principle is expressed clearly, precisely, whether it's how it's applied. Is it severely monitored? Are there decisions by the Supreme Court looking at that? And this is the point we are making.

There has been a legal opinion and we have seen that the situation could give rise to an invalidation of the catering agreement under Korean law. I put this as a matter of principle.

And if you go to the next slide, 34, it says contracts in violation of the Monopoly Regulation and Fair Trade Act. And if I go to the highlighted section: Apart from this abuse of bargaining position being an unfair trade practice under the Fair Trade Act it deals with Professor Kwon's expert report in saying that there are various aspects under which under Korean law the contract could be seen as not valid.

And the next slide goes to the same point.

As we have not had cross—examination of

82

Professor Kwon and have not at length discussed these principles, I believe that this is in the domain of what the arbitrators are perfectly well equipped to deal with themselves and look at it themselves, so that I am not going to belabour this point and these legal opinions more in detail, but I think they are important —— it's important to see that they are on the record and that they are properly understood.

Now I come to the next slide, where claimant says that Gate Gourmet has never argued that the BWA was directly connected to the specific pricing mechanism in the catering agreement, but simply that they were part of the same overall transactions so that the BWA forms part of the relevant factual background.

So the situation is a little bit ambiguous here because there's indeed also, from our point of view, no direct connection in the sense that something which happens in one contract would trigger something in the other. But one was clearly conditional on the other, that is indisputable. It was a package deal. It was made in the interest of a parent company. It could be considered to be sacrificing the interests of Asiana. That is something which can —— would have to be examined as under the specific data and circumstances. I am not going to go into this ——

83

THE PRESIDENT: Can I ask you a question there, because the transcript reads, as I heard you say, that:

"... one was clearly conditional on the other, that is indisputable. It was a package deal." {Day5/83:25}

Now, that is not, as I understand, the same as your pleaded case. Does respondent now accept that the catering agreement was part of a package deal with the BWA, and the joint venture agreement itself?

DR PETER: What I meant is that one was conditional on the other because there's a document which clearly says that if this contract is not —— the catering deal would not be entered into unless there's this cash injection that was contemplated. In that sense, I use the expression that there was a "conditionality". These two contracts have that link.

THE PRESIDENT: I'm not sure it was a condition. It may have given a right not to proceed with the transaction, but we can look at that as it goes. But I just wanted to be sure whether you are now changing position and agreeing that the three contracts were part of one package. And if you are not that's fine and if you are that's fine too, I just wanted to be certain that I understand the respondent.

DR PETER: Yes, I understand. The term "package deal" is, I think, the term used by claimant, and what I wanted to

84

November 28, 2020    ICC Case No. 24544/HTG, Gate G [...] Ltd. v. Asiana Airlines, Inc.    Day 5

highlight is that we clearly see that what I consider is a condition. But you're right, Mr Chairman, it's probably that if one contract is not concluded, then the other won't be concluded and, therefore, there's that link. And this is the basis I believe on what respondent relies and what has been argued by Professor Kwon, whether that situation is legal or whether the contract is valid under Korean law under certain circumstances.

Now, the fact that these two were connected in that sense condition is what I say, that it was a package deal and I think that expression is derived from claimant's position.

THE PRESIDENT: Thank you.

MR BORN: Dr Peter, I am trying to understand this point also. But I take it that whether or not the two agreements —— three agreements were a package deal your position is that the pricing mechanism in the catering agreement was an independent contractual provision just like the interest rate and repayment terms in the bonds was an independent financial transaction?

DR PETER: Yes, that is it, obviously. These two agreements followed their own rules and provisions.

MR KIM: If I may, I just clarify the position. The Professor Kwon's opinion is that if the tribunal —— or

85

if one tried to interpret that, that was actually package deal and there's somehow link that the conditions or like some other way have some —— a considerations given, that would be against the Korean law, so that's the point. Professor Kwon is not just suggesting that this transaction was —— we are talking about a hypothetical situation mentioned by Professor Kwon. That's all I want to clarify.

THE PRESIDENT: Thank you. Carry on Dr Peter.

DR PETER: Now, one of the questions is whether the NLF principle can really be enforced, whether it's manageable, whether it's quantifiable. My point is the NLF principle is quantifiable and it's manageable. We have heard in this —— in the course of this week discussions about change of flight routes which lead to many modifications, which lead to different prices. We have heard about labour costs increase, new material costs and other factors.

What I wish to stress here is that these are matters that can be recorded and which, therefore, do not say that, therefore, the NLF principle is not applicable. It's quantifiable and it's manageable. So in that sense, it is not an abstract vague principle hanging there somehow in the contract. It's something which I believe is clear in its basic rationale that you do

86

not want to pay more, all other things being equal, to the new caterer than you paid to the old one.

We know that there are a number of factors which would influence quantification, but they are manageable. This is what this slide wants you to —— wants to suggest. And, therefore, this is a real contractual provision. And I think the —— an arbitral tribunal must look at these contractual provisions especially as this is one where both parties claim they wanted it in and it must apply it and it must enforce it.

Therefore, I think understandably one party in this arbitration puts a lot of effort in convincing you to look mainly at the IBP and the net profit figures and everything which is related thereto, and the NLF principle basically is in the background.

Now, I heard also before that the NLF principle is limited in time. It, so to speak, comes to its end in 2020 because at that stage it would contribute in setting the preservation of reserve profits. And then thereafter, as we said before, these profits —— these net profits are preserved. That is clear.

But at that stage, it's very important —— it's very important to see what profits are really reserved by a proper application of the NLF principle. And I will come to this in a moment.

87

THE PRESIDENT: Just when you do come to it, I would like you to answer this question. In clause 6.1.1 of the main agreement, it requires your client to provide certain pricing information to Gate Gourmet in order to allow Gate Gourmet to formulate the pricing terms for the first 12 months after the commencement date, that's the initial pricing period:

"... which shall be no less favourable to either party than the current pricing terms paid by Asiana to any service provider at the stations."

Now, as I understand claimant's case, they would accept that the pricing for the first 12 months needs to be for like—for—like services needs to be the same, and they have made out their case on those points as best they can.

But, are you saying that if this tribunal should conclude that the pricing terms that claimant applied and invoiced for during the first 12 months after commencement date were no less favourable, that the principle of no less favourable continues in subsequent years or not?

DR PETER: That's understood, yes.

THE PRESIDENT: You can deal with that when you see fit in your argument, I just wanted to make sure you dealt with it.

88

**Exhibit 6, Page 8**